23

United States District Court
Southern District of Texas
FILED

JUN  3 2002

Michael N. Milby
Clerk of Court

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

EUGENIO REYNA MONTOYA, and                    )
JUAN LUIS GONZALEZ-SANCHEZ,                    )
  In their own name and right,              )
  and on behalf of all others               )
  similarly situated,                       )
                                  )
v.                                            )    C.A. No. B-02-026
                                    )
E.M. TROMINSKI, INS DISTRICT                   )
  DIRECTOR, and                             )
JOHN ASHCROFT, ATTORNEY                        )
  GENERAL OF THE UNITED STATES.             )
                                    )

**PETITIONERS' REPLY TO RESPONDENTS' OBJECTIONS TO
THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Petitioners, by and through counsel, file the instant Reply to
"Respondents' Objection to Magistrate Judge's Report and
Recommendation," (herein cited as (INS:__)), most of which, apart
from the conclusion that 8 U.S.C. §1226(c) is unconstitutional as
applied to permanent residents, were addressed in "Petitioners'
Response to Magistrate Judge's Report and Recommendation, and
Clarification of Relief Sought," (herein cited as (PET:__).

### I.  CLASS CERTIFICATION

For example, Respondents object to the recommendation that the
Court grant class certification.  As summarized at (INS:1):

> Respondent ... contends that in the context of mandatory,
> pre-order detention, the certification of any class to
> litigate multiple writs of habeas corpus offends the
> intent of Congress and hampers the ability of the
> Executive Branch to carry out the legislative will.

However, this overlooks the fact that the instant action was filed
not only as petitions of habeas corpus on behalf of the named
Petitioners, but also as a class action complaint.  Petitioners do
not seek class action status for their habeas petitions.  This was
clear from the Report and Recommendation of the Magistrate Judge,
(R&R:11), and was further clarified at (PET:1):

> To the extent that the instant case was filed as a
> petition for a writ of habeas corpus, the named
> Petitioners were acting in their individual capacity.

Respondents also assert that the standard of review for the "contested recommendation of class certification is also de novo," (RESP:2). While true, this overlooks the fact that the Respondents not only failed to deny the class allegations of the Complaint, but also failed to file *any* opposition, (let alone a timely one), to Petitioners' motion for class certification. Therefore, as the Magistrate Judge noted, (R&R:6), the class allegations are taken as admitted, under Rule 8(d), F.R.Civ.P.. Moreover, the motion is deemed to be unopposed under Local Rule 7.4 ("Failure to respond will be taken as a representation of no opposition.").

And even should the Court entertain Respondents belated opposition, it is without merit. First, as previously noted, Plaintiffs do not seek class status for their habeas corpus petitions. *See,* (INS:12-17). Nor do they seek a class-wide injunction, which would be problematic under 8 U.S.C. §1252(f)(1). *See,* (PET:2). Rather, they seek a class-wide declaratory judgment, and individual injunctions on their own behalf, and on behalf of other class members, as they are identified, and request such relief.

Respondents next assert, (INS:17-18) (emphasis in original), that:

> [T]he Magistrate Judge ... compounded his error by
> applying to the government's motion to dismiss a rule
> intended to apply to an answer to a complaint.

However, the instant action was explicitly styled as a petition for writ of habeas corpus, "**and** Class Action Complaint for Declaratory and Injunctive Relief." Jurisdiction was laid, *inter alia,* under 28 U.S.C. §1331 (federal question), §1346(a)(2) (actions against Officers of the United States) and §2201 et seq (Declaratory Judgment Act). In response thereto, Respondents filed a pleading

captioned: "Respondents' Motion To Dismiss **And Response To** Petition for Writ of Habeas Corpus **and Class Action Complaint For Declaratory and Injunctive Relief.**"   They cannot now claim that their "response" was not an "answer" to the class action complaint. *See, e.g., In re Zinke*, 1991 WL 107815, at *4 (E.D.N.Y.,1991):

> Fed.R.Civ.P. 8(f), ... provides that "pleadings shall be so construed as to do substantial justice." A moving party's label for a pleading is not controlling. *De Vito v. Hoffman*, 199 F.2d 468, 469 (D.C.Cir.1952). Rather, the court should construe a motion, however styled, to be the appropriate type to obtain the relief requested. *Id.* (pleading denominated "supplemental complaint" construed to be a counterclaim). *See also In re Schwartz & Meyers,* 64 B.R. 948, 955 (Bankr.S.D.N.Y.1986) (letter deemed to be a complaint because it stated it was a complaint, met the pleading requirements of Rule 8, and alleged fraud with sufficient specificity).
>
> ... A letter was found to meet these requirements and was deemed an answer in *Kinnear Corp. v. Crawford Door Sales Co.,* 49 F.R.D. 3, 4 (D.S.C.1970). ...

Furthermore, Respondents failed to file any opposition to the motion for class certification. They have no equivalent "wiggle room" with respect to this failure, which, under Local Rule 7.4, constitutes a representation that the motion was unopposed.

Nor do Respondents fare any better on the supposed "merits" of their opposition to class certification. Respondents object that certification would be "especially damaging" because INS sometimes brings LPRs to this facility from other locations, (INS:20). In this context, they cited *Yi v. Maughans,* 24 F.3d 500 (3rd Cir. 1994) (proposed class of Chinese aliens and their custodians could not be certified where it included aliens or custodians who were not in the judicial district). As noted above, class status is not sought for the named Petitioners' habeas actions. And the class (with respect to declaratory relief), is drafted to include only LPRs

3

detained locally.  Respondents do not explain, and Petitioners do not comprehend, what difference it makes whether the LPR previously resided in Houston, or Harlingen, if s/he is detained at PISPC.

If the class is certified, and relief granted, that LPR would be covered by a Declaratory Judgment that 8 U.S.C. §1226(c) was unconstitutional as applied to him or her.  S/he would also have the option of requesting an individual injunction, mandating that INS provide a bond hearing.  Such hearings are routinely conducted for aliens detained at great distances from their prior residences.

Finally, Respondents assert that the representative parties cannot "fairly and adequately protect the interests of the class." (RESP:21).  This assertion is based on the fact that the class members, (all of whom are, by definition, LPRs), may have committed different offenses.  Respondents complain, (RESP:22), that:

> A person convicted of possessing illegal firearms and who is suspected of having terrorist affiliations is put on the same legal footing as a person convicted of possessing cocaine.

First, this is only true if Respondents choose to detain the person under §1226(c), rather than as a suspected terrorist.  They formulate the objection in terms of a claim that a "drug possessor can not adequately represent the suspected terrorist," *id.*.  This is nonsensical. Respondents do not explain why the named Plaintiffs and their counsel cannot adequately represent such an LPR.  If Respondents opt not to charge such persons as suspected terrorists, they cannot complain about their inclusion in the class.

Rather, it appears that the intent of the objection is to raise the specter of a "suspected terrorist" being released as a result of a class-wide declaratory judgment, and option for the LPR to seek an individual injunction.  No such danger exists.  First, even before the enactment of the PATRIOT Act, Respondents had broad authority

4

to deal with suspected terrorists. *See, e.g.,* 8 U.S.C. §1531 *et seq*, "Alien Terrorist Removal Procedures." In fact, there is a specific detention procedure, 8 U.S.C. §1536, for such persons. Those tools have been greatly strengthened by the PATRIOT Act.

Second, the procedure suggested by Plaintiffs would require class members to request individual injunctions. Respondents could always invoke other bases for detaining suspected terrorists at that time. This would have the effect of removing a suspected terrorist from the definition of the class, since the basis for his or her detention would no longer be 8 U.S.C. §1226(c).

Finally, because the spectrum of offenses ranges from murder to sex offenses, Respondents claim Plaintiffs cannot adequately represent the class, because their claims are not "typical." (RESP:24):

> The two individuals before the Court are not typical or representative of all criminal aliens held now or in the future pursuant to [§1226(c)].

Respondents concede that perhaps the named Plaintiffs are correct on the merits of their removal cases, and that the new definition of aggravated felony should not apply to them. (INS:24) ("Simply put, if the petitioners are not aggravated felons, they cannot represent a class of aggravated felons"). While heartening, this misses the point, Petitioners seek to represent the class of LPRs who are detained in the Harlingen INS district, pursuant to 8 U.S.C. §1226(c), not "a class of aggravated felons." [1]

The differing offenses committed by the named Plaintiffs and some

---

[1]     The named Petitioners' constitutional claims, that they cannot be properly classified as aggravated felons, will be heard in the first instance by this Honorable Court, once administrative proceedings have been completed. That these Petitioners are being detained under §1226(c) is undisputed. Therefore, they are quite competent to represent other LPRs detained under that authority.

other class members does not defeat the typicality requirement. Typicality is determined by the legal claims raised before this Court, not by factual differences which will only become relevant if and when bond hearings are actually conducted. As explained by the Fifth Circuit in *James v. City of Dallas*, 254 F.3d 551,571 (5th Cir. 2001) (internal citations omitted):

> In order to meet the typicality requirement, "the claims or defenses of the parties [must be] typical of the claims or defenses of the class." ... "Like commonality, the test for typicality is not demanding. It focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." ... "Typicality does not require a complete identity of claims. Rather, the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." ...

*See also, Kalodner v. Michaels Stores*, 172 F.R.D. 200,204-205 (N.D. Dallas 1997) (internal citations omitted):

> The claims or defenses of representative parties must be typical of the claims or defenses of the class. ... However, the claims need not be identical.... Courts routinely find that similar legal theories satisfy this requirement even where significant factual distinctions are present. ...
>
> The typicality requirement protects class members from representation by a party who is "preoccupied with a defense which is applicable only to himself." ... Thus, class certification is inappropriate where a putative representative is subject to unique defenses which threaten to become the focus of the litigation.

Under these criteria, there is no question but that the claims of the Petitioners meet the "typicality" requirement. All are LPRs, being held during removal proceedings in the Harlingen INS District, without bond, or bond hearings, on the basis that they

are subject to mandatory detention under 8 U.S.C. §1226(c). The definition of the class **is** the typicality requirement.

There are doubtless "significant factual differences" which will become relevant if and when bond hearings are held. In such hearings, the issue of whether the class member is a flight risk, or danger to the community, is precisely the ultimate question to be determined. The nature of an LPR's criminal record, and the possibility of relief, are considered at that stage. [2] Immigration Judges, and the BIA, have made these judgments for decades. [3]

But these differences are not relevant in the case at bar, and are certainly not of the sort which will cause the representative parties to become "preoccupied with a defense which is applicable only to himself" in the context of the instant litigation.

Notably, Respondents challenge none of the other criteria for class actions. Commonality is clearly established by the fact that the sole issue presented herein is whether, as applied to LPRs, §1226(c) violates Due Process. And Respondents' Exhibit A, the Declaration of Aaron L. Cabrera, easily establishes numerosity.

---

[2]    A person is much more likely to be considered a flight risk if there is no form of relief available, and someone who has been convicted of a violent crime, such as murder, is also more likely to be considered a danger to the community. *See, e.g., Matter of Andrade*, 19 I&N Dec. 488 (BIA 1987) (copy attached).

[3]    Two such recent BIA decisions are attached. *Matter of West,* Int. Dec. 3438 (BIA 2000), and *Matter of Adeniji*, Int. Dec. 3417 (BIA 1999). In the former, INS appealed the Immigration Judge's conclusion that the person was not included under §1226(c), but not the amount of the bond set. The BIA dismissed INS' appeal. In the second, the Judge had ordered the person released on recognizance, and only the amount of the bond was at issue. The BIA sustained the appeal, and remanded for a new hearing.

## II.  THE MERITS

On the merits, (INS:4-12), Respondents raise no new arguments.
Their claims have been considered and rejected, not only by the
U.S. Magistrate Judge herein, but by every federal Court of
Appeals, [4] and the vast majority of the United States District
Courts, to consider the question after the issuance of *Zadvydas* v.
*Davis*, 121 S.Ct. 2492 (2001) (reading a reasonable time limitation
into the detention of former LPRs under final orders of deportation
which could not be immediately effectuated); and *INS* v. *St. Cyr*,
121 S.Ct. 2271 (2001) (holding that the repeal of §212(c) could not
be applied retroactively).  *See, Hoang v. Comfort,* 282 F.3d 1247
(10th Cir. 2002); *Kim v. Ziglar*, 276 F.3d 523 (9th Cir. 2002), and
*Patel v. Zemski*, 275 F.3d 299 (3rd Cir. 2001).  *See also, Serrano*
v. *Estrada*, 2002 W.L. 1067452 (N.D. TX May 13, 2002) (Irrebuttable
presumption that permanent resident aliens falling within 8 U.S.C.
§1226(c) are flight risks and/or a danger to the community does not
comport with substantive due process).

**WHEREFORE**, it is respectfully urged that this Court adopt the

---

[4]    For example, in *Patel, supra,* the Court examined, and
rejected, the statistics cited by INS herein, (INS:4). As the Court
concluded, *id.* at 311-312 (footnote omitted) (emphasis added):

> Section 236(c) creates an irrebuttable presumption that
> all aliens subject to removal under this statute present
> a flight risk or a danger to the community.  The
> government's own statistics cast doubt on that
> presumption.  The government cites a study ... finding
> that prior to the enactment of this statute ninety
> percent of criminal aliens not detained during
> proceedings fled.  Appellee's Br. at 12 (citing *Parra*,
> 172 F.3d at 956).  **In fact, a report from the Senate
> Committee on Governmental Affairs placed the percentage
> of aliens who fail to surrender at twenty percent.**
> S.Rep. No. 104-48, at 23 (1995) ...

United States Magistrate Judge's Report and Recommendation, and that the class herein be promptly certified;

It is further urged that the Court issue a Declaratory Judgment, on behalf of the certified class, declaring that, as applied to said class, 8 U.S.C. §1226(c)(1) violates Due Process;

It is further urged that the Court issue injunctions, on behalf of Plaintiffs Eugenio Reyna Montoya and Juan Luis Gonzalez-Sanchez, and class members Lucina Hernandez De Montalvo, Jose Luis Orosco, and Pedro Castillo-Luna, enjoining and restraining Respondents from not providing them with bond hearings within ten (10) days of this Court's Order, and from not releasing in accordance with the results of said hearings, without regard to the provisions of 8 U.S.C. §1226(c)(1), and

It is further urged that the Court conduct a status conference, at which to discuss class management, and procedures by which other class members may request individual injunctions.

Respectfully Submitted,

Lisa S. Brodyaga, Attorney
17891 Landrum Park Road
San Benito, TX 78586
(956) 421-3226
(956) 421-3423 (fax)
Fed. ID.  1178
Texas Bar 03052800

Thelma O. Garcia, Attorney
301 E. Madison
Harlingen, TX 78550
(956) 425-3701
(956) 428-3731 (fax)

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing, and proposed Order, were sent, first-class postage prepaid, to Paul Fiorino, Attorney, OIL, Box 878 Ben Franklin Station, Washington D.C. 20044, on June 3, 2002. Service was accomplished on Mr. Fiorino since the Objections were filed in his name, and because Ms. Putnam is currently ill.

9

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN    3 2002

Michael N. Milby
Clerk of Court

EUGENIO REYNA MONTOYA, and          )
JUAN LUIS GONZALEZ-SANCHEZ,         )
  In their own name and right,      )
  and on behalf of all others       )
  similarly situated,               )
                                    )
v.                                  )    C.A. No. B-02-026
                                    )
E.M. TROMINSKI, INS DISTRICT        )
  DIRECTOR, and                     )
JOHN ASHCROFT, ATTORNEY             )
  GENERAL OF THE UNITED STATES.     )
_____)


ADMINISTRATIVE DECISIONS, APPENDED TO

PETITIONERS' REPLY TO RESPONDENTS' OBJECTIONS TO
THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

1.  *Matter of West,* Interim Decision 3438 (BIA 2000);

2.  *Matter of Adeniji,* Interim Decision 3417 (BIA 1999), and

3.  *Matter of Andrade*, Interim Decision 3037 (BIA 1987).

**Matter of  Neville George WEST, Respondent**
**File A41 361 806 -- Newark**
**Board of Immigration Appeals**
**22 Immig. Rptr. B1-98; 2000 BIA LEXIS 18;   Interim Decision No. 3438**
**October 26, 2000**

**Editorial information: index**

Index: Detention (mandatory); Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (transitional rules)

**Editorial information: summary**

### SUMMARY OF ISSUES

DETENTION; IIRIRA: 8 U.S.C. § 1226(c); The mandatory detention provisions of section 236(c) of the Immigration and Nationality Act, 8 U.S.C. § 1226(c) (Supp. IV 1998), do not apply to an alien who was convicted after the expiration of the Transition Period Custody Rules (``Transition Rules"), but who was last released from the physical custody of state authorities prior to the expiration of the Transition Rules.

**Editorial information: syllabus**

### BIA SYLLABUS

The mandatory detention provisions of section 236(c) of the Immigration and Nationality Act, 8 U.S.C. § 1226(c) (Supp. IV 1998), do not apply to an alien who was convicted after the expiration of the Transition Period Custody Rules (``Transition Rules"), but who was last released from the physical custody of state authorities prior to the expiration of the Transition Rules and who was not physically confined or restrained as a result of that conviction.

**Editorial information: cross-ref**

### CROSS-REFERENCES

Immigration Law and Procedure chap. 108.

**Counsel**

COUNSEL: Robert Frank, Esquire, Newark, New Jersey, for respondent.
Patrice M. Rodman, Assistant District Counsel, for the Immigration and Naturalization Service.

**Judges**

Before: Board Panel: HEILMAN, FILPPU, and MOSCATO, Board Members.

Copyright  2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved.

**Opinion**

**Opinion by**

FILPPU, Board Member:

**Opinion**

In a bond decision dated August 30, 1999, an Immigration Judge determined that the respondent was not subject to mandatory detention under section 236(c) of the Immigration and Nationality Act, 8 U.S.C. § 1226(c) (Supp. IV 1998), granted the respondent's request for a change of custody status, and set bond in the amount of $5,000. The Immigration and Naturalization Service has appealed only from the Immigration Judge's finding that the respondent is not   subject to mandatory detention under section 236(c) of the Act. The appeal will be dismissed.

## I. FACTS AND PROCEDURAL HISTORY

The facts in this bond appeal are not in dispute. On April 10, 1997, the respondent was arrested and charged with various offenses, including possession of marijuana with intent to distribute in violation of section 2C:35-5(b)(11) of the New Jersey Statutes Annotated. He was indicted for these offenses on December 9, 1997, and, after posting bond, was released from state custody on December 10, 1997. On September 29, 1998, the respondent pled guilty to the drug charge and to a charge of receiving stolen property. On February 5, 1999, he was sentenced to 1 year of probation for each offense.

On August 12, 1999, the Service took the respondent into custody and served him with a Notice to Appear (Form I-862). The Service charged that, because of his drug conviction, the respondent was subject to removal under sections 237(a)(2)(A)(iii) and (B)(i) of the Act, 8 U.S.C. §§ 1227(a)(2)(A)(iii) and (B)(i) (Supp. IV 1998). The record before us indicates that the respondent was not in physical custody under New Jersey criminal proceedings   at any time after he posted criminal bond on December 10, 1997.

## II. IMMIGRATION JUDGE'S DECISION

The Immigration Judge analyzed the language of section 236(c)(1) of the Act, which mandates the detention of certain categories of aliens ``when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation'' (the ``when released'' language). He further considered the last sentence of section 303(b)(2) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-586 (``IIRIRA''), which provides that the provisions of section 236(c) of the Act ``shall apply to individuals released after'' October 8, 1998, the date on which the Transition Period Custody Rules (``Transition Rules'') expired (the ``released after'' language).

The Immigration Judge determined that the Service may take an alien into custody once he or she is free from physical restraint by the state. He concluded that the respondent was not subject to mandatory detention because he was free from physical restraint prior to the expiration of the Transition Rules when he posted bail following his arrest in December 1997. He ordered that bond be set in the amount of $5,000 after finding that the respondent did not pose a danger to property or persons and was unlikely to abscond.

## III. ANALYSIS

Although we agree with the Immigration Judge that the respondent is not subject to the mandatory detention provisions of section 236(c) of the Act because he was free from physical restraint

---

Immigration Precedent Decisions                                                                                          2
Copyright  2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved.

prior to the expiration of the Transition Rules, the focus of our analysis is substantially different, and we do not necessarily subscribe to the subsidiary points supporting his conclusion. However, the Immigration Judge applied the correct standard governing aliens subject to section 236(a) of the Act, and the Service has not appealed the amount of the bond. *See Matter of Adeniji*, Interim Decision 3417 (BIA 1999); 8 C.F.R. § 236.1(c)(8) (2000).

The Service proposes that the issue to be resolved in this case turns on the definition of the ``when released'' language of section 236(c) of the Act and asserts that, when the alien is not sentenced to imprisonment, the date of sentencing should be the date of ``release'' for the purpose of mandatory detention. As revealed by our analysis in *Matter of Adeniji, supra,* however, the initial issue to be resolved in this case is whether the respondent was ``released after'' the expiration of the Transition Rules on October 8, 1998, so as to trigger the mandatory detention provisions of section 236(c) of the Act.

We noted in *Matter of Adeniji, supra,* that the respondent, and subsequently the Service, contended that the ``released after'' language of section 303(b)(2) of the IIRIRA made section 236(c) of the Act applicable only to aliens released from criminal custody after the expiration of the Transition Rules. *Id.* at 8-9. We commented that the natural sense of the words would seem to point in the direction advanced by the parties, but we found ambiguity in the term ``released'' because it ``is not expressly tied to any other language that would clarify whether it refers to release from criminal custody, Service custody, or some other form of detention.'' *Id.* at 9. We observed that ``the parties' proposed reading . . . extends mandatory detention only to aliens who have been released from criminal (and perhaps psychiatric and other nonService) confinement after the expiration of those rules.'' *Id.* We accepted the proposed reading of the last   sentence of section 303(b)(2) of the IIRIRA and held that the respondent was not subject to mandatory detention under section 236(c) of the Act because ``he was released from his nonService custodial setting (i.e., from criminal custody) prior to the expiration of the Transition Rules.'' *Id.* at 12.

The respondent in *Matter of Adeniji* had been released from the state's custody, physical or otherwise, prior to the expiration of the Transition Rules, because he was convicted, incarcerated, and released from confinement while the Transition Rules were in effect. In this case, the respondent was also released from the physical custody of the state and convicted while the Transition Rules were in effect, but he was sentenced to probation after the expiration of the Transition Rules.

On appeal, the Service does not dispute that only aliens released after the expiration of the Transition Rules are subject to the mandatory detention provisions of section 236(c) of the Act. However, focusing its argument on the ``when released'' language of section 236(c), the Service asserts that if an alien is not sentenced to imprisonment, it is the date of ``release'' from the criminal proceeding itself, which occurs at the time of sentencing, that triggers the application of the mandatory detention provisions. We assume that the Service would make essentially the same argument regarding the ``released after'' language of section 303(b)(2) of the IIRIRA. That is, the pertinent date for determining the applicability of section 236(c) of the Act is the date of release from the technical custody of the criminal court, and not the date of release from physical custody. Therefore, in order to decide this case, we must determine whether the word ``released'' in the ``released after'' language in the last sentence of section 303(b)(2) of the IIRIRA refers to the respondent's release from physical custody, or to his release from the jurisdiction of the New Jersey court at the time of sentencing.

In construing a statutory term, we must start with the language of the statute, and the word should be given its `` `ordinary or natural' '' meaning. *Bailey v. United States*, 516 U.S. 137, 145 (1995) (quoting *Smith v. United States*, 508 U.S. 223, 228 (1993)). ``Release'' is variously defined as ``to set free from confinement, restraint, or bondage,''  or ``to unfasten, free, or let go of.'' *Webster's II New College Dictionary* 936 (1995). We determined in *Matter of Adeniji, supra,* that the ``released after'' language refers to release from nonService custody. However, the language is ambiguous to the extent that it does not specify the type of nonService custody from which the alien is released. The Service contends

Copyright 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

that it is clear that the term ``released'' can have a meaning other than release from physical restraint.

A provision that can seem ambiguous in isolation is often clarified by examining how the same terminology is used elsewhere in the statutory scheme. *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988). The words ``release'' or ``released'' are used several times in section 303 of the IIRIRA. Among the various provisions enacted by section 303 are those governing bond for aliens held by the Service pending completion of removal proceedings. The use of the term ``release'' in    the provisions relating to the release of an alien on an immigration bond obviously refers to release of the alien from the physical custody of the Service. *See* sections 236(a)(2),   (c)(2), (e) of the Act (as enacted by IIRIRA §§ 303(a), 110 Stat. at 3009-585; 303(b)(3)(B), 110 Stat. at 3009-587).

In addition, the word ``released'' in the ``when released'' language of section 236(c) and of the Transition Rules is modified by the subsequent clauses: ``without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.'' Section 236(c)(1) of the Act (as enacted by IIRIRA §§ 303(a), 110 Stat. at 3009-585; 303(b)(3)(A), 110 Stat. at 3009-587). ``Parole'' means the conditional release of a prisoner who has served part of the term for which he was sentenced to prison. *Black's Law Dictionary* 1116 (6th ed. 1990). ``Probation'' means a sentence ``whereby a convicted criminal offender is released into the community under the supervision of a probation officer in lieu of incarceration.'' *Id.* at 1202. ``Supervised release'' under federal criminal law is a period of supervision following completion of a prison term. *See Cuomo v. Barr*, 7 F.3d 17, 18 (2d Cir. 1993). The natural reading of the words ``released on'' within the context   of these clauses of section 236(c)(1) of the Act suggests that Congress is referring to the release of an alien from a restrictive form of criminal custody involving physical restraint to a less restrictive form of criminal custody without physical restraint. The reference in the last clause of the sentence to the possibility that the alien may be returned to a criminal custody status involving physical restraint (the ``arrested or imprisoned again'' language) buttresses this interpretation of the word ``released.''

The other use of the word ``release'' in section 303 of the IIRIRA is found in the section mandating that the Attorney General designate and train Service employees to serve as a liaison to law enforcement agencies, correctional agencies, and courts ``with respect to the arrest, conviction, and release of any alien charged with an aggravated felony.'' *See* section 236(d)(1)(B) of the Act (as enacted by IIRIRA § 303(a), 110 Stat. at 586). We draw no meaningful guidance from this provision on the question of the meaning of the word ``released'' in the last sentence of section 303(b)(2) of the IIRIRA.

Although the focus of the Service's argument is on the interpretation of the word    ``released'' in the ``when released'' language of section 236(c)(1) of the Act, we consider it appropriate to briefly summarize and respond to its other contentions in order to clarify our holding. The Service makes several arguments against interpreting the word ``released'' to mean freedom from physical restraint. The Service claims that certain statutory provisions of section 236(c) of the Act would be rendered ineffective by insistence on a ``release'' from physical custody. Citing to *Matter of Noble*, 21 I. & N. Dec. 672, 681-82 (BIA 1997), the Service offers the following as examples of aliens who would not be subject to mandatory detention: terrorists described in section 236(c)(1)(D) of the Act who have never been convicted of a crime, and aggravated felons described in section 236(c)(1)(B) of the Act who are not imprisoned, whether as the result of suspended sentences or of sentencing to probation. The Service also asserts that Congress clearly viewed aggravated felons as a category of criminal aliens who should be detained based solely on the nature of their convictions. In addition, the Service argues that the word ``probation'' in the ``when released''  language would become superfluous if a release from physical custody is required, and that a physical custody interpretation conflicts with the Board's decision in *Matter of Adeniji, supra,* in which we acknowledged that the term ``released'' could refer to psychiatric or other nonService confinement situations.

We do not find the Service's arguments convincing. The use of the words ``release'' or ``released'' in section 303 of the IIRIRA consistently appears to refer to a form of physical restraint.

Copyright  2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved.

Furthermore, interpreting the word ``released,'' as used in the ``released after'' language of section 303(b)(2) of the IIRIRA, to mean freedom from physical restraint does not necessarily preclude the application of the mandatory detention provisions of section 236(c) of the Act to criminal aliens who have not been released from a term of imprisonment after October 8, 1998. ``Released'' in this context can also refer to release from physical custody following arrest, as is the case with the respondent. We find support for this interpretation in the fact that section 236(c) of the Act requires detention ``when the alien is released, . . . without regard to whether the alien may be arrested . . . again for the same offense.''

In *Matter of Adeniji, supra,* we accepted the interpretation proposed by the Service even though it created certain anomalies. The Service now points to other anomalies that we noted in *Matter of Noble, supra.* In our judgment, these anomalies bear mainly on the issues that we resolved in *Matter of Adeniji.* However, the Service does not seek to revisit *Matter of Adeniji* itself.

In the end, we are not persuaded to accord the statutory language any meaning other than that which we derive from an examination of the statute as a whole. As such, we *construe* the word ``released'' in    the last sentence of section 303(b)(2) of the IIRIRA to refer to a release from physical custody. The respondent was last released from the physical custody of the State of New Jersey on December 10, 1997, prior to the expiration of the Transition Rules. He is therefore not subject to mandatory detention.

Accordingly, the appeal will be dismissed.

ORDER: The appeal of the Immigration and Naturalization Service is dismissed.

---

Copyright 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

Matter of Adewunmi ADENIJI, Respondent
File A41 542 131 – York
Board of Immigration Appeals
20 Immig. Rptr. B1-425; Interim Decision No. 3417
November 3, 1999

**Editorial information: index**

Index: Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) (Transitional rules)

**Editorial information: summary**

## SUMMARY OF ISSUES

TRANSITION PERIOD CUSTODY RULES: 8 U.S.C. § 1226(c); Section 236(c) of the Immigration and Nationality Act, 8 U.S.C. § 1226(c) (Supp. II 1996), does not apply to aliens whose most recent release from custody by an authority other than the Immigration and Naturalization Service occurred prior to the expiration of the Transition Period Custody Rules.

**Editorial information: syllabus**

## BIA SYLLABUS

(1) Section 236(c) of the Immigration and Nationality Act, 8 U.S.C. § 1226(c) (Supp. II 1996), does not apply to aliens whose most recent release from custody by an authority other than the Immigration and Naturalization Service occurred prior to the expiration of the Transition Period Custody Rules.

(2) Custody determinations of aliens in removal proceedings who are not subject to the provisions of section 236(c) of the Act are governed by the general custody provisions at section 236(a) of the Act.

(3) By virtue of 8 C.F.R. § 236.1(c)(8) (1999), a criminal alien in a custody determination under section 236(a) of the Act must establish to the satisfaction of the Immigration Judge and the Board of Immigration Appeals that he or she does not present a danger to property or persons.

(4) When an Immigration Judge bases a bond determination on evidence presented in the underlying merits case, it is the responsibility of the parties and the Immigration Judge to ensure that the bond record establishes the nature and substance of the specific factual information considered by the Immigration Judge in reaching the bond determination.

**Editorial information: cross-ref**

## CROSS-REFERENCES

Immigration Law and Procedure chap. 72.

**Counsel**

---

Immigration Precedent Decisions                                                                1
Copyright 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

Michael Maggio, Esquire, Falls Church, Virginia,   for respondent.
Brett M. Parchert, Appellate Counsel, for the Immigration and Naturalization Service.

**Judges**

Before: Board En Banc: DUNNE, Vice Chairman; SCIALABBA, Vice Chairman; HEILMAN, HOLMES, HURWITZ,   FILPPU, COLE, MATHON, JONES, and MILLER, Board Members. Dissenting Opinions: SCHMIDT, Chairman;   joined by VACCA, VILLAGELIU, and GUENDELSBERGER, Board Members; ROSENBERG, Board Member;   GRANT, Board Member, joined by MOSCATO, Board Member.

**Opinion**

**Opinion by**

FILPPU, Board Member:

**Opinion**

        The Immigration and Naturalization Service has appealed the Immigration Judge's March 10, 1998, bond   decision ordering the respondent released on his own recognizance. The Immigration Judge's bond   decision was based on the Transition Period Custody Rules (``Transition Rules'' or ``TPCR'') enacted by    section 303(b)(3) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of    Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-586 (``IIRIRA''). *See Matter of Noble,* 21 I. & N. Dec. 672 (BIA 1997). The Transition Period Custody Rules have expired, however, and a number of issues arise by    virtue of that expiration.

I. ISSUES

        The principal issues before us concern the following:

        1) Whether we have jurisdiction over a bond appeal when the underlying order was rendered *during the existence of the Transition Rules;*

        2) Whether the respondent is currently subject to mandatory detention under section 236(c) of the Immigration and Nationality Act, 8 U.S.C. § 1226(c) (Supp. II 1996), in the wake of the expiration of the Transition Rules;

        3) Whether the respondent, if he is not subject to mandatory detention, must show that he is not a danger to property or persons in order to obtain bond under the general bond provisions of section 236(a) of the Act; and

        4) Whether we may look to the record in the underlying merits case (that is also on appeal to the Board) to find support for the Immigration Judge's bond ruling, where the allegedly relevant material was not introduced into the bond record before us.

        As we explain in detail below, we find that we have continuing jurisdiction over this bond appeal. On the    issue of whether the respondent is subject to mandatory detention, we accept the view currently advanced by both parties that the respondent's custody proceedings are governed by the general bond provisions of section 236(a)   of the Act and that the criminal alien bond provisions of section 236(c)    do not apply because the respondent was released from criminal custody prior to the expiration of the Transition Rules.

        Under our case law addressing general bond provisions of prior law, an alien ordinarily would not

---

Immigration Precedent Decisions                                                                                        2
Copyright  2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved.

be   detained unless he or she presented a threat to national security or a risk of flight. *See Matter of Patel*, 15 I. & N. Dec. 666 (BIA 1976). But we agree with the parties' conclusions that an assessment of the   alien's danger to property or persons is a relevant consideration under section 236(a) of the Act, even   though we differ with regard to the reasons for that conclusion. In this respect, we find the regulation at 8 C.F.R. § 236.1(c)(8) (1999) to be controlling. *See Matter of Drysdale*, 20 I. & N. Dec. 815 (BIA 1994).   Finally, we find that a remand of this case is necessary to develop the record further to determine   whether the respondent, a criminal alien, poses a danger to property or persons or is a flight risk,   because we consider it inappropriate to look to portions of the record in the merits appeal that were not   referenced   in or made part of the bond record.

## II. PROCEDURAL HISTORY

A Notice to Appear (Form I-862) was issued on April 17, 1997, charging the respondent with removability   under section 237(a)(1)(A) of the Act, 8 U.S.C. § 1227(a)(1)(A) (Supp. II 1996), as an alien who was   inadmissible at the time of his entry as a lawful permanent resident. The Service alleged two underlying   grounds of inadmissibility. First, it charged that the respondent was inadmissible under section 212(a)(9)(A)(i) of the Act, 8 U.S.C. § 1182(a)(9)(A)(i) (Supp. II 1996), as an alien who had been ordered   removed and had sought admission in 1987 within 5 years of removal without obtaining prior consent from   the Attorney General to reapply for admission. Second, the Service charged the respondent with   inadmissibility under section 212(a)(6)(C)(i) of the Act for having procured his immigrant visa by fraud or   willful misrepresentation because he failed to disclose that he had been arrested and deported.

In addition, on December 4, 1997, the Service charged the respondent under section 237(a)(2)(A)(iii) of   the Act as an alien convicted of an aggravated   felony, as defined in sections 101(a)(43)(G), (M),   and (U) of the Act, 8 U.S.C. §§ 1101(a)(43)(G), (M), (U) (Supp. II 1996). This charge was based upon   the respondent's conviction on December 27, 1996, and sentence to imprisonment of 1 year and 1 day,   for the offense of conspiracy to commit bank fraud through acts intended to fraudulently withdraw a total   of $18,300 from the bank accounts of two other persons.

On March 10, 1998, the Immigration Judge found the respondent removable as an aggravated felon under   section 237(a)(2)(A)(iii) of the Act and granted him withholding of removal under section 241(b)(3) of the   Act, 8 U.S.C. § 1231(b)(3) (Supp. II 1996). The Immigration Judge then conducted a bond hearing and   ordered the respondent released on his own recognizance. The Service appealed both rulings. We address   the bond appeal in this decision.

## III. POSITIONS OF THE PARTIES

We requested supplemental briefs and held oral argument on the issue of the respondent's continued   eligibility for release after the expiration of the Transition Period Custody Rules. Immediately prior to oral   argument, the Service reversed   its position and argued that section 236(c) of the Act requires   mandatory detention of a criminal alien only if he or she was released from criminal custody after October 8, 1998, the last day that the Transition Period Custody Rules were in effect.

The Service further argued that it is appropriate to consider whether the alien is a danger to the community, and that cases such as *Matter of Drysdale, supra,* and *Matter of Andrade,* 19 I. & N. Dec. 488 (BIA 1987), are relevant to a criminal alien's custody determination, even under the general bond provisions set forth in section 236(a) of the Act. Applying those factors here, the Service requests that we uphold the district director's decision refusing to release the respondent on any bond condition or, alternatively, that we set a substantial bond.

Because of the Service's change in position, the parties are in agreement on the dispositive issues except   the amount of bond. The respondent agrees that section 236(a) of the Act should govern and, at oral   argument, agreed that any threat posed to the community is a relevant consideration where

Copyright 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

the bond    record contains evidence of criminal or terrorist    activity.

In a postargument brief, the respondent asserts that we should consider in this bond appeal the Immigration Judge's reasons for granting withholding of removal, as set forth in the merits decision in the underlying removal proceedings. The respondent argues that the Immigration Judge's reasons for granting    withholding of removal had a bearing on the custody ruling.

Finally, at oral argument, the respondent questioned whether we have continuing jurisdiction over this    bond appeal, suggesting that a bond determination made under the Transition Period Custody Rules is not    a custody determination pursuant to 8 C.F.R. § 236.1.

## IV. CONTINUING JURISDICTION OVER THE INSTANT APPEAL

We have appellate jurisdiction over bond rulings of Immigration Judges by virtue of 8 C.F.R. §§ 3.1(b)(7), 3.19(f), and 236.1(d)(3)(i) (1999). Notwithstanding any lack of clarity regarding appeals of Transition    Rule bond orders in the current versions of 8 C.F.R. § 236.1(c) or § 236.1(d)(1), the initial regulations to    implement the IIRIRA intended, with respect to criminal aliens who fell under the Transition Period Custody    Rules, to retain the prior structure for Immigration Judge bond redeterminations    and appeals. *See* 62 Fed. Reg. 444, 450 (Jan. 3, 1997) (noting, with regard to proposed rulemaking to implement the    IIRIRA, that ``the proposed rule essentially preserves the status quo for bond determination by the Service    and bond redetermination proceedings before immigration judges"); 62 Fed. Reg. 10,312, 10,323 (Mar. 6, 1997) (rejecting a commenter's assertion that ``it was not the intention of Congress that EOIR continue to    exercise bond redetermination authority under the Transition Rules").

Importantly, at the time of the respondent's bond redetermination hearing and the Service's appeal, 8 C.F.R. § 236.1(c)(1)(ii) (1998) provided that ``while the Transition Period Custody Rules remain in effect,    this paragraph and paragraph (d) of this section shall be subject to those Rules." (Emphasis added); *see    also* 62 Fed. Reg. 15,362, 15,363 (1997). We understand this provision to incorporate the Transition    Period Custody Rules into the existing regulatory structure for district director bond determinations,    Immigration Judge bond redeterminations, and appeals to the Board. Subsequent to the respondent's bond hearing and the filing of this appeal, more detailed bond regulations were promulgated. But    these regulations also envisioned some Immigration Judge bond adjudications under the Transition Rules,    as well as appeals to us. 63 Fed. Reg. 27,441 (1998); 8 C.F.R. § 3.19(f). The absence of a reference to    the Transition Rules in 8 C.F.R. § 236.1(d)(1), therefore, does not reflect an intent to completely remove    jurisdiction over Transition Rule bond cases from either Immigration Judges or the Board.

Our appellate jurisdiction over this case has not been extinguished by a change in the substantive bond    law that was applied by the Immigration Judge. [1.] We have independent authority to assess the record    and make our own bond determination under the current law. *Matter of Burbano*, 20 I. & N. Dec. 872 (BIA 1994). A remand might be necessary if the factors relevant to bond under the current law were not those    that were germane at the time of the hearing before the Immigration Judge, or if, as here, there were    other defects in the way the factors were applied below. *See Matter of Noble, supra,* at 686.

Furthermore, it does not appear that the dispute has become moot. We have been informed that on July 22, 1999, the district director issued an order (evidently pursuant to the Service's new interpretation of    the statute) requiring that the respondent continue to be detained without bond. On July 26, 1999, the    Immigration Judge entered an order declaring that the Service's new determination did not provide a    reason for the Immigration Judge to alter his earlier decision releasing the respondent on his own    recognizance. Under these circumstances, the dispute between the parties persists. Although some of    the issues have changed, neither party asserts that this appeal is moot by virtue of the Service's new    legal position or by virtue of its subsequent review and reaffirmation of its ultimate

---

Immigration Precedent Decisions                                                                                                    4

Copyright 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

conclusion that the   respondent should be detained without bond. *Matter of Valles*, 21 I. & N. Dec. 769 (BIA 1997).

## V. APPLICABILITY OF SECTION 236(c) FOLLOWING EXPIRATION OF THE TRANSITION RULES

The Transition Period Custody Rules were invoked by the Attorney General pursuant to section 303(b)(2)   of the IIRIRA, 110 Stat. at 3009-586, which provides:

NOTIFICATION   REGARDING CUSTODY. -- If the Attorney General, not later than 10 days after the date of the enactment of this Act, notifies in writing the Committees on the Judiciary of the House of Representatives and the Senate that there is insufficient detention space and Immigration and Naturalization Service personnel available to carry out section 236(c) of the Immigration and Nationality Act, as amended by subsection (a), or the amendments made by section 440(c) of Public Law 104-132, the provisions in paragraph (3) shall be in effect for a 1-year period beginning on the date of such notification, instead of such section or such amendments. The Attorney General may extend such 1-year period for an additional year if the Attorney General provides the same notice not later than 10 days before the end of the first 1-year period. After the end of such 1-year or 2-year periods, the provisions of such section 236(c) shall apply to individuals released after such periods.

The IIRIRA was enacted on September 30, 1996. On October 9, 1996, within the 10-day period specified   by section 303(b)(2) of the IIRIRA, the Attorney General, through the Commissioner of the Service, made   the necessary notifications.  The Attorney General subsequently invoked the additional 1-year   extension allowed under section 303(b)(2) of the IIRIRA. The additional 1-year extension expired at the   end of the day on October 8, 1998. The Transition Rules themselves specified that they would only   control criminal alien custody determinations ``during the period in which this paragraph is in effect   pursuant to paragraph (2)," as quoted above. IIRIRA § 303(b)(3)(A). The statute contains no explicit   savings clause pertaining to the Transition Period Custody Rules, and we agree with the parties that   those rules expired at the end of their second year.

Section 236(c) of the Act would have become effective on April 1, 1997, had the Attorney General not   invoked the Transition Rules, and thus would have governed the release of covered criminal aliens during   the course of removal proceedings on or after April 1, 1997. Section 236(c) provides in relevant part as   follows:

(1) CUSTODY. -- The Attorney General shall take into custody any alien who --

(A) is inadmissible by reason of having committed any offense covered in section 212(a)(2),

(B) is deportable by reason of having committed any offense covered in section 237(a)(2)(A)(ii), (A)(iii), (B), (C), or (D),

(C) is deportable under section 237(a)(2)(A)(i) on the basis of an offense for which the alien has been sentenced to a term of imprisonment of at least 1 year, or

(D) is inadmissible under section 212(a)(3)(B) or deportable under section 237(a)(4)(B),

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

(2) RELEASE. -- The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides... that release of the alien from custody is necessary [for certain witness protection matters], and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any

Copyright  2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved.

scheduled proceeding.

The respondent makes two interrelated arguments opposing the application of section 236(c) to his   current situation. He attacks our decision in *Matter of Noble, supra,* contending that the literal language   of section 236(c) provides for its application to an   alien only if the Service immediately takes   custody of the alien ``when the alien is released'' from criminal incarceration (the ``when released''   language). Additionally, the respondent, now supported by the Service, contends that the last sentence   of section 303(b)(2) of the IIRIRA makes section 236(c) applicable only to individuals released from   criminal custody after the expiration of the 2-year period during which the Transition Rules were in effect   (the ``released after'' language). We need not address at this time the respondent's arguments respecting   *Matter of Noble* and the ``when released'' clause, as we accept the parties' construction of the ``released   After'' clause in the last sentence of section 303(b)(2). 2.

Proper statutory construction must begin with the words used by Congress. *INS v. Cardoza-Fonseca,* 480 U.S. 421, 431 (1987). As previously noted, the last sentence of section 303(b)(2) of the IIRIRA provides   that after the end of the transition period, ``the provisions of such section 236(c) shall apply to individuals   released after such periods.''

We confronted the meaning of this sentence in *Matter of Noble* without coming to any resolution on how   it should be construed. We do not believe that this last sentence of section 303(b)(2), standing alone, is   free from uncertainty. The natural sense of the words, at first glance, would seem to point in the   direction presently advanced by the parties. But the term ``released'' is not expressly tied to any other   language that would clarify whether it refers to release from criminal custody, Service custody, or some   other form of detention.

In our judgment, additional language is needed to clarify the sentence. The parties now propose that this   sentence should be read to say that ``the provisions of such section 236(c) shall apply to individuals   released [from criminal custody] after such periods.'' The reading   previously given this sentence,   by a three-member panel of the Board in a series of unpublished cases, is not the one now advanced.   Those unpublished cases construed the sentence to say that ``the provisions of such section 236(c) shall   apply to individuals [seeking to be] released after such periods.''

The difference is profound. The reading in our unpublished cases extends the mandatory detention   provisions of section 236(c) to any covered criminal or terrorist alien in Service detention after the   expiration of the Transition Rules. The parties' proposed reading, on the other hand, extends mandatory   detention only to aliens who have been released from criminal (and perhaps psychiatric and other   nonService) confinement after the expiration of those rules. This would permit bond for all aliens released   from nonService custody before the Transition Rules expired, even if those aliens were not eligible for   bond during the life of the Transition Rules themselves. 3.

The meaning assigned to the last sentence of section 303(b)(2) should be the one that emerges from a   reading of the statute as a whole, taking into account its object and policy. *John Hancock Mut. Ins. Co.   v. Harris Trust & Sav. Bank,* 510 U.S. 86, 94-95 (1993). Minor gaps in a statute should be filled by   extrapolating from the statute's general design. *See United States v. Jackson,* 390 U.S. 570 (1968).

In *Matter of Noble, supra,* we expressed a reluctance to adopt the meaning of this ``released after''   sentence that the parties propose today. We saw it as providing criminal and terrorist aliens a   ``springing'' opportunity for release from Service custody under lenient standards not applicable to some of those   aliens for approximately a decade. For example, an aggravated felon who has not been lawfully admitted   has never been eligible for release, under the permanent provisions of the statute and during the   pendency of proceedings, since mandatory detention was first introduced in the Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181 (``ADAA''). *See* ADAA § 7343, 102 Stat.   at 4470; *see   also* Immigration Act of 1990, Pub. L. No. 101-649, § 504, 104 Stat. 4978, 5049 (``1990 Act'');   Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub.

Copyright  2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved.

L. No. 102-232, § 306, 105 Stat. 1733, 1751 (effective as if included in the 1990 Act).

Even under the temporary Transition Period Custody Rules, an aggravated felon who was not lawfully admitted remained barred from release unless it was established that he or she was not a danger to persons or property, was not a flight risk, and would not be accepted by the country designated for removal. IIRIRA § 303(b)(3)(B)(ii). Under the position advanced by the parties, such an aggravated felon would now suddenly be eligible for bond so long as the alien's release from criminal custody occurred prior to the expiration of the Transition Rules. And this would be true even if that same felon already had been in Service custody for many months because bond was not available under the Transition Rules.

If this were the end of the analysis, we would have substantial difficulty accepting the proffered construction in view of the overall structure of the IIRIRA's custody provisions, as well as the historical context of the similar provisions that were being replaced. In *Matter of Noble, supra,* at 682, we found it incomprehensible that Congress could have intended that such an alien be released after the expiration of the Transition Rules, without any consideration of his or her dangerousness, at the same time that Congress was mandating the detention of criminal aliens. The Transition Rules were not intended as a benefit to criminal or terrorist aliens, but rather as a temporary postponement of stringent custody requirements if the Service was not immediately able to carry out its obligations under the permanent law. It would be anomalous *to deem the expiration* of the Transition Rules and the concomitant conversion to the stringent permanent law to be the occasion upon which Congress relaxed the rigors of the bond provisions through increased generosity toward all criminal aliens in Service custody on the date of that expiration.

There is, however, a scenario under which the parties' proposed reading of the last sentence of section 303(b)(2) makes sense in view of the legislation as a whole, notwithstanding the various unexpected results flowing from that reading. *See Matter of Noble, supra,* at 681-83. Congress enacted the Transition Rules knowing that the Service might lack the capacity to enforce the permanent rules. That lack of capacity might not be fully rectified during the 2-year Transition Period. It therefore would make sense to apply the permanent rules to persons coming into Service custody after the Transition Period ended, and to continue to apply the Transition Rules to persons who had been subject to them during their existence. This would lead to no anomalous ``springing'' opportunities to obtain bond for criminal aliens, such as aggravated felons who never were lawfully admitted and whose detention had been required under the Transition Rules.

The problem is that Congress did not enact a savings clause for the Transition Rules. And we consider it beyond our authority to treat the IIRIRA, even implicitly, as containing one. We have doubts whether Congress intended one at all, let alone what its precise terms might have been. That doubt is reinforced to the extent that sudden bond eligibility arises for certain categories of aliens under the parties' reading of the statute.

We consequently perceive certain tension between the language of the last sentence of section 303(b)(2) and the overall thrust of the IIRIRA. Nevertheless, the parties' reading of the statute is not unreasonable, in light of its exact terms and the uncertainty we experience in discerning how Congress expected this provision to operate. Further, the district courts around the country have not agreed with the construction of the statute contained in our unpublished panel rulings. In response to these court decisions, the Service has changed its own view of the statute and has implemented that change in its own bond adjudications. At oral argument, the Service indicated that there were no plans to challenge these federal district court decisions in the courts of appeals. *See Matter of Silva,* 16 I. & N. Dec. 26, 29-30 (BIA 1976) (acceding to a construction of section 212(c) of the Act, 8 U.S.C. § 1182(c) (1976), under generally similar circumstances); *see also id.* at 32-33 (Appleman, concurring).

In this case, the natural sense of the language in question points to the construction jointly supported by the parties. That interpretation of the ``released after'' language in the last sentence of

---

Copyright 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

section 303(b)(2) of the IIRIRA would not be inconsistent with the legislation as a whole if Congress intended,    but neglected, to include a savings clause pertaining to persons who were subject to the Transition    Period Custody Rules during their existence. In such circumstances, any unexpected results would arise    from the absence of the savings clause. In the end, we have found little that helps us determine what    Congress actually intended when it adopted the language in that last sentence.

In sum, we are uncertain of the intent behind the ``released after'' language and agree that its natural    sense supports the parties' reading. While the statute as a whole raises questions about that reading, we    cannot rule out the possibility that the answer lies in a failure to enact a savings clause for persons    subject to the Transition Rules. Consequently, we are able to accept the parties' reading when we factor    in the district court rulings rejecting our prior construction, the Service's reversal of its own position, and    the Service's decision not to pursue the litigation in the court cases. Given this overall set of    circumstances, we find that the respondent    is not subject to mandatory detention under section 236(c) of the Act because he was released from his nonService custodial setting (i.e., from criminal custody) prior to the expiration of the Transition Rules.

## VI. STANDARDS GOVERNING BOND

We agree with the parties that the general bond provisions of section 236(a) govern bond for the respondent at present. The parties further agree that the respondent must show that he is not likely to abscond, is not a threat to the national security, and is not a threat to the community, in keeping with our decision in *Matter of Drysdale, supra.* The ``threat to the community'' test in *Drysdale* followed the then-existing statutory language applicable to bond for criminal aliens. Some similar test would seem to be warranted for criminal aliens who were previously covered by the Transition Rules, particularly if their eligibility for release under the general bond provisions of section 236(a) stems, in part, from the absence    of a savings clause that continues the Transition Rules for persons once subject to those rules.

There is, moreover, a regulation that we deem applicable to this situation, 8 C.F.R. § 236.1(c)(8) (1999),    which provides, in relevant part, as follows:

Any officer authorized to issue a warrant of arrest may, in the officer's discretion, release an alien not described in section 236(c)(1) of the Act, under the conditions at section 236(a)(2) and (3) of the Act; provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding.

An Immigration Judge is not authorized to issue a warrant of arrest. Nevertheless, 8 C.F.R. § 3.19(a)    incorporates substantive aspects of the bond regulations governing the Service, and provides that    ``custody and bond determinations made by the service [sic] pursuant to 8 C.F.R. part 236 may be reviewed by an Immigration Judge pursuant to 8 C.F.R. part 236.''

At oral argument, the Service expressed the view that 8 C.F.R. § 236.1(c)(8) became inapplicable, along    with all the provisions of § 236.1(c)(2) through (8), upon expiration of the Transition Rules. The Service's    view was based on the first sentence of 8 C.F.R. § 236.1(c)(1)(ii), which provides that ``paragraph (c)(2)    through (c)(8) of this section shall govern custody determinations    for aliens subject to the TPCR    while they remain in effect.''

At first blush, the regulatory language would suggest that paragraph (c)(8) died with the Transition    Rules. But 8 C.F.R. § 236.1(c)(1)(ii) does not actually say that paragraph (c)(8) loses all force upon    expiration of the Transition Rules. Rather, it simply states that it governs Transition Rule cases during the    existence of the Transition Rules. It says nothing about how paragraph (c)(8) is to apply if the alien in    question is not subject to the Transition Rules, either because those rules never applied to the alien or    because they have now expired.

Copyright 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

Importantly, the text of paragraph (c)(8) itself is not in any way restricted to Transition Rule aliens. Indeed, the text suggests just the opposite, as it applies to aliens ``not described in section 236(c)(1) of the Act,'' many of whom will simply be aliens described in section 236(a), the general bond provision. The regulatory history confirms that paragraph (c)(8) was intended to have broader application than merely being applicable during the existence of the Transition Rules.

The substance of paragraph (c)(8) was promulgated as 8 C.F.R. § 236.1(c)(2) at the time that regulations implementing the IIRIRA were first adopted in 1997. 62 Fed. Reg. at 10,360; 8 C.F.R. § 236.1(c)(2) (1998). That this was intended to be part of the permanent regulations is suggested not only by the text of the paragraph, but also by the commentary that accompanied its promulgation. See 62 Fed. Reg. at 10,323 (``The Department intends to issue a separate proposed rule in the near future establishing both substantive limitations and procedural safeguards concerning the release of criminal aliens eligible to be considered for release under the Transition Rules.''). Proposed and final rulemaking, focusing principally on the Transition Period Custody Rules, did follow. 62 Fed. Reg. 48,183-87 (Sept. 15, 1997) (proposed rules); 63 Fed. Reg. 27,441-50 (May 18, 1998) (final rules). It was the May 19, 1998, final rules that redesignated paragraph (c)(2) as (c)(8), where it now appears. 63 Fed. Reg. at 27,449.

It was also that May 19, 1998, regulatory package that added 8 C.F.R. § 236.1(c)(1)(ii), providing that ``paragraph (c)(2) through (c)(8) ... shall govern custody determinations for aliens subject to the TPCR while they remain in effect.'' 63 Fed. Reg. at 27,449. The addition of this language, however, does not alter the fact that the pertinent portion of paragraph (c)(8) was part of the original rulemaking package to implement the permanent provisions of the IIRIRA.

From the outset, therefore, the regulations under the IIRIRA have added as a requirement for ordinary bond determinations under section 236(a) of the Act that the alien must demonstrate that ``release would not pose a danger to property or persons,'' even though section 236(a) does not explicitly contain such a requirement. This test is certainly akin to the ``threat to the community'' test contained in *Matter of Drysdale, supra,* which the parties agree should apply in the case of this respondent. We deem the regulatory provision at 8 C.F.R. § 236.1(c)(8) (1999) to contain the appropriate test, as it is binding on us and pertains directly to removal proceedings under the IIRIRA. Consequently, to be eligible for bond, the respondent must demonstrate that his ``release would not pose a danger to property or persons, and that [he] is likely to appear for any future proceeding.'' *Id.*

## VII. RESPONDENT'S REQUEST FOR RELEASE FROM CUSTODY

In a memorandum of decision dated April 21, 1998, the Immigration Judge set forth the reasons for his March 10, 1998, order releasing the respondent on his own recognizance. The Immigration Judge considered the respondent's dangerousness and risk of flight. Those same factors are relevant considerations in assessing the respondent's request for release from custody today under section 236(a) of the Act.

The bond record reflects that the respondent was ordered deported in 1983. In 1984, the respondent filed a nonimmigrant visa application while residing in Nigeria. Later that year, he entered the United States as a nonimmigrant. After overstaying his authorized admission, the respondent married a United States citizen. The respondent returned to Nigeria in 1985. In 1986, he applied for an immigrant visa. During the course of the respondent's interview, it was discovered that the respondent obtained his 1984 nonimmigrant visa by willfully misrepresenting material facts unrelated to his prior deportation. He was nevertheless granted a waiver. At that time, it had not yet been discovered that the respondent was the same individual who had been ordered deported in 1983, and the respondent did not seek or obtain permission to reenter the United States after deportation.

In 1990, after he had immigrated, the conditional basis of his permanent resident status was removed. The respondent was later divorced from his petitioning spouse. In 1993, he married his present spouse, a native of Nigeria. The respondent and his current spouse have two United States

Copyright 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

citizen children. The    respondent's current spouse has been granted asylum.

On December 27, 1996, the respondent was convicted of the offense of conspiracy to commit bank fraud.    The bond record also indicates that the respondent was convicted of making false statements to the    Service. The respondent previously alleged that both convictions were on appeal, but does not now    contest removability based on the bank fraud conspiracy conviction.

The Immigration Judge's memorandum of decision contains little analysis on the issue of the respondent's    danger to property or persons. The Immigration Judge ruled that the respondent had the burden of proof    on this issue, but that the Service would be required to rebut    an otherwise satisfactory showing    by the respondent. Nevertheless, the Immigration Judge immediately proceeded to state that ``there is no    showing that the respondent is a danger to persons or property which would necessitate holding the    respondent in Service custody at this point.'' This would appear to place the burden on the Service to    show that the respondent posed such a danger, as the Immigration Judge recounted no evidence that led    him to conclude that the respondent had made a satisfactory showing requiring rebuttal. The only    additional point discussed by the Immigration Judge involved an observation that the Service did not    consider the respondent's bank fraud crime to be a ``particularly serious crime'' that would bar withholding    of removal.

With respect to the risk of flight, the Immigration Judge merely noted that he had granted the respondent    withholding of removal, reducing the likelihood that the respondent would fail to appear for any future    hearings.

There is little to suggest that the respondent would pose a physical danger to persons if released. His    bank fraud conviction and history of deceitful behavior, however, make the determination whether he    presents a danger    to property a difficult one. In view of his criminal record and history of other questionable or deceitful behavior, we do consider him to present a risk of flight should he lose his case on the merits.

Evidently in an effort to overcome some of the deficiencies in the record, the respondent asks that we    consider the information presented to the Immigration Judge during the underlying removal proceeding in    connection with this bond appeal. The respondent asserts that an Immigration Judge may base a custody    determination on any information that is available, which in this case included the information presented    during the removal hearing. Custody proceedings must be kept separate and apart from, and must form    no part of, removal proceedings. *See* 8 C.F.R. § 3.19(d). Information adduced during a removal hearing,    however, may be considered during a custody hearing so long as it is made part of the bond record.

The parties and the Immigration Judge are responsible for creating a full and complete record of the    custody proceeding. In this case, the Immigration Judge did reference his conclusion in the underlying    removal hearing. But a grant of withholding of removal by itself would    not prevent the Service    from attempting to effect removal to a third country, and the Immigration Judge's discussion seems to    reflect an incomplete assessment of the risk of flight. Moreover, we have no way of ascertaining exactly    what evidence or other aspects of the removal hearing may have been deemed pertinent. Reliance on the    removal record, even though it is also pending on appeal, would require our speculation regarding what, if    any, information from this record may have played a part in the custody determination. Thus, we will not    consider the evidence presented during the respondent's removal proceedings, except to the extent that    it is already part of this bond record. In any bond case in which the parties or the Immigration Judge rely    on evidence from the merits case, it is necessary that such evidence be introduced or otherwise    reflected in the bond record (such as through a summary of merits hearing testimony that is reflected in    the Immigration Judge's bond memorandum). Otherwise, it will not be part of the bond record available for    our review on appeal.

As indicated earlier, we have significant concerns regarding the respondent's danger to property and his    risk of flight. The Immigration Judge's bond assessment is exceptionally sketchy as it pertains

Immigration Precedent Decisions                                                                10
Copyright 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

to   the evidence in this case. In fairness to the respondent, however, the Immigration Judge may well have    relied on undisclosed evidence from the merits hearing in making the bond determination. Accordingly, we   will vacate the Immigration Judge's March 10, 1998, bond order, but we will remand the record for further    proceedings to give the respondent an opportunity to make a more complete record and to allow the    Immigration Judge to better explain the basis for his bond ruling, regardless of the outcome on remand.

## VIII. CONCLUSION

Although he has been convicted of an aggravated felony, the respondent is eligible for consideration for    bond under the general bond provisions of section 236(a)(1) of the Act because he was released from his    criminal custody on or before October 8, 1998. Pursuant to 8 C.F.R. § 236.1(c)(8), the respondent must    demonstrate that his release would not pose a danger to property or persons, and that he is likely to    appear for any future proceedings. [4.] A remand is appropriate because of the manner in which these    tests were applied below. In view of the length of time this bond    appeal has been pending, the    Immigration Judge should hold the new bond hearing promptly.

ORDER: The appeal of the Immigration and Naturalization Service is sustained.

FURTHER ORDER: The Immigration Judge's March 10, 1998, bond order is vacated, and the record is    remanded to the Immigration Court for further proceedings consistent with this decision.

CONCUR BY: ROSENBERG

**Dissent by**

DISSENT BY: SCHMIDT; GRANT; ROSENBERG

**Dissent**

DISSENTING OPINION: Paul W. Schmidt, Chairman; in which Fred W. Vacca, Gustavo D. Villageliu, and    John Guendelsberger, Board Members, joined

I respectfully dissent. We should decide this case and release the respondent on bond.

I agree with the majority that the respondent is not subject to mandatory detention. I also agree that, to    be released, the respondent must show that he will appear when required to do so and will not present a    danger to persons or property.

Applying that standard to the respondent's    situation, I agree with the Immigration Judge that the    respondent should be released. Unlike the Immigration Judge, however, I would impose a bond of $3,000.

I disagree with the majority's decision to remand for four reasons. First, the Immigration Judge applied    the proper legal standard. In concluding that release was warranted, he properly evaluated the following    relevant factors.

He pointed out that the respondent had been granted withholding of removal, thus giving him a reasonable expectation of success on the merits and reducing the incentive to abscond. He noted the absence of any suggestion in the record that the respondent is, or ever has been, a physical danger to persons. He also noted that the particular aggravated felony of which the respondent was convicted, bank fraud, does not qualify as a ``particularly serious crime" for withholding of removal purposes. That determination necessarily includes a balancing of various factors relating to the level of danger to society, including the danger to property. *See, e.g., Matter of S-S-*, Interim Decision 3374 (BIA 1999).

Immigration Precedent Decisions                                                                11
Copyright  2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved.

He further noted that the Immigration and Naturalization Service, the party with every incentive to do so, had not asserted that the respondent's crime was ``particularly serious."

Second, the uncontested information available to us on appeal supports the Immigration Judge's decision   to release. The respondent is married to an individual who has herself been granted asylum in the United    States, and he is the father of two United States citizen children. These significant ties to the United    States give the respondent additional reasons to comply with the terms of release and to refrain from    fraudulent or criminal conduct while his immigration case is pending.

Third, at this point, the duration of the respondent's release on our order will be so brief that fraudulent   harm to property is highly unlikely before his case is resolved. We have the merits of the respondent's   withholding of removal case before us. Assuming that we act promptly, one of two things will occur   shortly. If we dismiss the Service's appeal, the respondent will be granted the relief of withholding of   removal and his ultimate, long-term release from custody is highly likely. If we sustain the Service's   appeal, the respondent's circumstances will thereby change and his custody status could be reexamined   by the   appropriate authorities at that time.

Fourth, and finally, a remand is pointless. The Immigration Judge has already ordered the respondent   released under the standard we are adopting and, as recently as July 26, 1999, he declined to alter that   decision. We can reasonably anticipate that the same result will occur on remand. Assuming that the   Immigration Judge once again orders release, the Service undoubtedly will appeal and the case will be   returned to us. We should resolve it now, rather than later.

This remand is wrong. This appeal has been pending before us for more than a year, and it should be   decided now. I would affirm the Immigration Judge's decision to release the respondent. However, in light   of some of the concerns expressed by the majority, I would impose a bond in the amount of $3,000.

Therefore, I respectfully dissent from the decision to remand this case.


## Dissent by

DISSENTING OPINION: Edward R. Grant, Board Member, in which Anthony C. Moscato, Board Member,   joined

## Dissent

I respectfully dissent.

The majority opinion capably presents the options that face this Board in determining what standard   ought to be applied in deciding whether the respondent shall be subject to custody by   the Immigration and Naturalization Service or released on bond. These options are to apply:

(1) the permanent detention provisions of section 236(c) of the Immigration and Nationality Act, 8 U.S.C. § 1226(c) (Supp. II 1996), as enacted by section 303(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-585 (``IIRIRA");

(2) the Transition Period Custody Rules, as enacted by section 303(b)(3) of the IIRIRA, 110 Stat. at 3009-586; or

(3) the general ``arrest, detention, and release" provisions of section 236(a) of the Act, also enacted by section 303(a) of the IIRIRA.

The majority has selected the third option, which allows the release on bond of an alien pending

Copyright 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

deportation proceedings, but with no specific mandate to detain if the alien is a criminal. In so doing, the majority makes the one choice that is manifestly contrary to the clear intent of Congress, expressed in the major immigration legislation of 1996, to require detention of criminal aliens such as the respondent.

Prior to 1996, subparagraph (A) of former section 242(a)(2) of the Act, 8 U.S.C. § 1252(a)(2) (1994), mandated the detention only of an alien convicted of an aggravated felony, and subparagraph (B) prohibited release of such an alien unless the alien demonstrated that he or she was not a threat to the community and was likely to appear at future hearings.

The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (``AEDPA''), significantly expanded the scope of the requirement to detain criminal aliens, while at the same time limiting the ability of this larger category of criminal aliens to be released. First, section 440(c) of the AEDPA, 110 Stat. at 1277, amended section 242(a)(2) of the Act to mandate detention of aliens convicted under a wide range of offenses listed as grounds for deportation under former section 241(a)(2) of the Act, 8 U.S.C. § 1251(a)(2) (1994). Second, section 435 of the AEDPA, 110 Stat. at 1274-75, expanded the deportation grounds under section 241(a)(2)(A)(i)(II) of the Act (crimes involving moral turpitude), and section 440(e) of the AEDPA, 110 Stat. at 1277, expanded the definition of aggravated felony, both having the effect of increasing the numbers of criminal aliens subject to mandatory detention. Finally, Congress repealed subparagraph (B) of section 242(a)(2) of the Act, thus terminating the ability of aliens under the detention mandate to obtain release.

Congress did not significantly retreat from this position in the IIRIRA. In fact, by extending the definitional and temporal scope of the term ``aggravated felony,'' Congress further expanded the ranks of criminal aliens who would be subject to mandatory detention. Congress did, however, temporarily ameliorate the ``no-release'' policy of the AEDPA by enacting the Transition Period Custody Rules (``TPCR''). As the Board recognized in *Matter of Noble*, 21 I. & N. Dec. 672, 675 (BIA 1997), Congress included the TPCR in the IIRIRA to allow time for this new detention mandate to be fully implemented. The impact of our ruling today is the opposite: for that class of aliens ``released'' during the Transition Period defined in section 303(b)(2) of the IIRIRA (and, perhaps, for that class released before the Transition Period, the class at issue in *Noble*), the end of the Transition Period means that they can have their custody status determined under the most minimal standard now existing in the statute-even if, as the majority concedes, they would have been ineligible for release under the TPCR. Rather than leading to full implementation of the detention mandate, the Board's interpretation allows criminal aliens released during the Transition Period to revert back, after its expiration, to a more favorable position, and to avoid any scheme of mandatory detention, even the modified one in place under the TPCR.

At the core of the majority's evident conundrum in resolving the standard under which bond and custody matters will be decided for those released during the TPCR are two provisions, one present in the IIRIRA as enacted and the other one absent from it. The first is the last sentence of section 303(b)(2) of the IIRIRA, which states that the mandatory detention scheme set forth at section 236(c) of the Act will apply only to those released after the end of the TPCR. The second, and absent, provision is a ``savings'' clause for the TPCR. In considering these factors, the majority reasons that, because Congress included no savings clause for the TPCR (thus causing its complete termination on October 8, 1999), and because those released during the TPCR cannot be subject to mandatory detention owing to the last sentence of section 303(b)(2), the only standard available for consideration of bond/custody matters relating to criminal aliens released during the TPCR is section 236(a), the general provision of the Act governing such matters for all aliens in proceedings, criminal and noncriminal alike.

Thus, the majority concludes that the presence of the last sentence of section 303(b)(2), coupled with the absence of a saving clause, compels a result that even it admits militates against the clear design of the statute: to constrain or even eliminate the capacity of aliens who have committed crimes to remain at liberty. It is true that the TPCR contain no explicit savings clause. Congress did not

Copyright 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

include one, in all    likelihood, because it expected that upon the termination of the TPCR, the mandatory detention scheme    of section 236(c) would come into effect. The last sentence of section 303(b)(2), which appears to    preclude the application of the mandatory detention scheme to those released during the TPCR, is    sufficient to serve as an implicit savings clause for those who had already been subject to the TPCR. It    states that only those released after such periods would be subject to detention under section 236(c). The words ``such periods" refer to the 1- or 2-year TPCR periods provided in the statute. The    clear inference to be drawn from that sentence is that those released during the TPCR would remain    subject to the terms of the rules during the pendency of their proceedings.

Had Congress intended this group to be adjudicated under section 236(a), it would presumably have said    so, given the profound shift from a policy of mandatory detention that this would have entailed. In the    absence of such clear direction, our only reasonable choice is to infer from both the overall purpose of    the statute and the words of section 303(b)(2) that Congress intended this class of aliens to have their    bond and custody status determined under the TPCR, and not under the standard bond/custody provision    available to noncriminal aliens in proceedings.

Our ruling today could have far-reaching impact. Potentially, thousands of criminal aliens who were    released from federal or state custody before or during the Transition Period could see their prospects for    release from Service custody improve. As can be seen in the split decision issued here, it is uncertain to    what extent the application of 8 C.F.R. § 236.1(c)(8)    (1999) will result in release of such aliens.    However, it is likely that one of the key purposes of Congress in mandating detention-that criminal aliens    do not abscond and actually are removed from the United States if they are found deportable-will be    undermined. As Congress noted in enacting the AEDPA and the IIRIRA, the standard of ``low flight risk"    incorporated in immigration bond determinations has proved to be a weak assurance that aliens will    actually show up for their hearings.

Our responsibility to interpret ambiguous statutory terms does not arise in a vacuum. The plenary    authority to regulate immigration vested in the Congress by the Constitution has been delegated for    purposes of implementation to the Attorney General, who has in turn delegated the adjudicatory portion    of that authority to us and to the Immigration Judges. Thus, our responsibility to give precise meaning to    legislative terms must always be at the service of implementing the will and intent of Congress. Here,    there is no reasonable ground to disagree that, from the enactment of the AEDPA forward, Congress    intended that mandatory detention of criminal aliens be a new and fundamental directive in immigration policy. The majority appears to acknowledge that clear intent, yet, for reasons that I find    inexplicable, refuses to implement it.

I fear that this exercise of statutory deconstruction will ill-serve the Board and frustrate the very purposes for which the parties have advanced it. The mandatory detention provisions of the AEDPA and the IIRIRA are controversial and have imposed burdens on criminal aliens and their families, as well as on    the resources of the Service. We must assume, however, that these are burdens that Congress felt ought to be imposed because of the risks inherent in previous, more generous policies of release. It is for Congress, not the Service, and not the Board, to alleviate those burdens. The risk of today's decision is that Congress's first priority in revisiting the issue of criminal alien detention may be to address the ``gap"    that we have needlessly created in our decision today.

CONCURRING AND DISSENTING OPINION: Lory Diana Rosenberg, Board Member

I respectfully concur in part and dissent in part.

I agree with the majority's conclusion that the respondent is not subject to mandatory detention under    section 236(c) of the Immigration and Nationality Act, 8 U.S.C. § 1226(c) (Supp. II 1996), because he was not released from criminal incarceration [1.] ``after the expiration of the 2-year period" during which the Transition Period Custody Rules (``TPCR") were in force. *Matter of Adeniji,* Interim

---

Copyright 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

Decision 3417, at 8 (BIA 1999); *see also Matter of Noble,* 21 I. & N. Dec. 672, 680-81 (BIA 1997) (criticizing the concurring and dissenting opinion for its interpretation of the ``released after'' effective date language in section 303(b)(2) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-586 (``IIRIRA''), relating to section 236(c) of the Act). I also agree that whether the respondent poses any danger to persons or property is a relevant consideration in determining the terms of release from detention by the Immigration and Naturalization Service under section 236(a) of the Act. *See Matter of Andrade,* 19 I. & N. Dec. 488, 489 (BIA 1987). I part ways with the majority, however, with respect to its analysis of the two principal statutory provisions at issue, and with respect to its decision to remand this case to the Immigration Judge.

As I discussed in my concurring and dissenting opinion in *Matter of Noble, supra,* our interpretation of the   statutory phrases ``released after'' in section 303(b)(2) of the IIRIRA and ``when the alien is released'' in   section 236(c) of the Act go hand in hand, referring, as did earlier statutory language, to the detention   of a noncitizen by immigration authorities once he or she has completed a period of imprisonment for a   criminal conviction. *Id.* at 695-97 (Rosenberg, concurring and dissenting). Moreover, while I agree with   the dissenting opinion of Chairman Schmidt that the Immigration Judge's decision to release the   respondent was based on a proper evaluation of the relevant bond factors and that ``a remand is   pointless,'' I find no reason in the ``concerns expressed by the majority,'' to increase the amount of bond   that must be posted to secure the respondent's release beyond the minimum of $1,500 required by the   statute. *Matter of Adeniji, supra,* at 19-20 (Schmidt, dissenting); *see also* section 236(a) of the Act.

I agree with Chairman Schmidt that it is time to decide the respondent's bond appeal-which has been   pending for well over a year-and to move   on. Nevertheless, for jurisprudential reasons, I am compelled to address portions of the majority opinion, which I find to accede so grudgingly to the joint position asserted by the parties and to give no more than a passing mention to the virtually unanimous body of federal district court law rejecting our analysis in *Matter of Noble, supra.* I also find the dissenting opinion of Board Member Grant, which appears to challenge the result reached by the majority and seems   to suggest that we should look to some abstract indicia of congressional intent apart from the plain   language, or a reasonable agency interpretation, of the statute, to warrant discussion.

## I. DETENTION OF THE RESPONDENT UNDER SECTION 303(b)(2) OF THE IIRIRA AND SECTION 236(c)   OF THE ACT

The Immigration Judge's redetermination of the respondent's detention by the Service originally was   subject to the Transition Period Custody Rules enacted by Congress and activated by the Attorney General under section 303(b) (3) of the IIRIRA. Applying this then-controlling statutory authority, the Immigration Judge ordered the respondent released on his own recognizance, because ``the Service admitted that the respondent's   criminal conviction was not a `particularly serious crime,' '' and because of the respondent's extensive family ties to the United States (including his wife, who was granted asylum by the Service, and his two United States citizen children). On March 11, 1998, the Board   granted the Service's motion for a stay of the Immigration Judge's order resulting from the bond redetermination, pending our adjudication of the Service's appeal from that order.

While the Service's appeal was pending, the applicable law changed. The period during which the TPCR   were allowed to substitute for the detention provisions enacted as section 236(c) of the Act expired.   According to the specific language of section 303(b) (2) of the IIRIRA, Congress provided that section 236(c) of the Act ``shall apply to individuals released after [the expiration of the TPCR on October 9, 1998].'' Section 236(c) of the Act provides that the Attorney General shall take into custody any alien   who has committed or been convicted of certain enumerated crimes ``when the alien is released, without   regard to whether the alien is released on parole, supervised release, or probation, and without regard to   whether the alien may be arrested   or imprisoned again for the same offense.''

Copyright 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

It is undisputed that the respondent was released from criminal incarceration well before October 9, 1998.   Owing to the passage of time, the TPCR have expired and our determination of the Service's appeal of   the Immigration Judge's bond order is governed by section 236(c) of the Act. The questions before us are   whether the terms of section 236(c) mandate that the respondent remain detained, and if not, under   what standard he may be released from custody.

A. Plain Language: ``Released After'' and ``When the Alien Is Released''

A statute's legislative purpose is expressed by its plain language. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-43 (1984); *INS v. Phinpathya,* 464 U.S. 183, 189 (1984); *United States v. American Trucking Ass'ns,* 310 U.S. 534, 543 (1940) (ruling that ``there is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes''). We too recognize that ``it is assumed that the legislative purpose is expressed by the ordinary meaning of the words... [and that] the language of the statute must ordinarily be regarded as conclusive....'' *Matter of Noble, supra,* at 677 (citing *INS v.    Cardoza-Fonseca,* 480 U.S. 421, 431 (1987)); *see also Matter of M/V Signeborq,* 9 I. & N. Dec. 6, 7-8 (BIA 1960) (holding that ``the language of the law cannot be enlarged beyond the ordinary meaning of its    terms'').

Notably, in *Matter of Noble, supra,* at 678, the Board ruled that ``our reading [of the transition rule statute] comports with a `plain meaning' statutory construction and is wholly consistent with congressional intent.'' *See also id.* at 694 (Rosenberg, concurring and dissenting) (agreeing that the language is plain, but challenging the majority's interpretation of the language in the TPCR and section 236(c) of the Act as not comporting with the plain meaning of the terms in the statute). Given that we unanimously determined the language of the TPCR to be plain in *Noble,* I cannot now agree with the majority's assertion that the ``last sentence of section 303(b) (2)... is [not] free from uncertainty.'' *Matter of Adeniji, supra,* at 9.

First, the provisions that we are addressing here are, in effect, effective date provisions. *See, e.g., Rivera v. Demore,* No. C-99-3042 TEH, 1999 WL 521177, at *5 (N.D. Cal. July 13, 1999) (citing *Landgraf v. USI Film Products,* 511 U.S. 244, 280 (1994)); *Grant v. Zemski,* 54 F. Supp.2d 437, 443 (E.D. Pa. 1999); *Velasquez v. Reno,* 37 F. Supp. 2d 663, 670, 671 n.8 (D.N.J. 1999); *see also Matter of Noble, supra,* at 689-92, 694-95 (Rosenberg, concurring and dissenting); *Matter of Valdez,* 21 I. & N. Dec. 703, 720 (BIA 1997) (Rosenberg, dissenting) (noting that over 10 federal courts had found, contrary to the thesis advanced by the majority, that applying the amended rules to an alien previously released from incarceration not only offended constitutional considerations, but resulted in an impermissibly retroactive application of the TPCR). Section 303(b) (2) of the IIRIRA states that ``after the end of such 1-year or 2-year periods [during which the TPCR are effective], the provisions of such section 236(c) shall apply to individuals released after such periods.'' (Emphasis added.) The operative words, ``released after such period,'' clearly refer to the period after the expiration of the TPCR. The temporal limitations in the statute    attached to the use of the    word ``released'' make clear that the release contemplated by Congress    to trigger mandatory custody under section 236(c) of the Act is prospective; it may only occur after    October 8, 1998, the date on which the provisions of the TPCR expire.

Second, while the majority concedes that ``the natural sense of the words'' in section 303(b) (2) of the    IIRIRA supports the construction proposed by the parties, the majority inexplicably persists in questioning    the use of those words on the basis that ``the term `released' is not expressly tied to any other language    [that would clarify whether Congress was referring to a release from criminal custody or from Service    custody].'' *Matter of Adeniji, supra,* at 9. To the contrary, the context in which this language appears    supports the conclusion that the plain meaning of the words refers to release from criminal incarceration    rather than release from Service custody. *See K Mart Corp. v. Cartier Inc.,* 486 U.S. 281, 291 (1988); *see    also Rivera v. Demore, supra,* at *5; *Velasquez v. Reno, supra,* at 670; *Pastor Camarena v. Smith,* 977 F.    Supp. 1415, 1417 (W.D. Wash. 1997). In particular, Congress' use of the term ``released'' in section 236(c) further illuminates its use of the term ``released'' in section 303(b) (2) of the IIRIRA, the    provision at issue here. *See Matter of Noble, supra,* at 695-97 (Rosenberg,

Copyright  2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved.

concurring and dissenting).

The specific terms of section 236(c) of the Act expressly go on to broadly construe ``when the alien is   Released'' to encompass releases on ``parole, supervised release, or probation, and without regard to...   arrest or imprisonment again for the same offense.'' Section 236(c) (1) of the Act. These types of   ``release'' involve restrictions that exclusively relate to individuals in the criminal justice system who have   completed a period normally following actual criminal incarceration. *See Cuomo v. Barr,* 7 F.3d 17, 18 (2d   Cir. 1993) (finding that although ``the term 'release' is not defined except as to include 'parole,' 'supervised release,' and 'probation,' ... the term 'supervised release' ... replaced the special parole'   which was ` ``a period of supervision served upon completion of a prison term.' '' *Gozlon-Peretz v. United   States,* 498 U.S. 395, 399 (1991) (quoting *Bifulco v. United States,* 447 U.S. 381, 388 (1980))'' (citations   omitted)). What Congress is   indicating by using this limiting language is that a noncitizen is   subject to detention by the Service once his period of incarceration ends and he is released from actual   imprisonment, notwithstanding that he still may be satisfying the terms of a sentence imposed by a   criminal court.

By contrast, nothing in the Act authorizes such parole, supervised release, probation, or subsequent   arrest or imprisonment as a civil penalty related to charges of removability. Thus, the clause in section 236(c) of the Act referring to an alien who is ``released'' clarifies that Congress intended the term   ``released'' to refer to release from criminal incarceration. It follows that in enacting the TPCR section in   the IIRIRA, Congress intended that noncitizens released from criminal incarceration while the TPCR were in   force would be taken into custody by the Service and detained subject to the terms of the TPCR, and   that those who were released from criminal incarceration after the TPCR expired would be subject to   being taken into custody by the Service according to the mandatory detention provisions set forth in   section 236(c) of the Act.

I find mind boggling the majority's unwillingness to accept the   statutory references to an alien who is taken into custody by the Attorney General ``when released [from criminal incarceration]'' under section 236(c) of the Act, and an alien who is ``released [from criminal incarceration custody] after'' the end of the TPCR period, to whom section 236(c) then would become applicable, as referring to the same type of ``release.'' *See Matter of Adeniji, supra,* at 8 (emphasis added); *Matter of Noble, supra,* at 679-80. We have every reason to presume that Congress intended the same term, ``released,'' to be understood similarly in each provision, as ``it is axiomatic that 'identical words used in different parts of the same act are intended to have the same meaning.' '' *Sale v. Haitian Centers Council, Inc.,* 509 U.S. 155, 203 n.12 (1993) (quoting *Atlantic Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427, 433 (1932)).

In his dissenting opinion, Board Member Grant charges that the majority makes the one choice that he   believes to be manifestly contrary to the clear intent of Congress, to require detention of criminal aliens   such as the respondent. Board Member Grant contends that even the majority views its decision as   militating   ``against the clear design of the statute: to constrain or even eliminate the capacity of   aliens who have committed crimes to remain at liberty.'' *Matter of Adeniji, supra,* at 22 (Grant,   dissenting). He finds this position inexplicable because he concludes that ``here, there is no reasonable   ground to disagree that, from the enactment of the AEDPA forward, Congress intended that mandatory   detention of criminal aliens be a new and fundamental directive in immigration policy.'' *Id.* at 23.

However, we are neither legislators nor mind readers, but adjudicators. The Board has emphasized that in   the absence of ``clearly expressed legislative intention,... inferences... are insufficient to override the   literal language of the statute.... We are not at liberty to rewrite the literal language... [and] any   changes to the express language must be left to Congress.'' *Matter of Noble, supra,* at 685-86. Nowhere   in Board Member Grant's dissent does he attempt to account for the plain language that Congress used in   the statute, or to rationalize his concerns as being consistent either with applicable principles of   statutory construction or with the considerable federal   court authority,

Copyright 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

discussed below, to the    contrary.

With all due respect, Board Member Grant has it backwards: we discern congressional intent from the    explicit language Congress uses in the statute. We do not imbue the statutory language with whatever    meaning we feel certain that Congress intended. In discerning the intent of Congress, ``Our compass is    not to read a statute to reach what we perceive-or even what we think a reasonable person should    perceive -- is a `sensible result.' " *Bifulco v. United States,* 447 U.S. 381, 401, 402 (1980) (Burger, C.J.,    concurring) (``The temptation to exceed our limited judicial role... takes us on a slippery slope. Our duty    ... [is to] apply the law and hope that justice is done." (citing *The Spirit of Liberty: Papers and    addresses of Learned Hand* 306-07 (Dilliard ed. 1960))).

Finally, employing a literal interpretation of section 303(b) (2) of the IIRIRA in concluding that section 236(a) controls the bond redeterminations of aliens who are not subject to section 236(c) of the Act    does not yield absurd or anomalous results. *See Chapman v. United States,* 500 U.S. 453, 463 (1991)    (ruling that ``[a] straightforward reading of [the federal    statute] does not produce a result `so absurd or glaringly unjust,' " *United States v. Rodgers,* 466 U.S. 475, 484 [] (1984)); *see also Matter of Fuentes-Campos,* 21 I. & N. Dec. 905 (BIA 1997). As discussed below, custody determinations made under such a standard may include consideration of dangerousness. Furthermore, as the Supreme Court concluded in *Bifulco v. United States, supra,* at 400-01:

If our construction... clashes with present legislative expectations, there is a simple remedy-the insertion of a brief appropriate phrase, by amendment, into the present language .... But it is for Congress, and not this Court, to enact the words that will produce the result the Government seeks in this case.

### B. Federal Court Review of the Statute

Virtually every federal court that has addressed the issue has ruled that section 236(c) of the Act applies    only to aliens ``released" from criminal incarceration on October 9, 1998, and has found the statutory    language to be plain, not ``uncertain." *Cf. Matter of Adeniji, supra,* at 12. Similarly, each of these federal    courts has understood the ``release" in question to be release from criminal incarceration.

In so ruling, each of these federal courts has considered the issue of whether section 236(c) of the Act    applies to persons released from criminal incarceration prior to October 9, 1998, and has struck down the    interpretation of the term ``released" suggested by our decision in *Matter of Noble, supra,*and adopted    by the Service under the current regulations. *See, e.g., Miranda-Arteaga v. Reno,* No. CV-99-0949 (M.D.    Pa. July 1, 1999); *Velasquez v. Reno, supra; Abdel-Fattah v. Reno,* No. 99-CV-0947 (M.D. Pa. June 28, 1999); *Grant v. Zemski, supra; Aguilar v. Lewis,* 50 F. Supp.2d 539 (E.D. Va. 1999); *Alvarado-Ochoa v.    Reno,* No. 99-0470-IEG (AJB) (S.D. Cal. May 28, 1999); *Baltazar v. Fasano,* No. 99-CV-380 BTM (S.D.    Cal. Mar. 25, 1999); *Reyes-Rodriguez v. Fasano,* No. 99-CV-0023 (S.D. Cal. Feb. 26, 1999); *Alves-Curras    v. Fasano,* No. 98-CV-2295 (S.D. Cal. Feb. 22, 1999); *Alwaday v. Beebe,* 43 F. Supp.2d 1130 (D. Ore. 1999).

These cases all hold that the plain language ``released" in both section 236(c) of the Act and section 303(b) (2) of the IIRIRA makes clear that only aliens who are released from criminal incarceration on or    after    October 9, 1998, are subject to mandatory detention. Specifically, ``IIRIRA § 303(b) (2) clearly sets forth the express command of Congress that the permanent mandatory detention provisions are to be applied to aliens who were released after the transitional rules expired. *Velasquez v. Reno, supra,* at 671 (emphasis added). As the district court in *Miranda-Arteaga v. Reno, supra,* the district wherein the respondent's case arises, stated succinctly,

Section 236(c) states that ``the Attorney General shall take into custody any alien who... is deportable by reason of having committed [a deportable offense]... when the alien is released..." 8 U.S.C. § 1226(c). Congress further provided that section 236(c) ``shall apply to individuals released after [the expiration of the transitional rules]." Illegal Immigration Reform and Immigrant

---

Copyright  2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved.

Responsibility Act of 1996 (``IIRIRA'') § 303(b) (2); *Velasquez v. Reno,* 37 F. Supp.2d. at 671-73; *Alwaday v. Beebe,* 1999 WL 184028 (D. Or., Jan. 29, 1999). IIRIRA § 303(b) (2) clearly sets forth the express command of Congress that the permanent mandatory detention provisions are to be applied to aliens who were released    after the transitional rules expired. *Velasquez,* 37 F. Supp.2d. 671 (emphasis in original). The mandatory detention rule of § 236(c) thus does not apply to aliens released before the expiration of the Transition Period Custody Rules on October 9, 1998. Two district courts in this Circuit have reached the same conclusion on factual circumstances very similar to the recent action. *Velasquez, supra; Grant, supra.* I find their reasoning compelling and for the sake of expedition, adopt their analysis.

*Id.* at 6.

These courts have universally rejected the majority's reading of the statutory language of the TPCR,   which was set forth in *Matter of Noble, supra,* as a ``deviation from the plain language of section 303(b)(3)(A)." *See Rivera v. Demore, supra,* at *5 (remarking on the Board's dismissal of the phrase ``when the alien is released" as having no purpose other than serving as a modifier to alert the Attorney General when to take an alien into custody as ``this curious interpretation"). In addition, at least one court has rejected as ``unconvincing" the Board's original interpretation of the term ``released," which was   based on its ``disbelief   that Congress meant to narrow the class of criminal aliens subject to mandatory detention." *Id.*

### C. Constitutional Considerations

Notably, no court that has addressed the propriety of a petitioner's detention on the merits under these   rules as they were previously interpreted has upheld a determination that the mandatory detention of the   petitioner without access to a hearing before an impartial adjudicator is warranted. In part, this is due to   the fact that the significant liberty interests implicated in the context of the current detention provisions   militate in favor of the most restrictive interpretation of the statute that is permissible. *See generally   United States v. Himler,* 797 F.2d 156, 158 (3d Cir. 1986) (interpreting language narrowly where 1984 Bail   Reform Act marked a ``radical departure" from former federal bail policy).

The encroachment on the liberty interests of an alien deemed to be subject to mandatory detention   raises questions of constitutional magnitude concerning the reach of the TPCR and section 236(c) of the   Act. *See Cabreja-Rojas v. Reno,* 999 F. Supp. 493, 496 (S.D.N.Y. 1998); *St. John v. McElroy,* 917 F.   Supp. 243, 250 (S.D.N.Y. 1996) (finding   the interest in freedom from confinement to be ``of the   highest constitutional import"). As I noted in my dissenting opinion in *Matter of Valdez, supra,* at 718 (Rosenberg, dissenting), the canons of statutory construction militate in favor of a restrictive   interpretation of a statutory provision ``if a broader meaning would generate constitutional doubts." *United   States v. Witkovich,* 353 U.S. 194, 199 (1957); *see also Lyng v. Northwest Indian Cemetery Protective   Ass'n,* 485 U.S. 439, 445-46 (1988).

While the Board may not decide the constitutionality of a statute, we do have the duty to render our   decisions in a manner that will avoid constitutional questions. *Matter of Cenatice,* 16 I. & N. Dec. 162 (BIA 1977). Certainly, it is beyond dispute that constructions that cast doubt on a statute's constitutionality should be avoided. *Public Citizen v. Department of Justice,* 491 U.S. 440, 465-466 (1989); *cf. Matter of Joseph,* Interim Decision 3387 (BIA 1999) (contending that the Justice Department's regulations took into account a detained alien's ``constitutional and liberty interests"). Taken   together, the statutory issues and the constitutional questions that follow   close behind warrant rejecting the objections voiced by Board Member Grant and adhering to the result reached by the majority.

The overwhelming majority of district courts that have considered mandatory immigration detention   statutes, prior to this most recent enactment, have found them unconstitutional. *See, e.g.,*

Copyright 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

*Kellman v. District Director, United States INS, supra; Paxton v. United States INS,* 745 F. Supp. 1261 (E.D. Mich. 1990), *aff'd on other grounds,* 954 F.2d 1253 (6th Cir. 1992); *Agunobi v. Thornburgh,* 745 F. Supp. 533 (N.D. Ill. 1990); *Leader v. Blackman,* 744 F. Supp 500 (S.D. N.Y. 1990). In particular, such statutes were found to violate the constitutional guarantees of substantive and procedural due process, and the prohibition against excessive bail. *See, e.g., St. John v. McElroy, supra* (finding mandatory detention of lawful permanent residents under former section 236(e) of the Act unconstitutional). The principles upheld in these cases apply with equal force to the issue now before us.

## II. FACTORS WARRANTING CHANGE IN CONDITIONS OF DETENTION AND RELEASE ON IMMIGRATION BOND

Custody redetermination for aliens released from criminal incarceration prior to the expiration date of the TPCR (after which time section 236(c) of the Act governs), still are subject to discretionary standards. Looking to section 303(b)(3)(B) of the IIRIRA, a criminal alien who was eligible for release under the TPCR had to demonstrate that he would not pose a danger to the safety of others if released and that he would be likely to appear in court. Furthermore, he either had to have been lawfully admitted to the United States or, if not, his country of removal had to be unwilling to accept him. Therefore, nonviolent criminal aliens could obtain a bond, whereas dangerous criminals could be held in detention.

As I read the majority opinion, the Board now requires a respondent who has been convicted of a criminal offense or other prohibited activity contrary to national security interests, but who is not subject to mandatory detention, to establish that he or she does not pose a danger to persons or property and is not likely to abscond. These factors are those that controlled under section 303(b)(3)(B)(i) of the IIRIRA. Similarly, former section 242(a)(2)(B) of the Act, 8 U.S.C. § 1252(a)(2)(B) (1994), provided that the Attorney General may not release an alien convicted of an aggravated felony unless the alien demonstrates that he or she has been lawfully admitted to the United States, does not present a threat to the community, and is likely to appear for any scheduled hearing. *See Matter of Ellis,* 20 I. & N. Dec. 641, 643 (BIA 1993).

Thus, I find a fairly clear declaration by the majority that the standard to be imposed is the one articulated under the TPCR and our precedents interpreting the immediately preceding versions of the detention statute authorizing immigration detention in which the respondent bears the burden of proof. *Matter of Ellis, supra.* That said, however, I do not find it necessary to conclude that 8 C.F.R. § 236.1(c)(8) (1999) controls our adjudication of the terms of the respondent's bond under section 236(a) of the Act. *Cf. Matter of Drysdale,* 20 I. & N. Dec. 815 (BIA 1994). Nor do I agree that section 236(a) of the Act or 8 C.F.R. § 236.1(c)(8) creates a presumption of dangerousness.

Moreover, I cannot agree with the spectre raised by Board Member Grant that ``that class of aliens `released' during the Transition Period defined in section 303(b)(2) of the IIRIRA (and, perhaps, for that class released before the Transition Period, the class at issue in *Noble*),... can have their custody status determined under the most minimal standard now existing in the statute.'' *Matter of Adeniji, supra,* at 21 (Grant, dissenting). There is nothing in the majority opinion that relieves a convicted alien who has been released from criminal incarceration before the effective date of section 236(c) (occurring upon the expiration of the TPCR) from demonstrating that he or she is not a danger to persons or property and will not abscond.

Specifically, as I documented in *Matter of Noble, supra,* we have been perfectly capable of ordering criminal aliens who pose a threat to our communities to be held in or returned to Service detention, or to be released only under a significant bond. For example, in *Matter of Shaw,* 15 I. & N. Dec. 794 (BIA 1976), decided 20 years ago, we cited the complete lack of information regarding community ties, coupled with an undocumented entry and pending criminal possession of firearms charges, as warranting dismissal of an appeal of a $ 10,000 bond. In *Matter of Andrade, supra,* decided in 1987, we recognized that despite a record of long residence and family ties for much of the 12-year period prior to his arrest by the Service, the respondent had been involved in criminal activity involving

Copyright 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

attempted   robbery and other theft of property, and we imposed a $ 10,000 bond. More recently, in *Matter of Kalifah,* 21 I. & N. Dec. 107 (BIA 1995), where no conviction or incarceration of any sort was involved, we readily   invoked the flight risk factor under section 242(a)(1) of the Act to agree with the Immigration Judge in   concluding that an alien, who was charged with a serious crime involving terrorism abroad, was best held   without any bond at all.

I also disagree with the position taken by the majority that we may not consider portions of the record   made before the Immigration Judge in a hearing on the merits that already has been resolved in the   respondent's favor, for purposes of resolving bond issues in the case of an alien whom the Service continues to hold in detention.

The language of the regulation, which instructs that bond redetermination hearings shall be held separate   and apart from the removal hearing, makes it plain that evidence considered by an Immigration Judge during a removal hearing may be considered in redetermining bond, notwithstanding the rule that   evidence presented at a bond hearing cannot be used to establish removability. The regulation at 8 C.F.R. § 3.19(d) provides that:

> Consideration by the Immigration Judge of an application or request of a respondent regarding custody or bond under this section shall be separate and apart from, and shall form no part of, any deportation or removal hearing or proceeding. The determination of the Immigration Judge as to custody status or bond may be based upon any information that is available to the Immigration Judge or that is presented to him or her by the alien or the Service.

It is clear from this language that evidence presented in a removal hearing may be considered for   purposes of bond redetermination. The underlying purpose of the regulation is not to limit the information   an Immigration Judge may consider in redetermining bond, but to insure that evidence presented in the   far more informal bond hearing does not taint the ultimate adjudication of the charges of removability, in   which the Service often carries the burden of proof. *Matter of Chirinos,* 16 I. & N. Dec. 276 (BIA 1977) (holding that absent a showing of prejudice to the alien, a bond decision resulting from a joint   bond redetermination and deportation hearing will not be reversed).

Certainly, what transpires and is decided during a removal hearing may have a major impact on the alien's   eligibility for bond. *See, e.g., Matter of Joseph,* Interim Decision 3398 (BIA 1999); *Matter of Joseph,*   Interim Decision 3387, *supra.* In the instant case, consideration of the Immigration Judge's determination in the removal hearing is to the respondent's advantage, and there would be no prejudice to the respondent if the Board were to review the removal and bond records simultaneously in the course of considering the instant appeal. Although the Board ordinarily does not consider evidence offered on appeal, *see Matter of Soriano,* 19 I. & N. Dec. 764 (BIA 1988); *Matter of Obaigbena,* 19 I. & N. Dec. 533 (BIA 1988), the Board has issued its decisions after taking administrative notice of facts upon appeal. *Matter of H-M-,* 20 I. & N. Dec. 683 (BIA 1993) (affirming the Board's authority to take administrative notice).

Furthermore, based on the record now before us, we know that after a   hearing on the respondent's application for withholding of removal, the Immigration Judge granted that application and thereafter redetermined that the respondent should be released on his own recognizance. Even if we do not look to the record of the merits hearing or consider the Immigration Judge's decision granting the respondent withholding of removal, as the respondent requests, the undisputed fact that the Immigration Judge granted withholding establishes that the Immigration Judge did not find the respondent to be convicted of a ``particularly serious crime.''

Consequently, I would grant relief on the same basis that the Immigration Judge ordered the respondent's   release on his own recognizance. Unlike Chairman Schmidt, I see no basis in the majority opinion that   warrants altering the bond order originally entered by the immigration Judge and no reason to alter the   decision of the Immigration Judge other than to render an order in conformity with the statute as it   currently exists. Therefore, I favor an order finding the respondent eligible for release and

Copyright 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

setting his   bond at the minimum required by statute.

_____

Copyright  2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved.

**Matter of ANDRADE**
**In Bond Proceedings Pursuant to 8 C.F.R. Sec. 242.2(b)**
**A12271705**
**Board of Immigration Appeals**
**19 I. & N. Dec. 488 (BIA 1987); Interim Decision #3037**
**November 20, 1987**

**Editorial information: Annotation**

Order:  The appeal is sustained and the respondent is ordered held on bond in the amount of $10,000.

### syllabus

(1) In bond redetermination proceedings, the Board of Immigration Appeals may consider the respondent's extensive and recent criminal record in determining the necessity for a bond or the appropriate amount of a bond.

(2) The Board determined that the respondent's numerous convictions indicate a consistent disrespect for the laws of the United States and adversely reflect upon his character.

(3) In setting a substantial bond, the Board took into consideration the respondent's disrespect for the law, his poor character, and the effect of his crimes upon his eligibility for relief from deportation.

(4) An alien's early release from prison and transition to a parole status do not necessarily reflect rehabilitation, and, therefore, such facts do not carry significant weight in determining whether he is a good bail risk for immigration purposes.

**Counsel**

ON BEHALF OF APPLICANT:  Pro se
ON BEHALF OF SERVICE:  Beverley M. Phillips General Attorney

**Judges**

BY:  Milhollan, Chairman;  Dunne, Morris, and Vacca, Board Members Concurring Opinion: Heilman, Board Member

**Opinion**

**Opinion by**

BY:  Milhollan, Chairman;  Dunne, Morris, and Vacca, Board Members Concurring Opinion:  Heilman, Board Member

**Opinion**

The Immigration and Naturalization Service has appealed from an immigration judge's February 27, 1987, decision releasing the respondent on his own recognizance, after the district director had set

---

Immigration Precedent Decisions                                                                           1
Copyright 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved.

bond at $15,000. The appeal will be sustained and the bond will be raised to $10,000.

By Order to Show Cause, Notice of Hearing, and Warrant for Arrest of Alien (Form I-221S) dated February 20, 1987, the respondent was alleged to be a native and citizen of Mexico who was admitted to the United States on April 9, 1960, as a lawful permanent resident, but who was deportable for having been convicted of two crimes involving moral turpitude. See section 241(a)(4) of the Immigration and Nationality Act, 8 U.S.C. Sec. 1251(a)(4) (1982). At the time the Order to Show Cause was issued, the district director ordered a $15,000 bond. Following a bond redetermination hearing, the immigration judge determined that release on recognizance was appropriate for several reasons. She noted that the respondent had been a lawful permanent resident since the age of 3 and that his entire family are United States citizens or lawful permanent residents. The immigration judge found that, although the respondent had a criminal record, there was no evidence that he had ever failed to appear for immigration or criminal proceedings. She relied on the fact that the state parole authorities had granted the respondent early release. Such release, stated the immigration judge, `demonstrates an assessment by experts, who are better qualified than I am on such matters, that he is rehabilitated and does not constitute a threat to public safety,`and that he is not likely to abscond. In addition, the immigration judge considered the respondent's possible eligibility for a waiver of deportation under section 212(c) of the Act, 8 U.S.C. Sec. 1182(c) (1982). She expressed the view that the respondent has `many factors in his case which would militate toward a favorable exercise of discretion`on a section 212(c) application and that the respondent would therefore have every reason to appear for deportation proceedings to pursue this remedy. Citing Matter of Kwun, 13 I&N Dec. 457 (BIA 1969, 1970), the immigration judge held that the respondent should not be denied bail `for punitive reasons, nor should the alien be deprived of his liberty pending deportation proceedings unless there are compelling reasons.`She concluded that the decision to impose a $15,000 bond `reflects the displeasure`of the Service at the respondent's criminal record. Finding that the respondent was `not a flight risk,`she released him on his own recognizance.

The Service has filed a lengthy brief on appeal detailing why in its view the immigration judge's decision should be vacated and a substantial bond set. Without addressing each of the Service's contentions specifically, we agree that a substantial bond is necessary in this case.

We have held that an alien generally should not be detained or required to post bond pending a determination of deportability unless there is a finding that he is a threat to the national security or is a poor bail risk. Matter of Patel, 15 I&N Dec. 666 (BIA 1976). In determining the necessity for and the amount of bond, such factors as a stable employment history, the length of residence in the community, the existence of family ties, a record of nonappearance at court proceedings, and previous criminal or immigration law violations may properly be considered. See id.; Matter of San Martin, 15 I&N Dec. 167 (BIA 1974);  Matter of Moise, 12 I&N Dec. 102 (BIA 1967);  Matter of S-Y-L-, 9 I&N Dec. 575 (BIA 1962).

In the present case, the respondent does have a very long residence in this country, having lived here virtually all his life. He also has his family living here. However, he does not have a stable employment history. Indeed, during much of the last 12 years the respondent appears to have been engaged in criminal activity or incarcerated for his crimes. The respondent was convicted in 1975, as a juvenile, for attempted robbery. He was convicted of burglary twice, in 1981 and in 1985. In 1986, he was convicted of receipt of stolen goods. He was sentenced to 16 months' imprisonment for this crime and was released on probation in February of 1987. On April 1, 1987, the respondent was convicted for receiving stolen property.

We consider the respondent's extensive and recent criminal record to be a very serious matter militating against his release without a significant bond. While we do not consider a criminal record per se a reasonable basis for a high bond amount, we find it a relevant consideration in determining the necessity for or the appropriate amount of bond insofar as it relates to a respondent's character. More importantly, we find a conviction record relevant to a respondent's bond status to the extent that it relates to his potential eligibility for relief from deportation, which in turn may be an incentive or disincentive for

Copyright 2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

him to appear at his deportation hearing.  A respondent with a greater likelihood of being granted relief from deportation has a greater motivation to appear for a deportation hearing than one who, based on a criminal record or otherwise, has less potential of being granted such relief.

In the case at hand, the respondent's numerous convictions indicate a consistent disrespect for the laws of the United States and adversely reflect upon his character.  A respondent's character is one of the factors we consider in determining the necessity for or the amount of a bond.  Further, we do not agree with the immigration judge that the respondent's early release from prison on parole in February of 1987 indicates that he is rehabilitated and is unlikely to abscond.  Indeed, we find that the immigration judge placed undue reliance on the respondent's parole in reaching her decision.  Incarcerated individuals may be released from prison early on parole for reasons other than rehabilitation.  We do not believe this factor in and of itself carries significant weight in determining whether an alien is a good bail risk for immigration purposes.  We note that in this particular case the respondent was convicted on another criminal charge only 2 months after his release on parole.  Under these facts, we are unwilling to assume, as the immigration judge did, that the respondent's release on parole indicates his rehabilitation, and we are not persuaded that such parole warrants his release without bond in these proceedings.

More significantly, while we agree with the immigration judge that an alien's potential eligibility for relief from deportation can reflect on the likelihood of his appearance at deportation proceedings, we believe she placed undue weight on this respondent's eligibility for section 212(c) relief.  While the respondent obviously has equities which could weigh in favor of a grant of that relief, there also are very serious adverse factors militating against a grant of discretionary relief. Without ruling on the merits of such an application, a matter beyond the scope of our review in these bond proceedings, we conclude that the respondent's potential eligibility for relief under section 212(c) of the Act does not warrant his release without bond or on a minimal bond. While the respondent may appear statutorily eligible for such relief, his lengthy and recent conviction record negatively affects the discretionary grant of the same, thereby giving him less motivation to appear at his deportation hearing.

We emphasize that the setting of a substantial bond in this case does not represent punishment to the respondent for his crimes, an inappropriate action for the Board, the immigration judge, or the district director to take.  Rather, it reflects our conclusion that the respondent's crimes, combined with the other evidence of record, negatively affect the likelihood of his future appearance such that his release on a lower bond is not warranted. We note further that the Service has informed us that the respondent failed to appear for a scheduled deportation hearing on June 17, 1987, and that the respondent has not challenged this information.

Upon consideration of the totality of the circumstances in this case, we find that a $10,000 bond is necessary to ensure the respondent's appearance at future immigration proceedings. Accordingly, the Service's appeal will be sustained and the following order will be entered.


**Concur by**

CONCURRING OPINION:  Michael J. Heilman, Board Member

**Concur**

I respectfully concur.

This appeal may be sustained on the ground that the respondent failed to appear for his scheduled deportation hearing.  This is clear evidence that a bond is required to assure his appearance. While this factor arose subsequent to his filing of the bond appeal, in my view it may be taken into account where, as here, the respondent has had an opportunity to respond to the adverse information, and has failed to do so.

---

Copyright  2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved.

The majority's reliance on `character`as evidenced by his criminal convictions, as a basis to require a substantial bond, strikes me as likely to cause more problems than it will resolve. Since the term `character`is fairly nebulous, it may be seen as incorporating all types of behavior which would have little bearing on the possibility of an alien absconding.  I assume that the majority would limit the application of character determinations to egregious criminal behavior, and not to such factors as personal living arrangements, or the acceptance of welfare, or other similar indices of `bad`character.

Copyright  2001 Matthew Bender & Company, Inc., a member of the LexisNexis Group.  All rights reserved.