IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 1 1 2002

Michael N. Milby
Clerk of Court

EUGENIO REYNA-MONTOYA, ET AL.    )
                                 )
                    Petitioner,  )
                                 )
v.                               )
                                 )    Civil Action No. B-02-026
E.M. TROMINSKI,                  )
INS DISTRICT DIRECTOR            )
                                 )
                    Respondent.  )
_____)

**RESPONDENT'S MOTION FOR STAY PENDING APPEAL**

Respondent, through undersigned counsel, respectfully moves the Court to stay, pending appeal to the United States Court of Appeals for the Fifth Circuit, its September 9, 2002, order certifying a class of detainees held pursuant to Immigration and Nationality Act ("INA") § 236(c), 8 U.S.C. § 1226(c), and granting them injunctive relief[1]

**BACKGROUND**

The petitioners are two lawful permanent resident aliens, citizens and nationals of Mexico, ordered removed for possession of marijuana. Petitioner Eugenio Reyna-Montoya was convicted of possessing marijuana, sentenced to three years probation in deferred adjudication in November of 2001, and has been in INS

_____

[1] The Court issued two documents. An eight page decision, outlining its legal reasoning, ("Decision"), and a two-page order ("Order").

1

custody since that time.  Petitioner Juan Luis Gonzalez-Sanchez
was convicted of possessing marijuana, sentenced to seven years
probation in October of 2001, and has been in INS custody since
December of 2001.

Petitioners filed their habeas petition on March 20, 2002,
seeking injunctive relief, declaratory judgment, and the
certification of a class defined as all present and future alien
lawful permanent residents detained at the Harlingen INS facility
under INA § 236(c).  On May 13, 2002, the Magistrate Judge issued
his Report and Recommendation, which recommended granting the
request for class certification, granting the habeas petition,
and providing the petitioners with a bond hearing within ten days
of adoption of the Report and Recommendation.  On September 9,
2002, this Court adopted in part the Report and Recommendation of
the Magistrate Judge and issued an order certifying this case as
a class action and "issued a preliminary and permanent injunction
upon the government, effectively restraining and enjoining them
from detaining legal permanent residents in deportation
proceedings in the Harlingen INS district without a bond
hearing.[2]'"  Order, Item 6.

---

[2] "Lawful permanent residents held in the Harlingen District
under the authority of 8 U.S.C. § 1226(c)(1)" [INA Sec. 236(c)]
is the certified class in this case.  Therefore, the injunction
is class-wide.

2

**DISCUSSION**

For a stay pending appeal, the moving party must address four factors:  (1) the likelihood of success on the merits; (2) the likelihood of irreparable harm if the stay is not granted; (3) the absence of harm to opposing parties; and (4) the public interest.  Hilton v. Braunskill, 481 U.S. 770, 776 (1987); Ignacio v. I.N.S., 955 F.2d 295, 299 (5th Cir. 1992).  "If a serious legal question is involved, the first prong of the test requires a showing only of 'a substantial case on the merits.'" Ignacio v. I.N.S., 955 F.2d at 299 (citing Ruiz v. Estelle, 650 F.2d 555, 565 (5th Cir. 1981), cert. denied, 460 U.S. 1042 (1982)).  Because this case concerns a question regarding the constitutionality of a provision of the Immigration and Nationality Act, the resolution of which would have widespread consequences in contravention of expressed Congressional intent and the clearly delegated statutory authority of the Attorney General, it necessarily involves a serious legal question.  Under the above standard, a stay is warranted in this case.

## 1.  Substantial Case on the Merits

The Respondent's appeal is premised upon several grounds which independently, and when examined as a whole, establish a

likelihood of success on the merits and certainly at a minimum, a
substantial case on the merits.  First, the Court's class-wide
injunctive order violates INA § 242(f)(1), which prohibits any
Court, other than the Supreme Court, from issuing an injunction
except in individual cases.  Second, certification of a class in
habeas litigation is inappropriate generally and especially in
this case.  Third, the class certified in this case does not meet
the adequacy requirement in that the named petitioners will not
adequately represent the interests of the class.  Fourth, the
Court erred in finding that the named petitioner Eugenio Reyna-
Montoya is a member of the class, where he is no longer held
under INA § 236(c) and is under a statutory provision allowing
for detention review and possible release on bond.  Finally, the
Court erred in finding INA § 236(c) unconstitutional.

### A.    The Court Is Without Jurisdiction to Issue a Class-Wide Injunction.

The U.S. Supreme Court in Reno v. American-Arab Anti-
Discrimination Committee, 525 U.S. 471 (1999), noted that class-
wide injunctive relief is prohibited by INA § 242(f), and it is
prohibited in the context of INA § 236(c):

> By its plain terms, and even by its title, that
> provision is nothing more or less than a limit on
> injunctive relief.  It prohibits federal courts from
> granting classwide injunctive relief against the
> operation of §§ 1221-1231, but specifies that this ban
> does not extend to individual cases.

American Arab, supra, at 481-482.  INA § 236(c), 8 U.S.C. §
1226(c), clearly falls within the proscription.

4

The Court's decision omitted a discussion of whether the class certification constituted a class-wide habeas petition. Decision at 3, footnote 1.  In this regard, the Court observed that the petitioners "do not seek to  certify a class for their habeas corpus petitions; they merely seek class status for purposes of securing . . . declaratory judgments, as well as individual injunctions on their own behalf, and on behalf of other class members." Decision at 3.  However, that is not what the Court did in this case.  As the above-cited item 6 of the Court's order indicates, the Court clearly issued a class-wide injunction, and therefore violated INA § 242(f).[3]

---

[3]Furthermore, assuming for the sake of argument that the Court had, as the petitioners proposed, issued merely class-wide declaratory relief with individual injunctions, this scheme, too, would violate INA § 242(f).  Presumably, under this scheme, petitioners' individual injunctions would issue from the class-wide declaratory judgment.  Any member of the class might, once the class is certified and declaratory judgment is rendered, merely file a habeas petition in the district court, allege class membership, cite to the class-wide declaratory judgment, and claim his or her injunction.  But INA §242(f) cannot be circumvented so easily.

Chapter 151 of Title 28 of the United States Code outlines the procedure for declaratory judgments.  Section 2201 of Title 28, entitled "Declaratory Judgments," reads as follows:

   . . .any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a)(emphasis added).  In the case at bar, any member of the certified class may walk into court with the declaratory judgment and seek his injunction under the provision of § 2202, which is entitled "Further Relief" and provides:

   Further necessary or proper relief based on a

**B.   Certification Of A Class Is Generally Inappropriate In Habeas Proceedings.**

In the case at bar, the Court certified the following class of litigants under Rule 23 of the Federal Rules of Civil Procedure: "all Legal Permanent Residents who are or will be held by Respondents without bond in the Harlingen INS District, under the authority of 8 U.S.C. § 1226(c)(1) for purposes of declaratory judgment only."[4/]  Given the nature of habeas corpus and its focus upon securing the liberty of an individual, in addition to the well-defined legislative considerations behind Section 236(c), certification of a entire class of persons "who are or will be" detained under Section 236(c) is inappropriate in the habeas corpus context.

The writ of habeas corpus historically has been used to review the legality of detention and its focus has been on affording relief to an individual in custody.  <u>INS v. St. Cyr</u>, 533 U.S. 289 at 290 (2001).  <u>See also Felker v. Turpin</u>, 518 U.S.

_____

<u>declaratory judgment</u> or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

28 U.S.C. § 2202 (emphasis added).  Thus, members of the class may obtain injunctions based on their membership in the class.  In such a case, were petitioners' scheme adopted, claiming that this is not a "class-wide injunction" merely winks at the reality that the petitioners' scheme operates precisely the way that INA § 242(f)(1) prohibits.

[4] As is discussed elsewhere, item 6 of the Court's order conflicts with the limitation of "for purposes of declaratory judgment only."

6

651 (1996).  The writ of habeas corpus gives a court power to direct an official to "produce the body" of a person in custody within the jurisdiction of the court issuing the writ.  Barry v. Brower 864 F.2d 294 at 301 (3d Cir. 1998).  The writ of habeas corpus "has been for centuries esteemed the best and only sufficient defence [sic] of personal freedom."  Ex parte Yerger, 8 Wall. 85, 95, (1869).  Federal courts have been authorized to issue writs of habeas corpus since the enactment of the Judiciary Act of 1789, and the federal habeas statute provides that federal judges may grant the writ of habeas corpus on the application of a prisoner held "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241.

One of the principal criteria for applying the writ of habeas corpus has been to secure the freedom of an individual in custody:

> The custody requirement of the habeas corpus statute is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty. Since habeas corpus is an extraordinary remedy whose operation is to a large extent uninhibited by traditional rules of finality and federalism, its use has been limited to cases of special urgency, leaving more conventional remedies for cases in which the restraints on liberty are neither severe nor immediate.

Hensley v. Municipal Court, San Jose Milpitas Judicial Dist., Santa Clara County, California 411 U.S. 345, 351-52 (1973).  The very text of 28 U.S.C. § 2241 sheds light on the historical role of habeas corpus.  The remedy of habeas corpus is targeted toward

7

individuals in custody, not classes of individuals who may be in

custody:

§ 2241. Power to grant writ

(c) The writ of habeas corpus shall not extend to a
prisoner unless--

(1) He is in custody under or by color of the authority
of the United States or is committed for trial before
some court thereof; or

(2) He is in custody for an act done or omitted in
pursuance of an Act of Congress, or an order, process,
judgment or decree of a court or judge of the United
States; or

(3) He is in custody in violation of the Constitution
or laws or treaties of the United States; or

(4) He, being a citizen of a foreign state and
domiciled therein is in custody for an act done or
omitted under any alleged right, title, authority,
privilege, protection, or exemption claimed under the
commission, order or sanction of any foreign state, or
under color thereof, the validity and effect of which
depend upon the law of nations; or

(5) It is necessary to bring him into court to testify
or for trial.

(Emphasis added).  Some cases recognize that courts at times have

relaxed the custody requirement, addressing restraints upon

liberty in contexts other than criminal confinement.  See Lehman

v. Lycoming County Children's Services Agency,  458 U.S. 502

(1982).  However, as the history and jurisprudence of the writ

show, it is historically a drastic remedy to protect the liberty

of an individual then in custody by the government and NOT as a

means to prospectively legislate on the legality of detentions of

unknown persons at some unknown point in the future.  See Jones

8

v. Cunningham, 371 U.S. 236, 243 (1963), (the "grand purpose" of
the writ is "the protection of individuals against erosion of
their right to be free from wrongful restraints upon their
liberty"); Carafas v. LaVallee, 391 U.S. 234, 238 (1968) (the
"province" of the writ "is to provide an effective and speedy
instrument by which judicial inquiry may be had into the legality
of the detention of a person").

In light of the unique nature of habeas corpus and the
individualized nature of it as a remedy, the imposition of a
class for habeas litigation is unusual indeed.  Courts have
recognized that class actions are generally inapplicable in
habeas litigation.  Napier v. Gertrude, 542 F.2d 825 (10th Cir.
1976); United States ex rel. Sero v. Preiser, 506 F.2d 1115, 1125
(2d Cir. 1974), cert. denied, 421 U.S. 921 (1975).

Given the history of habeas corpus as an extreme measure to
secure the liberty of individual persons in custody, and the
problems courts have recognized in litigating habeas petitions on
a class basis, it is readily apparent that the class
certification in the case at bar is unworkable.  The class
directs the release of persons yet unknown and, according to the
evidence, potentially outside the Harlingen District.  See,
Declaration of Charles R. Arendale, attached as Exhibit A.  In
that respect, since the members of the class are unidentified,
the class does not take into account that some of the members,
now or in the future, may have valid defenses to their removal

9

charges and thus may not be subject to further detention.[5]  In
that regard, the class certification is too broad and too poorly
defined to meet the requirements of either class action
litigation or the writ of habeas corpus.

Furthermore, the class does not meet the typicality
requirement, as members are classed on the basis of a status
which is, by law, a necessarily temporary and fluid one.  The
very fact that petitioner Reyna-Montoya is no longer a class
member perfectly illustrates the problematic nature of class
certification in § 236(c) habeas litigation.  It is the legal
equivalent of putting a round peg in a square hole.

### C.  The Class Certified in this Case Does Not Meet the Adequacy Requirement

There can be no assurance that the named petitioners can or

---

[5] Though the Court concludes otherwise, Respondents
respectfully submit that they did, in fact, challenge
commonality.  The following text from page 23 the Objections to
the Magistrates Report and Recommendation illustrates this:

This is precisely where petitioner's argument for
commonality fails.  As the attached declaration of
Aaron Cabrera (Exhibit A) demonstrates, the spectrum of
aliens in Harlingen includes aliens convicted of other
offenses -- sexual offenses, murder, etc. -- for which
such relief may not be applicable.  It therefore is
obvious that there is not a commonality of interest
among all present and future 236(c) detainees in
Harlingen, and therefore, certifying a class based on
the non-existent commonality of legal postures among
all present and future members of the class upsets the
purposes behind the requirement.  Simply put, if the
petitioners are not aggravated felons, they cannot
represent a class of aggravated felons.

will adequately represent the interests of the entire class
because the certification fails to distinguish between criminal
aliens for whom discretionary relief (e.g. cancellation of
removal) may be possible, and other criminal aliens for whom such
relief is likely not available.  Given the broad parameters of
the certified class, it is virtually certain that it contains
both convicted criminal aliens who are aggravated felons and
convicted criminal aliens who are not aggravated felons.  Non-
aggravated felons held under INA § 236(c) are eligible to apply
for cancellation of removal under INA § 240A, 8 U.S.C. § 1229b,
whereas aggravated felons are ineligible for all forms of relief
from removal.[6]  To that extent, an aggravated felon has much
greater incentive to aggressively litigate the constitutionality
of his or her detention.  The two named petitioners in the
present case are not aggravated felons in that they are convicted
of simple possession of marijuana under Texas law.  Therefore,
they are not representative of a class that contains aggravated
felons, and for this reason the named petitioners can not
adequately represent the interests of the entire class.

_____

[6]Indeed, as a recent Board of Immigration Appeals decision
notes, the adoption by the Board of uniform standards of defining
the term "aggravated felony," as that term is defined in 8 U.S.C.
§ 1101(a)(43)(B), may offer relief for some aliens convicted of
drug possession crimes.  Matter of Santos-Lopez, 23 I&N Dec. 419
(BIA 2002) (multiple drug possession offenses each classified as
a misdemeanor under Texas law do not individually or in the
aggregate constitute an aggravated felony).

11

### D.    The Principal Named Petitioner is Not a Member of the Class

On July 18, 2002, petitioner Eugenio Reyna-Montoya's appeal of the Immigration Judge's removal order was dismissed by the Board of Immigration Appeals.  Reyna-Montoya's removal order became final upon the BIA's dismissal of his appeal.  8 C.F.R. § 241.1(a).  As such, he is no longer held under INA § 236(c); his detention is now governed by INA § 241(a) which mandates detention of an alien for a period of 90 days while the government arranges for his deportation.  If the alien is not removed within 90 days, his custody status will be reviewed under the provisions of 8 C.F.R. § 241.4(c) to determine whether his continued detention pending removal is warranted.  Because he is no longer held in pre-order mandatory detention under INA § 236(c), he is no longer a class member and the Court's order arguably does not apply to him.

### E.    The Court Erred in Finding INA § 236(c) Unconstitutional

The existence of a substantial constitutional question is evident by the Supreme Court's grant of certiorari in Kim v. Ziglar, 276 F.3d 523 (9th Cir. 2002), a Ninth Circuit case which found INA § 236(c) unconstitutional.  See Demore v. Kim, — S.Ct. —, 2002 WL 704365, 70 USLW 704365 (U.S. Jun. 28, 2002) (No. 01-1491).  The Solicitor General's brief in Demore is attached as Exhibit B.

12

Controlling Supreme Court precedent confirms that a reviewing court's inquiry into the constitutionality of an immigration statute like INA § 236(c) is limited to determining whether the statute rationally relates to legitimate legislative ends. <u>Carlson v. Landon</u>, 342 U.S. 524, 532-33 (1952); <u>see also</u> <u>Mathews v. Diaz</u>, 426 U.S. 67, 82-83 (1976). Insuring that removable criminal aliens are available during their removal proceedings to facilitate a final administrative decision and expeditious removal, and preventing them from absconding or committing further crimes in the interim, are not only legitimate, but substantial and compelling, governmental goals.

The constitutionality of INA § 236(c) was sustained by the Seventh Circuit in <u>Parra v. Perryman</u>, 172 F.3d 954 (7th Cir. 1999)(finding that mandatory pre-order detention does not impermissibly infringe on an alien's due process rights under the Fifth Amendment). The Seventh Circuit's analysis weighed several factors: (1) the Government's compelling interests in lessening the risk of flight by an alien in removal proceedings whose removal was almost certain because of his serious criminal conviction; (2) the alien's diminished legal status as a person who is removable because of his criminal conviction; and (3) the alien's significantly curtailed opportunity to avoid removal because of the Illegal Immigration Reform and Immigrant Responsibility Act's legislative reforms, which made discretionary relief from removal largely unavailable for

13

criminal aliens.  Id.  The Seventh Circuit ultimately concluded that the balance of these factors favored the Government, and that considering Congress's and the Executive Branch's plenary authority in the immigration arena, longstanding judicial precedent upholding the Attorney General's authority to detain aliens pending deportation proceedings, and Congress's express intent to expedite the removal of criminal aliens under the 1996 legislative reforms, INA § 236(c) is constitutional.  Id.

Although there is a split among the Circuits that have entertained this issue, those Circuits that have found INA § 236(c) unconstitutional have uniformly relied upon a misreading of the Supreme Court's decision in Zadvydas v. Davis, 533 U.S. 678 (2001), and the Supreme Court has granted certiorari in the Ninth Circuit's decision in  Kim v. Ziglar, 276 F.3d 523 (9th Cir. 2002).  See Demore v. Kim, — S.Ct. —, 2002 WL 704365, 70 USLW 704365 (U.S. Jun. 28, 2002) (No. 01-1491).

In Zadvydas, the Supreme Court examined whether criminal aliens could, in accordance with the provisions of 8 U.S.C. § 1231 and consistent with the Due Process Clause, be detained indefinitely in the custody of the INS when they could not be deported because their native countries would not authorize their return, and the United States could not find another country willing to accept them.  Choosing not to reach the constitutional issue, the Court instead interpreted the statute as limited by a

14

"reasonableness" requirement. _Zadvydas_, _supra_, at 70-701.
Acknowledging the broad discretion that the Constitution and
Congress have afforded the Executive Branch to regulate
immigration and to conduct foreign policy, the Court stated that
a six-month period of continuing detention was presumptively
reasonable "in order to limit the occasions when courts" will
need to make "difficult judgments" in these sensitive areas. _Id._

        Although _Zadvydas_ dealt specifically with the potentially
indefinite post-final order detention of illegal aliens who
cannot be removed, the decision supports the position that the
detentions alleged here are constitutional in the first instance,
and is controlling on the question of the defendants' entitlement
to qualified immunity. While the Supreme Court held in _Zadvydas_
that the relevant provisions of 8 U.S.C. § 1231 could not be read
as allowing criminal aliens to be detained indefinitely merely
because no country would accept them, the Court expressly
acknowledged the possibility that even indefinite detention might
be permissible in certain situations, such as "terrorism or other
special circumstances where special arguments might be made for
forms of preventive detention and for heightened deference to the
judgments of the political branches with respect to matters of
national security." _Id_. at 696. The Supreme Court has also
counseled that "[a]ny rule of constitutional law that would
inhibit the flexibility of the political branches of government
to respond to changing world conditions should be adopted only

with the greatest caution." <u>Mathews v. Diaz</u>, 426 U.S. 67, 81

(1976). It therefore is clear that <u>Zadvydas</u> neither created nor

recognized a constitutional (or statutory) right to be removed as

soon as removal can be accomplished, but, instead, acknowledged

the permissibility of detaining an alien who is under a final

order of removal where the detention is supported by grounds such

as the enormous national security and foreign policy concerns

presented by the terrorist attacks of September 11, 2001.

For all of the above reasons, Respondent has a likelihood

of success on the merits of its appeal and at a minimum has

presented a substantial case on the merits.


### 2.    Irreparable Harm to Respondent


The Attorney General is responsible for enforcing the

immigration laws of the United States and for protecting the

community from dangerous criminal aliens. The certification of

such a broad class which includes both present and future

detainees and the granting of injunctive relief from "mandatory

detention" improperly interferes with the Attorney General's

statutory authority to enforce the immigration laws of the United

States and is contrary to the clear intent of Congress.

The Government has a compelling interest in lessening the

risk of flight by an alien in removal proceedings who has already

16

been convicted of a crime.  Congress enacted INA § 236(c) of the
Immigration and Nationality Act as a part of legislative reforms
under the Illegal Immigration Reform and Immigrant Responsibility
Act of 1996, Pub. L. 104-208, 110 Stat. 3009 (1996) ("IIRIRA").
The legislative history shows that there were several important
purposes underlying INA § 236(c):  (1) to prevent criminal aliens
from absconding so that they can be removed as required by law;
(2) to protect the public from the presence of potentially
dangerous criminal aliens; (3) to correct the failure of the
prior bond procedures, under which more than 20 per cent of
criminal aliens absconded prior to their proceedings; and (4) to
repair the serious damage to the American immigration system
caused by the Government's inability to detain criminal aliens
pending deportation and remove them promptly.[7] '  The Senate
Governmental Affairs Committee, for example, found that criminal
aliens "often fail[ed] to appear for their actual deportation"
and that in New York during fiscal year 1993, 88% of all aliens
who were ordered to surrender for deportation absconded.  S. Rep.
No. 48, 104th Cong., 1st Sess. 24 (1995); see also id. at 23 (as
of 1992, nearly 11,000 aliens convicted of aggravated felonies
had failed to appear for their deportation hearings).
Considering Congress's and the Executive Branch's plenary

--------

[7]See S. Rep. No. 48, 104th Cong., 1st Sess. (1995) (1995 WL
170285 (Leg.Hist.) at 1-6, 9, 18-23).

authority in the immigration arena, longstanding judicial precedent upholding the Attorney General's authority to detain aliens pending deportation proceedings, and Congress's express intent to expedite the removal of criminal aliens under the 1996 legislative reforms the granting of injunctive relief to such a broad and temporally unlimited class would result in irreparable harm to the Respondent.

Further still, the class-wide injunction, and the attendant bond hearings for class members would not only burden the INS, but would upset the balance of powers to the extent that it severely interferes with the ability of the executive branch to enforce immigration laws and protect the community.  In <u>INS v. Legalization Assistance Project</u>, 510 U.S. 1301, 1305-06 (1993), the District Court had ordered the INS, with respect to certain classes of immigrants, to adjudicate legalization applications, refrain from arrest or deportation, and temporarily grant stays of deportation.  Finding that such an order interfered with the INS' responsibility to enforce immigration laws, Justice O'Connor, as the Ninth Circuit Justice, found the balance of equities in the government's favor and granted a stay of the District Court's decision.  Justice O'Connor wrote:

> The balance of equities also tips in the
> INS' favor. The order would impose a
> considerable administrative burden on
> the INS, and would delay the deportation
> of -- and require the granting of
> interim work authorizations to -- at

18

> least those aliens who are deportable
> and who could not seek relief on their
> own behalf under CSS. Moreover, if the
> above analysis is correct the order is
> not merely an erroneous adjudication of
> a lawsuit between private litigants, but
> an improper intrusion by a federal court
> into the workings of a coordinate branch
> of the Government.

Id. at 1505-6. The Court's order in the case at bar presents a

similar scenario. For this reason, the Court's order is not

merely in violation of §242(f), but it likewise represents an

improper intrusion into the workings of the executive branch.


**3.  No Harm to Adverse Party**


Petitioners will not be harmed in a legally cognizable

way[8/] by a stay of the Order pending appeal to the Fifth Circuit.

Their required detention pending removal hearings does not

obstruct their ability to respond to the charges upon which their

removal is based. Additionally, as the Seventh Circuit noted in

Parra:

> Persons subject to § 1226(c) have forfeited any
> legal entitlement to remain in the United States .
> . . An alien in [Petitioner's] position can
> withdraw his defense of the removal proceeding and
> return to his native land, thus ending his
> detention immediately. He has the keys in his

---

[8] Cf. Ignacio v. INS, 955 F.2d at 299 ("although [Ignacio]
will suffer some hardship as a result of the denial of a stay, we
do not find that this represents the irreparable harm that a stay
aims to prevent").

> pocket. A criminal alien who insists on
> postponing the inevitable has no constitutional
> right to remain at large during the ensuing delay,
> and the United States has a powerful interest in
> maintaining the detention in order to ensure that
> removal actually occurs. Continuation of such
> detention pending appeal would not deprive him of
> any right to release . . . . The private interest
> here is not liberty in the abstract, but liberty
> in the United States by someone no longer entitled
> to remain in this country but eligible to live at
> liberty in his native land . . . .

Parra, 172 F.3d at 958 (emphasis added). Further still, it is

important to remember that detention under INA § 236(c) is only

temporary, pending resolution of the removal case on the merits.

Given such limited interests petitioners will not suffer

cognizable harm if this Court's Order is stayed pending review.


### 4.  Public Interest


A stay would promote the public interest.  Congress made

clear that alien criminality is a national crisis that must be

brought under control through expeditious enforcement of removal

orders.

> At this point, there is a fundamental
> committee intent that should be clearly
> expressed -- an intent that should be
> taken into account in the interpretation
> of every provision of this bill.  The
> committee intends that aliens within the
> jurisdiction of this country be required
> to fully obey all State and Federal laws
> -- including the immigration laws. . . .
> Aliens who violate U.S. immigration law
> should be removed from this country as

20

> soon as possible.  Exceptions should be
> provided only in extraordinary cases
> specified in the statute and approved by
> the Attorney General

Senate Judiciary Committee Report on S. 1664, Illegal Immigration

Reform and Immigrant Responsibility Act of 1996, p. 7, Pub. L.

104-828 (emphasis added).  As indicated in the attached

declaration, detainees in Harlingen cover a broad spectrum of

criminality, from simple possession to murder, manslaughter, and

sexual assault of a minor.  Though the named petitioners are

convicted of simple possession, others are not.  The operation of

the Court's order has the potential to release as many as 200-250

criminal aliens into the Harlingen District.  The downside risk

that a truly dangerous individual will be released in Harlingen,

and possibly abscond, is too great to assume, especially given

the fact that such individuals have virtually no right to remain

in the United States and their detention is by law temporary.  A

stay will thus promote the public interest by guaranteeing that

petitioners will not be prematurely released, abscond while

pending removal, engage in further criminal activity, or create

further delays in their removal by requiring additional reviews

or hearings.

**CONCLUSION**

For the foregoing reasons, the Court should issue a stay of its September 9, 2002 Order, pending appeal to the United States Court of Appeals for the Fifth Circuit.

Respectfully submitted,

ROBERT D. McCALLUM, Jr.
Assistant Attorney General
Civil Division

RICHARD M. EVANS
Assistant Director

PAUL FIORINO
Attorney
Office of Immigration Litigation
Civil Division
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044

September 11, 2002

22

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Respondent's Motion to Stay Pending Appeal was mailed via first class mail, postage prepaid to:

                    Lisa Brodyaga, Esquire
                    Refugio Del Rio Grande
                    17891 Landrum Park Rd.
                    San Benito, TX  78586

on this __11__ day of September, 2002.


                    LISA M. PUTNAM
                    Special Assistant United States Attorney



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

EUGENIO REYNA-MONTOYA, ET AL.,    )
                                  )
          Petitioners,            )
                                  )    CIVIL ACTION NO. B-02-026
          v.                      )
                                  )
E.M. TROMINSKI,                   )
INS DISTRICT DIRECTOR             )
                                  )
                                  )
          Respondent.             )
_____)

**DECLARATION OF CHARLES R. ARENDALE**

1.   I am Acting Director for Detention and Removal for the
     Harlingen, Texas, Field Office.  I have administrative
     responsibility over the petitioners, Mr. Eugenio Reyna-
     Montoya, and Mr. Juan Luis Gonzalez-Sanchez who are in the
     custody of the Immigration and Naturalization Service at the
     Port Isabel Service Processing Center in Los Fresnos, Texas.

2.   The Harlingen facility currently has 41 lawful permanent
     resident aliens detained under the provision of Section
     236(c) of the Immigration and Nationality Act, 18 U.S.C. §
     1226(c).

3.   Harlingen occupies a unique position close to the Mexican
     Border which facilitates the removal of deportable aliens to
     Mexico.  Because of its geographic location, Harlingen acts
     as a collection point for Mexican and Central American
     aliens who remain in custody pending their removal hearings
     and/or appeals.

4.   Harlingen receives approximately 1-5 new aliens per week who
     are held under 236(c).  It is estimated that, over the
     course of a year Harlingen will receive and house
     approximately 200 to 250 aliens to be held under 236(c).

5.   Although most of the aliens detained in Harlingen under
     Section 236(c) are from the Rio Grande valley, Harlingen
     occasionally receives aliens from other parts of the United
     States.  For example, in the past year, Harlingen has housed
     aliens under Section 236(c) from the following cities:
     Houston, Philadelphia, Chicago, Dallas, and St. Paul,
     Minnesota.

6.   At any given time, approximately 10% of the aliens held in
     Harlingen actually were apprehended outside the Rio Grande
     valley and were transferred here for detention and hearings.

8.   The types of crimes of which such aliens are convicted range
     from simple possession of controlled substance, to murder,
     manslaughter, sexual assault of a minor and alien smuggling.


I declare under penalty of perjury that the foregoing is true and
correct.

Executed on September 11, 2002, in Harlingen, Texas.


Charles R. Arendale



No. 01-1491

# In the Supreme Court of the United States

CHARLES DEMORE, DISTRICT DIRECTOR,
SAN FRANCISCO DISTRICT OF IMMIGRATION AND
NATURALIZATION SERVICE, ET AL., PETITIONERS

*v.*

HYUNG JOON KIM

ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

## BRIEF FOR THE PETITIONERS

THEODORE B. OLSON
*Solicitor General*
*Counsel of Record*
ROBERT D. MCCALLUM, JR.
*Assistant Attorney General*
EDWIN S. KNEEDLER
*Deputy Solicitor General*
AUSTIN C. SCHLICK
*Assistant to the Solicitor*
*General*
DONALD E. KEENER
MARK C. WALTERS
HUGH G. MULLANE
MICHELLE GORDEN
*Attorneys*
*Department of Justice*
*Washington, D.C. 20530-0001*
*(202) 514-2217*

39-11-5473

## QUESTION PRESENTED

Section 1226(c)(1) of Title 8 of the United States Code requires the Attorney General to take into custody aliens who are inadmissible to or deportable from the United States because they have committed a specified offense, including an aggravated felony. Section 1226(c)(2) of Title 8 prohibits release of those aliens during administrative proceedings to remove them from the United States, except in very limited circumstances not present here. The question presented in this case is:

Whether respondent's mandatory detention under Section 1226(c) violates the Due Process Clause of the Fifth Amendment, where respondent concedes that his criminal convictions after admission into the United States put him within the class of removable aliens who are subject to detention.

(I)

TABLE OF CONTENTS

Page

Opinions below .................................................................... 1
Jurisdiction ......................................................................... 1
Constitutional and statutory provisions involved ................... 1
Statement ........................................................................... 2
Summary of argument ......................................................... 8
Argument ........................................................................... 11
  I. Mandatory detention of criminal aliens under
     Section 1226(c) during proceedings to remove
     them from the United States is consistent with
     due process ................................................................ 11
     A. Congress determined that criminal aliens'
        flight risk and danger to the community were
        serious problems that justified mandatory
        detention ................................................................ 12
     B. Congress's determinations about the necessity
        of mandatory detention are judgments about
        immigration policy that merit particular
        judicial respect ...................................................... 23
     C. *Zadvydas* supports a determination that
        Section 1226(c) is constitutional ............................ 38
 II. Section 1226(c) does not in any event violate due
     process on its face ...................................................... 42
     A. Aliens detained at the United States border
        have no due process right to avoid detention,
        and aliens who enter or remain illegally have
        a diminished due process ........................................ 44
     B. Mandatory detention during removal proceed-
        ings is particularly permissible as applied to
        aliens for whom there is not a significant likeli-
        hood of avoiding removal ........................................ 46

(III)

IV

TABLE OF CONTENTS—Continued:

| | Page |
|---|---|
| C. Mandatory detention also is especially warranted when the alien has committed the most serious crimes that trigger Section 1226(c) | 47 |
| D. Section 1226(c) could not be held unconstitutional without reference to the duration of the alien's detention | 47 |
| Conclusion | 49 |
| Appendix | 1a |

## TABLE OF AUTHORITIES

Cases:

Carlson v. Landon, 342 U.S. 524 .......... 10, 33, 39, 47
Fiallo v. Bell, 430 U.S. 787 (1977) .......... 23, 44
Hartisiades v. Shaughnessy, 342 U.S. 580 (1952) .......... 33
Hoang v. Comfort, 282 F.3d 1247 (10th Cir. 2002), petition for cert. pending, No. 01-1616 (filed May 3, 2002) .......... 31, 32, 38, 39, 43
INS v. Aguirre-Aguirre, 526 U.S. 415 (1999) .......... 29
INS v. St. Cyr, 533 U.S. 289 (2001) .......... 24, 28
INS v. Stevic, 467 U.S. 407 (1984) .......... 29
INS v. Yueh-Shaio Yang, 519 U.S. 26 (1996) .......... 27
Jay v. Boyd, 351 U.S. 345 (1956) .......... 27
Johnson v. Eisentrager, 339 U.S. 763 (1950) .......... 45
Jones v. United States, 526 U.S. 227 (1999) .......... 42
Joseph, In re, 22 I. & N. Dec. 799, 1999 WL 339068 (BIA 1999) ..........
Kansas v. Hendricks, 521 U.S. 346 (1997) .......... 26, 27
Leng May Ma v. Barber, 357 U.S. 185 (1958) .......... 35
Mathews v. Diaz, 426 U.S. 67 (1976) .......... 33
Mathews v. Eldridge, 424 U.S. 319 (1976) .......... 5, 24
Narenji v. Civiletti, 617 F.2d 745 (D.C. Cir. 1979), cert. denied, 446 U.S. 957 (1980) .......... 33
Olim v. Wakinekona, 461 U.S. 238 (1983) .......... 27

V

Page
Cases—Continued:

Parra v. Perryman, 172 F.3d 954 (7th Cir. 1999) .......... 8, 32, 43, 46
Patel v. Zemski, 275 F.3d 299 (3d Cir. 2001) .......... 32, 38, 39, 43
Plyler v. Doe, 457 U.S. 202 (1982) .......... 32
Rodomic v. Zemski, 28 Fed. Appx. 113 (3d Cir. 2000), petition for cert. pending, No. 01-1459 (filed Apr. 4, 2002) .......... 32
Reno v. Flores, 507 U.S. 292 (1993) .......... 43, 46
Richardson v. Reno, 180 F.3d 1311 (11th Cir. 1999), cert. denied, 529 U.S. 1086 (2000) .......... 10, 23, 31, 33, 41
Rosker v. Goldberg, 453 U.S. 57 (1981) .......... 25
Schall v. Martin, 467 U.S. 253 (1984) .......... 32
Schlanger v. Seamans, 401 U.S. 487 (1971) .......... 48
Shaughnessy v. United States ex rel Mezei, 345 U.S. 206 (1953) .......... 4
Tefel v. Reno, 180 F.3d 1286 (11th Cir. 1999), cert. denied, 530 U.S. 1228 (2000) .......... 23
United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537 (1950) .......... 27
United States v. Salerno, 481 U.S. 739 (1987) .......... 44
Vasquez v. Reno, 233 F.3d 688 (1st Cir. 2000), cert. denied, 122 S. Ct. 43 (2001) .......... 4, 43, 48
Weiss v. United States, 510 U.S. 163 (1994) .......... 4
Welch v. Ashcroft, 293 F.3d 213 (4th Cir. 2002) .......... 32
Wong Wing v. United States, 163 U.S. 228 (1896) .......... 32, 38, 39, 42, 43, 47, 48
Zadvydas v. Davis, 533 U.S. 678 (2001) .......... 11, 24, 29, 31, 46, passim

Constitution, statutes and regulations:

U.S. Const. Amend. V .......... 4, 1a
Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, Tit. VII, § 7343(a), 102 Stat. 4470 .......... 12

VI

| | Page |
|---|---|
| Statutes and regulations—Continued: | |
| Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 | 21 |
| § 440(c), 110 Stat. 1277 | 21 |
| § 440(e), 110 Stat. 1277-1278 | 22 |
| Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009-546 | 2 |
| § 303(b), 110 Stat. 3009-586 (8 U.S.C. 1226(c) note) | 37, 47 |
| § 303(b)(2), 110 Stat. 3009-586 (8 U.S.C. 1226(c) note) | 37 |
| § 304(c), 110 Stat. 3009-587 to 3009-593 | 2 |
| Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 | |
| § 501(a), 104 Stat. 5048 | 13 |
| § 504(a)(6), 104 Stat. 5049 | 14 |
| § 504(b), 104 Stat. 5050 (8 U.S.C. 1226(e)(1) (Supp. II 1990)) | 14 |
| Immigration and Nationality Act, 8 U.S.C. 1101 et seq. | 2 |
| § 101, 8 U.S.C. 1101(a)(13)(B) | 44 |
| § 101(a)(43), 8 U.S.C. 1101(a)(43) (1988) | 13 |
| § 101(a)(43), 8 U.S.C. 1101(a)(43) | 2, 13, 22, 38 |
| § 101(a)(43)(A), 8 U.S.C. 1101(a)(43)(A) | 47 |
| § 101(a)(43)(E)(ii), 8 U.S.C. 1101(a)(43)(E)(ii) | 34 |
| § 101(a)(43)(F), 8 U.S.C. 1101(a)(43)(F) | 34 |
| § 101(a)(43)(G), 8 U.S.C. 1101(a)(43)(G) | 3 |
| § 101(a)(43)(R), 8 U.S.C. 1101(a)(43)(R) | 24 |
| §§ 201-203, 8 U.S.C. 1151-1153 | |
| § 208(b), 8 U.S.C. 1158(b) | 6 |
| § 208(b)(2), 8 U.S.C. 1158(b)(2) | 30 |
| § 212, 8 U.S.C. 1182 (1994) | 27 |
| § 212(c), 8 U.S.C. 1182(c) (1994) | 27 |
| § 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) | 25 |
| § 212(d)(6)(A), 8 U.S.C. 1182(d)(6)(A) | 44 |

VII

| | Page |
|---|---|
| Statutes and regulations—Continued: | |
| § 236(a), 8 U.S.C. 1226(a) | 1a |
| § 236(c), 8 U.S.C. 1226(c) | passim |
| § 236(c)(1), 8 U.S.C. 1226(c)(1) | 2, 2B, 1a |
| § 236(c)(1)(A), 8 U.S.C. 1226(c)(1)(A) | 22, 1a |
| § 236(c)(1)(B), 8 U.S.C. 1226(c)(1)(B) | 2, 22, 47, 1a |
| § 236(c)(1)(C), 8 U.S.C. 1226(c)(1)(C) | 2 |
| § 236(c)(1)(D), 8 U.S.C. 1226(c)(1)(D) | 2, 2a |
| § 236(c)(2), 8 U.S.C. 1226(c)(2) | 2, 22, 47, 2a |
| § 236(c)(2)(D), 8 U.S.C. 1226(c)(2)(D) | 2, 2a |
| § 237(a)(1)(B), 8 U.S.C. 1227(a)(1)(B) | 45 |
| § 237(a)(1)(B), 8 U.S.C. 1227(a)(1)(B) | 45 |
| § 237(a)(2), 8 U.S.C. 1227(a)(2)(A)-(D) | |
| § 237(a)(2)(A)(i), 8 U.S.C. 1227(a)(2)(A)(i) | 2 |
| § 237(a)(2)(A)(iii), 8 U.S.C. 1227(a)(2)(A)(iii) | 3-4 |
| § 237(a)(2)(B), 8 U.S.C. 1227(a)(2)(B) | 2 |
| § 237(a)(2)(C), 8 U.S.C. 1227(a)(2)(C) | 2 |
| § 237(a)(4)(B), 8 U.S.C. 1227(a)(4)(B) | 2 |
| § 238(a), 8 U.S.C. 1228(a) | 40 |
| § 239.3, 8 U.S.C. 1229 | 3 |
| § 240, 8 U.S.C. 1229a | 3 |
| § 240A, 8 U.S.C. 1229b | 27, 30 |
| § 240A(a)(3), 8 U.S.C. 1229b(a)(3) | 47 |
| § 241(a), 8 U.S.C. 1231(a) | 2, 38, 40 |
| § 241(a)(3), 8 U.S.C. 1231(a)(6) | 7, 38, 39, 40, 42 |
| § 241(b)(3), 8 U.S.C. 1231(b)(3) | 24 |
| § 241(b)(3)(A), 8 U.S.C. 1231(b)(3)(A) | 29 |
| § 241(b)(3)(B), 8 U.S.C. 1231(b)(3)(B) | 30 |
| § 242(a), 8 U.S.C. 1252(a) (1982) | 12 |
| § 242(a), 8 U.S.C. 1252(a) | 13 |
| § 242(a)(1), 8 U.S.C. 1252(a)(1) (1994) | 13 |
| § 242(a)(2), 8 U.S.C. 1252(a)(2) (1988) | 15 |
| § 242(a)(2)(B), 8 U.S.C. 1252(a)(2)(B) (Supp. II 1990) | |
| § 242(a)(2)(B), 8 U.S.C. 1252(a)(2)(B) (1994) | 14 |
| § 242(a)(3)(A), 8 U.S.C. 1252(a)(3)(A) (1988) | 13 |

VIII

Statutes and regulations—Continued:

Page

Immigration and Nationality Technical Correc-
tions Act of 1994, Pub. L. No. 103-416, § 222, 108
Stat. 4320 ..................................................... 22

Immigration Technical Corrections Act of 1991,
Pub. L. No. 102-232, § 306(a)(4), 105 Stat. 1751
(8 U.S.C. 1252(a)(2)(B) (1994)) .......................... 14

18 U.S.C. 16 ........................................................ 14, 34

28 U.S.C. 2241 .................................................... 4

Cal. Penal Code (West 1999):
§ 484 ................................................................ 3
§ 666 ................................................................ 3

8 C.F.R.:
Section 3.1(a)(7) ............................................... 40
Section 3.19(c) .................................................. 26
Section 3.1(b) ................................................... 26
Section 3.19(h)(2)(ii) ......................................... 26
Section 208.1(b) ................................................ 29
Section 208.16(f) ............................................... 29
Section 208.22 .................................................. 29
Section 236.1(c)(10) .......................................... 25
Section 236.1(d)(1) ............................................ 25
Section 236.1(d)(3) ............................................ 25
Section 242(c) (1996) ........................................ 14
Section 242.2(d) (1996) ..................................... 15
Section 242.2(b) (1996) ..................................... 14

Miscellaneous:
138 Cong. Rec. (1987):
P. 8771 ............................................................ 13
P. 28,840 .......................................................... 12, 13
P. 28,841 .......................................................... 13
140 Cong. Rec. 4936 (1994) ................................. 16
141 Cong. Rec. (1995):
P. 4394 ............................................................ 35
PP. 4395-4396 ................................................. 35

IX

Miscellaneous—Continued:

Page

P. 15,018 ........................................................... 17
P. 16,038 ........................................................... 17

142 Cong. Rec. (1996):
P. 5281 ............................................................ 21
PP. 5293-5294 ................................................. 21
P. 7348 ............................................................ 16
P. 7349 ............................................................ 16

Criminal and Illegal Aliens, Statement on Immigra-
tion and Claims of the House Comm. on the
Judiciary, 1996 WL 5020071 (Sept. 5, 1996) ....... 21, 36

Criminal Aliens in the United States: Hearings
Before the Permanent Subcomm. on Investigations
of the Senate Comm. on Governmental Affairs,
103d Cong., 1st Sess. (1993) .............................. 17, 18, 19, 21, 36, 38

67 Fed. Reg. (Aug. 13, 2002):
P. 52,627 ......................................................... 28
PP. 52,628-52,629 .......................................... 28
P. 52,629 ......................................................... 28

Hearing on H.R. 723 Before the Subcomm. on Inter-
national Law, Immigration, and Refugees of the
House Comm. on the Judiciary, 103d Cong.,
2d Sess. (1994) ................................................. 17, 34

Hearing on H.R. 3333 Before the Subcomm. on
Immigration, Refugees, and International Law,
of the House Comm. on the Judiciary, 101st Cong.,
1st Sess. (1989) ................................................ 16, 17, 20, 34, 35, 37

H.R. 3529, 100th Cong., 1st Sess. (1987) .............. 12-13

H.R. Rep. No. 22, 104th Cong., 1st Sess. (1995) .... 17, 18, 34

H.R. Rep. No. 469, 104th Cong., 2d Sess., Pt. 1
(1996) .............................................................. 16, 19, 34, 35

H.R. Rep. No. 645, 103d Cong., 2d Sess. (1994) .... 18

X

|  | Page |
|---|---|
| Miscellaneous—Continued: | |
| INS: | |
| Enforcement, Fiscal Year 2000 <http://www.ina.gov/graphics/aboutins/statistics/00yrbk._REFVRA2000.pdf> | |
| Refugees, Asylees, Fiscal Year 2000 <http://www.ins.usdoj.gov/graphics/aboutins/statistics/00yrbk._REFVRA2000.pdf> | 30 |
| Restatement (Second) of Torts (1965) | 30 |
| S. 972, 100th Cong., 1st Sess. (1987) | 45 |
| S. Rep. No. 48, 104th Cong., 1st Sess. (1995) | 13 |
| S. Rep. No. 249, 104th Cong., 2d Sess. (1996) | 16, 17, 19, 21, 22, 25, 42, 46 |
| Testimony of Doris Meissner, Commissioner, INS, Before the Senate Judiciary Comm. Concerning S. 269, the Immigrant Control and Financial Responsibility Act of 1995 and the Immigration Enforcements Improvements Act of 1995, 1995 WL 110488 (Mar. 14, 1995) | 16, 34 |

# In the Supreme Court of the United States

No. 01-1491

CHARLES DEMORE, DISTRICT DIRECTOR, SAN FRANCISCO DISTRICT OF IMMIGRATION AND NATURALIZATION SERVICE, ET AL., PETITIONERS

v.

HYUNG JOON KIM

*ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT*

## BRIEF FOR THE PETITIONERS

### OPINIONS BELOW

The opinion of the court of appeals (Pet. App. 1a-30a) is reported at 276 F.3d 523. The memorandum order of the district court (Pet. App. 31a-51a) is unreported.

### JURISDICTION

The judgment of the court of appeals was entered on January 9, 2002. The petition for a writ of certiorari was filed on April 9, 2002, and was granted on June 28, 2002. The jurisdiction of this Court rests on 28 U.S.C. 1254(1).

### CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

Relevant constitutional and statutory provisions are set out in an appendix to this brief. App. infra, 1a-3a.

(1)

2

## STATEMENT

1. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009-546, amended the Immigration and Nationality Act (INA), 8 U.S.C. 1101 et seq., to streamline procedures for removing certain criminal aliens from the United States. The provision of IIRIRA that is at issue in this case is Section 236(c) of the INA, 8 U.S.C. 1226(c). Section 1226(c)(1) requires the Attorney General to take into custody aliens who are inadmissible to or deportable from the United States because they have committed specified crimes. In the case of a deportable alien, Section 1226(c)(1) applies if the alien has been convicted of any of certain crimes including an aggravated felony (as defined in INA § 101(a)(43), 8 U.S.C. 1101(a)(43)), two or more crimes involving moral turpitude or a crime of moral turpitude that resulted in a sentence of at least one year's imprisonment, a controlled-substance offense (other than simple possession of 30 grams or less of marijuana), a firearms offense, a specified immigration offense, espionage, sabotage, treason, or threatening the President, see 8 U.S.C. 1226(c)(1)(B) and (C), 1227(a)(2)(A)-(D), or if the alien has engaged in terrorist activities, see 8 U.S.C. 1226(c)(1)(D), 1227(a)(4)(B). Section 1226(c)(2) prohibits the release of aliens detained under Section 1226(c)(1) during the pendency of administrative proceedings instituted to remove them from the United States, except in very limited circumstances involving witness protection. 8 U.S.C. 1226(c)(2).

Detention under Section 1226(c) lasts only for the duration of the criminal alien's administrative removal proceedings.[1]

---

[1] In Section 304(a) of IIRIRA, 110 Stat. 3009-587 to 3009-593, Congress instituted a new form of proceeding—known as "removal"—that applies to aliens who have entered the United States but are deportable,

3

Detention of an alien following the entry of a final order of removal is governed by Section 241(a) of the INA, 8 U.S.C. 1231(a), which this Court interpreted in Zadvydas v. Davis, 533 U.S. 678 (2001). In Zadvydas, this Court avoided constitutional concerns by interpreting 8 U.S.C. 1231(a) to limit the duration of detention of two permanent resident aliens following final orders directing their removal from the United States. See 533 U.S. at 689-701.

2. Respondent is a native and citizen of the Republic of Korea (South Korea). Respondent entered the United States legally in 1984 and became a lawful permanent resident of the United States in 1996, when he was eight years old. Pet. App. 2a, 31a-32a. In July 1996, when he was 18 years old, respondent was convicted in California state court of first-degree burglary for unlawfully entering an inhabited dwelling house and inhabited portion of a building, for which he was sentenced to a suspended sentence of five years' imprisonment. See Sentence, No. SC961052 (Cal. Super. Ct. Aug. 1, 1996); Information, No. SC961052 (Cal. Super. Ct. dated May 7, 1996). In April 1997, respondent was convicted of "petty theft with priors," in violation of California Penal Code Sections 666 and 484 (West 1999), for which he received a sentence of three years' imprisonment. See Pet. App. 32a.

In December 1998, while respondent was serving his three-year state sentence, the INS charged respondent with being deportable because of his 1997 conviction for an aggravated felony.[2] Pet. App. 32a; see 8 U.S.C. 1101(a)(43)(G),

---

as well as to aliens who are inadmissible at the border. See 8 U.S.C. 1229, 1229a.

[2] On August 16, 2002, the INS served respondent with an additional charge of being removable because his 1996 burglary conviction and 1997 theft conviction "together constitute[] 'conviction[s]' of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct." 8 U.S.C. 1227(a)(2)(A)(ii).

4

1227(a)(2)(A)(iii)). Respondent was released from state prison on February 1, 1999. On February 2, 1999, the INS took respondent into custody under Section 1226(c) and commenced removal proceedings. Pet. App. 2a, 82a. In light of the mandatory nature of Section 1226(c), the INS's San Francisco District declined to release respondent on bond. See id. at 83a; C.A. E.R. 3.

3.  On May 17, 1999, respondent commenced this habeas corpus action under 28 U.S.C. 2241 in the United States District Court for the Northern District of California. Pet. App. 2a, 31a, 33a. Respondent asserted in his habeas corpus petition that Section 1226(c) is unconstitutional on its face because detention of a removable criminal alien without an individualized bond hearing violates substantive and procedural due process guaranteed by the Fifth Amendment. Respondent did not dispute that he had committed an aggravated felony, and he conceded that he is subject to mandatory detention under the terms of Section 1226(c). J.A. 8-10; see Br. in Opp. 1-2.[3]

On August 11, 1999, the district court declared Section 1226(c) unconstitutional on its face and ordered an individualized bond hearing to determine whether respondent presents a flight risk or a danger to the community. Pet. App. 31a-51a. Using the analytic framework of *United States v. Salerno*, 481 U.S. 739, 747 (1987), the district court

_____

[3]  Respondent brought his habeas corpus action against the District Director of the San Francisco District of the INS and the Attorney General of the United States. See Pet. App. 31a, 33a. The District Director was the custodian of respondent and was present in the Northern District of California, and therefore was the proper respondent to the habeas corpus petition. The Attorney General was not a proper respondent in the Northern District of California, and therefore was not a proper respondent to the habeas corpus petition. See *Schlanger v. Seamans*, 401 U.S. 487 (1971); *Vasquez v. Reno*, 233 F.3d 688 (1st Cir. 2000), cert. denied, 122 S. Ct. 43 (2001).

5

reasoned that "lawful resident aliens possess substantive due process rights during deportation proceedings" (Pet. App. 39a), and that "[l]ess excessive means exist for accomplishing Congress's goals [in enacting Section 1226(c)], such as having individualized bail hearing" (id. at 45a). Although the district court thus focused specifically on the substantive due process rights of permanent resident aliens, the court's holding was that Section 1226(c) "is unconstitutional on its face." Id. at 48a. In the alternative, the district court held that Section 1226(c) denies criminal aliens procedural due process under the analysis of *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Pet. App. 48a-50a.

After the district court's decision, the District Director of the INS released respondent on $5000 bond. Pet. App. 2a; see J.A. 11. Respondent then requested a continuance of his administrative removal proceedings. The immigration court granted respondent's request and rescheduled his removal hearing for March 2002. See Pet. App. 2a. After respondent obtained new counsel, the hearing was continued again at respondent's request, and over the INS's objection, until December 24, 2003.[4]

4.  The court of appeals affirmed on the ground that Section 1226(c) violates substantive due process when applied to respondent, as a permanent resident alien. Pet. App. 30a. The court of appeals, however, specifically did not affirm the district court's facial invalidation of Section 1226(c). The court noted in particular that it was not addressing whether Section 1226(c) is constitutional as applied to excludable

_____

[4]  As a matter of policy, the Justice Department's Executive Office for Immigration Review expedites removal proceedings for aliens who are detained under Section 1226(c). Respondent is not subject to that expedition policy because he was released upon order of the district court and thereafter has not been treated as a detained alien.

6

aliens who have been detained at the United States border. *Id.* at 5a-6a.

The court of appeals first emphasized respondent's status as a lawful permanent resident alien, observing that this "most favored" (Pet. App. 7a) immigration status entitles an alien to live permanently in the United States, to work in this country, and to apply for citizenship, and that permanent resident status most often is granted because of the alien's family ties to the United States. See generally 8 U.S.C. 1151-1153. The court concluded that, because of their statutory rights and potentially strong family and business ties to the United States, lawful permanent resident aliens have a liberty interest in freedom from detention during removal proceedings, which the Constitution protects. Pet. App. 7a-8a.

The court of appeals next reasoned that although detention of lawful permanent residents under Section 1226(c) "is civil and regulatory" in nature, "not criminal or punitive" (Pet. App. 12a; see *Zadvydas*, 533 U.S. at 690), that detention is permissible only if the government "provide[s] a 'special justification' outweighing the individual's liberty interest" (Pet. App. 11a (quoting *Zadvydas*, 533 U.S. at 690)). The court identified "two principal justifications" for mandatory detention: "(1) preventing criminal aliens from fleeing during removal proceedings; and (2) protecting the public from potentially dangerous aliens." *Id.* at 12a. But the court found those justifications insufficient.

The court of appeals acknowledged the government's interest in ensuring criminal aliens' availability for removal from the country. Pet. App. 12a. The court held, however, that ensuring availability for removal does not justify mandatory detention during removal proceedings because some criminal aliens may be able to obtain a determination that they are not removable, or to obtain relief from removal under the provisions of the INA. See *id.* at 13a-15a. The

7

court also rejected the government's reliance on a 1996 Justice Department study (J.A. 14-64) that showed that 89% of "nondetained" aliens subject to a final deportation order failed to appear for deportation. The court believed that the Justice Department study in fact suggested that aliens who have been released on bail are likely to be removed successfully. See Pet. App. 15a-16a; but see note 7, *infra*.

The court of appeals also recognized the government's interest in protecting the public against additional wrongdoing by criminal aliens while removal proceedings are pending. See Pet. App. 16a-17a. The court concluded, however, that the "aggravated felony" classification that triggered respondent's mandatory detention under Section 1226(c) reaches crimes that the court did not deem "egregious" or inherently suggestive of a public "menace[]." *Id.* at 20a. The court thus determined that commission of one of the crimes that requires detention under Section 1226(c) is not sufficiently probative of dangerousness to justify mandatory detention of a permanent resident alien. *Id.* at 20a-21a.

The court of appeals cited congressional testimony by a former Commissioner of the INS for the proposition that "the government itself appears to have some doubt about" "the necessity and desirability of the mandatory detention required by Section 1226(c). Pet. App. 21a. The court also concluded that the necessity of mandatory detention of criminal aliens during administrative removal proceedings is called into question by 8 U.S.C. 1231(a)(6), which gives the Attorney General discretion to release criminal aliens who are *under a final order of removal*, if they have not been removed during the 90-day removal period. Pet. App. 22a-23a. The court of appeals therefore determined "that the government has not provided a 'special justification' for no-bail civil detention sufficient to overcome a lawful permanent resident alien's liberty interest." *Id.* at 23a. In doing so, the court of appeals disagreed (*id.* at 26a-27a) with the Seventh

Circuit's decision in *Parra v. Perryman*, 172 F.3d 954 (1999), which upheld Section 1226(c) against a due process challenge by a lawful permanent resident alien.[5]

Finally, the court of appeals determined that there is no plausible narrowing construction of Section 1226(c) that would cause it to satisfy substantive due process. See Pet. App. 27a-29a. Accordingly, the court held that a lawful permanent resident alien in removal proceedings must be afforded "a bail hearing with reasonable promptness to determine whether the alien is a flight risk or a danger to the community." *Id.* at 30a.

## SUMMARY OF ARGUMENT

I. A. The mandatory detention requirement of 8 U.S.C. 1226(c) is the product of Congress's close scrutiny of the actual consequences of allowing release of criminal aliens. The legislative record showed that approximately 80% of deportable criminal aliens had multiple arrests while in the United States, and that nearly half of those aliens were re-arrested within a year of being released from prison. More than 20% of criminal aliens who were released by the Attorney General or never taken into custody during their deportation proceedings failed to appear for the proceedings. When non-detained aliens were ordered to appear for deportation from the United States, nearly 90% absconded. Numerous witnesses confirmed that mandatory detention should be part of Congress's solution to those problems.

Congress determined that existing statutory provisions that gave the Attorney General discretion to release criminal aliens were not ensuring removal of the most undesirable aliens from the United States. Congress con-

---

[5] The court of appeals also expressed the view (Pet. App. 23a-26a) that its decision was consistent with the analysis of Justice Kennedy's dissenting opinion in *Zadvydas*, 533 U.S. at 705-725.

8

cluded that mandatory detention of a selected group of criminal aliens, during the pendency of their removal proceedings, is necessary to implement its immigration policies.

B. The policy judgments that Congress made when it enacted Section 1226(c) are within its plenary power over the admission and expulsion of aliens and deserve judicial deference. The court of appeals' reasons for holding Section 1226(c) unconstitutional are without merit.

The court of appeals deemed it important that a criminal alien's removal proceedings will not always result in a final order of removal. That has no bearing upon Congress's effort to ensure that the criminal aliens specified in Section 1226(c) appear at the removal proceedings themselves. Furthermore, an alien who disputes that he is removable may raise that argument as a challenge to his detention, and will be released if he shows that the INS is substantially unlikely to prevail on its charge of removability.

The theoretical possibility that a criminal alien might obtain discretionary relief from removal or withholding of removal also does not undermine the constitutionality of Section 1226(c). As part of its effort to address the serious problem of criminal aliens, Congress imposed rules that make the removal of those aliens more certain and more speedy. Those restrictions and Section 1226(c) are mutually reinforcing, because each makes it very likely that a criminal alien subject to detention under Section 1226(c) will soon be removed.

Congress similarly acted within the scope of its plenary immigration powers when it determined that criminal aliens who flee from removal proceedings present a special danger to the Nation. Congress routinely makes categorical judgments about the admission, treatment, and removal of different groups of aliens. Even when detention is at issue, this Court has upheld the use of a categorical approach in the immigration context, subject to only deferential judicial

9

review. See *Reno* v. *Flores*, 507 U.S. 292 (1993); *Carlson* v. *Landon*, 342 U.S. 524 (1952). Here, Congress's judgment rests upon the high recidivism rate for criminal aliens, as well as the nature of the crimes specified in Section 1226(c). The crimes that trigger Section 1226(c) are ones that Congress found to present special concerns because of their implications for national security or public safety.

C. *Zadvydas* v. *Davis*, 533 U.S. 678 (2001), supports the constitutionality of Section 1226(c). The critical fact in *Zadvydas*, which gave rise to constitutional concern, was that the deportable aliens in that case, who were under final orders of removal, might be subject to indefinite (and possibly permanent) detention if they could not be removed. Section 1226(c), by contrast, is limited in duration because it applies only while the alien is in proceedings to determine whether there will be a final order of removal. Throughout the period of detention, Section 1226(c) always serves the purpose of ensuring the alien's availability for removal pro-ceedings, as well as for removal if it is ordered. And Section 1226(c) does not raise the possibility of open-ended detention as in *Zadvydas*. Indeed, removal proceedings are expedited for aliens who are in detention and generally are resolved by immigration judges within approximately one month.

II. Respondent's facial due process challenge to Section 1226(c) is especially untenable, because respondent clearly cannot show that Section 1226(c) violates due process in every application. For example, an alien who was stopped at the border has no due process claim to be released from de-tention under Section 1226(c), which prevents him from entering the United States without authorization while his removal proceeding is pending. Likewise, an alien who entered or remained in the United States illegally, and com-mitted further crimes during his unlawful presence, has an especially weak claim to due process protection in this con-text. A criminal alien who has no significant likelihood of

10

avoiding removal likewise could not present a viable due process challenge to detention pending his impending re-moval. And some removable aliens will have committed crimes, such as terrorist activities or the most egregious felonies, that justify mandatory detention without regard to other governmental interests. Finally, Section 1226(c) could not be held unconstitutional without reference to the duration of the alien's detention. The necessity of con-sidering factors such as these demonstrates that a facial due process attack on Section 1226(c) cannot succeed.

## ARGUMENT

### I. MANDATORY DETENTION OF CRIMINAL ALIENS UNDER SECTION 1226(C) DURING PRO-CEEDINGS TO REMOVE THEM FROM THE UNITED STATES IS CONSISTENT WITH DUE PROCESS

Aliens detained under 8 U.S.C. 1226(c) have committed crimes that terminate their entitlement to remain in the United States. In their criminal proceedings, those aliens benefitted from the same due process protections as United States citizens. See *Wong Wing* v. *United States*, 163 U.S. 228, 237 (1896). Congress has determined that *after* their criminal convictions, those aliens should be removed from the United States with as much certainty, and as little risk to the public, as possible. The mandatory detention pro-visions of Section 1226(c) effectuate those objectives. Be-cause Congress enacted Section 1226(c) in the exercise of its plenary power to direct the removal of unwelcome aliens from the United States, because the legislative record com-piled by Congress concretely demonstrated the widespread problem of flight and recidivism among criminal aliens, and because detention under Section 1226(c) applies only to aliens who have committed specified crimes and lasts only

11

12

during the limited duration of the alien's removal proceedings, Section 1226(c) satisfies due process.

A. Congress Determined That Criminal Aliens' Flight Risk And Danger To The Community Were Serious Problems That Justified Mandatory Detention

Congress required the Attorney General to detain specified criminal aliens during their removal proceedings because it determined that earlier detention procedures, which allowed discretionary release, had failed to ensure the removal of criminal aliens from the United States. That legislative determination was made after an extensive investigation by Congress, in an area in which congressional findings are entitled to particular judicial respect.

1. Until the late 1980s, Section 242 of the INA afforded the Attorney General wide latitude to release criminal aliens from custody during their deportation proceedings. The law provided that "[p]ending a determination of deportability" in administrative proceedings, an alien "may, upon warrant of the Attorney General, be arrested and taken into custody." 8 U.S.C. 1252(a) (1982) (emphasis added). When the Attorney General detained an alien, he had discretion (subject to judicial review in habeas corpus proceedings) whether to keep the alien in custody, release the alien on bond, or release the alien on conditional parole. 8 U.S.C. 1252(a) (1982).

In 1988, Congress limited the Attorney General's discretion over custody determinations as part of the Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, Tit. VII, § 7343(a), 102 Stat. 4470. Representative Smith, one of the sponsors of the 1988 legislation, expressed the concern that "[a]ll too often, [criminal] aliens—whether here legally or illegally—who are arrested for various felonious crimes, evade deportation, dodge trials, and continue with their recidivist activities." 133 Cong. Rec. 28,840 (1987) (discussing H.R.

13

8529, 100th Cong., 1st Sess. (1987)). He noted that, whereas more than 100,000 illegal aliens were arrested for criminal offenses in 1986, the INS was able to deport only 12,000. Ibid.; id. at 8771 (statement of Sen. Chiles, introducing S. 972, 100th Cong., 1st Sess. (1987)). Representative Smith also explained that criminal aliens operated major narcotics syndicates throughout the United States and "have been connected with money laundering, racketeering, weapons sales, prostitution rings, and a host of other heinous crimes." Id. at 28,840. "[O]ften," he observed, criminal aliens "are able to pay expensive bonds and disappear under a new identity" until arrested again "with a different name and a new offense." Ibid.; see id. at 8771. Senator Chiles observed that the presence of criminal aliens "is so widespread and lucrative that they are attracting other aliens into the United States to join in the illegal enterprises." Id. at 8771.

As part of an effort to address the "growing problem of felonious aliens," 133 Cong. Rec. at 28,841 (Rep. Smith), Congress amended Section 242(a) of the INA by providing that "[t]he Attorney General shall take into custody any alien convicted of an aggravated felony upon completion of the alien's sentence for such conviction," and prohibiting the Attorney General from releasing those deportable aliens. 8 U.S.C. 1252(a)(2) (1988). Congress defined the term "aggravated felony" to include murder, drug trafficking, and trafficking in firearms or destructive devices. 8 U.S.C. 1101(a)(43) (1988). Congress additionally required the Attorney General to pursue new initiatives for the identification and apprehension of criminal aliens. 8 U.S.C. 1252(a)(3)(A) (1988).

Congress refined the INA's detention provisions in the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978. On one hand, Congress broadened the definition of "aggravated felony" set out in 8 U.S.C. 1101(a)(43) by adding additional narcotics trafficking offenses, crimes of violence

(as defined in 18 U.S.C. 16) for which a prison term of at least five years was imposed, and like offenses in violation of foreign law—thus expanding the category of criminal aliens potentially subject to mandatory detention. See Pub. L. No. 101-649, § 501(a), 104 Stat. 5048. Congress also required detention of inadmissible aggravated felons during their exclusion proceedings. See Pub. L. No. 101-649, § 504(b), 104 Stat. 5050 (codified at 8 U.S.C. 1226(e)(1) (Supp. II 1990)). On the other hand, Congress added to Section 242 a new provision, 8 U.S.C. 1252(a)(2)(B) (Supp. II 1990), that required the Attorney General to release a permanent resident alien from custody during his deportation proceeding "if the Attorney General determines that the alien is likely to appear before the community and that the alien is not a threat to any scheduled hearings." See Pub. L. No. 101-649, § 504(a)(5), 104 Stat. 5049.

In 1991, Congress again amended the provision governing detention and release by clarifying that the alien had the burden of proving non-dangerousness and the absence of a flight risk, and by extending the possibility of release to all lawfully admitted aliens who could make the necessary showing, rather than just permanent resident aliens. See Immigration Technical Corrections Act of 1991, Pub. L. No. 102-232, § 306(a)(4), 105 Stat. 1751 (codified at 8 U.S.C. 1252(a)(2)(B) (1994)).

Due to the various amendments, as of 1991 lawfully admitted aliens convicted of aggravated felonies could obtain discretionary release from custody during their deportation proceedings, provided that they could demonstrate that they were not a threat to the community and were likely to appear for any scheduled deportation hearings. See 8 U.S.C. 1252(a)(2)(B) (1994); see also 8 C.F.R. 242.2(c) and (b) (1996). As had long been the case, moreover, the Attorney General continued to have discretion whether to detain, during the pendency of deportation proceedings, criminal aliens whose

14

crimes did not include an aggravated felony. See 8 U.S.C. 1252(a)(1) (1994); see also 8 C.F.R. 242.2(d) (1996).

2. While Congress was addressing the specific question of detention of criminal aliens during the late 1980s and early 1990s, it also began to consider wholesale reform of the Nation's immigration laws, including revisions that would enable the INS to remove aliens convicted of serious crimes more expeditiously from the United States. Congress concluded after extensive investigation that "America's immigration system is in disarray and criminal aliens (non-U.S. citizens residing in the U.S. who commit serious crimes for which they may be deportable) constitute a particularly vexing part of the problem." S. Rep. No. 48, 104th Cong., 1st Sess. 1 (1995). That conclusion led to the enactment in 1996 of IIRIRA, including its provision for mandatory detention of aliens convicted of serious crimes, during the pendency of their removal proceedings.

Congress's investigation showed that at least 450,000 aliens were incarcerated or under some form of criminal justice supervision, and that the INS could not identify most deportable criminal aliens, much less locate them and remove them from the country. S. Rep. No. 48, supra, at 1, 2. Indeed, the Senate Governmental Affairs Committee calculated that, at the then-current rate of deportation, it would take more than 23 years to remove every criminal alien who was already subject to deportation. Id. at 5.

Congress's inquiry into the problem identified three particular concerns about the INS's failure to remove more criminal aliens. First, criminal aliens' ongoing presence in the United States undermined the Nation's borders. As the House Report on IIRIRA explained, Congress concluded that "our immigration laws should enable the prompt admission of those who are entitled to be admitted, the prompt exclusion or removal of those who are not so entitled, and the clear

15

16

distinction between these categories." H.R. Rep. No. 469, 104th Cong., 2d Sess., Pt. 1, at 111 (1996). Congress determined that "[a]liens who enter or remain in the United States in violation of our law are effectively taking immigration opportunities that might otherwise be extended to others, potential legal immigrants whose presence would be more consistent with the judgment of the elected government of this country about what is in the national interest." S. Rep. No. 249, 104th Cong., 2d Sess. 7 (1996); see 142 Cong. Rec. 7348, 7349 (1996) (statement of Sen. Abraham) (removing criminal aliens opens "slots in this country for immigrants who want to make a contribution.").

Furthermore, as an official of the General Accounting Office testified, failures in removing deportable aliens "ha[d] to be addressed in an effective immigration policy." *Hearing on H.R. 8838 Before the Subcomm. on Immigration, Refugees, and International Law of the House Comm. on the Judiciary (1989 House Hearing)*, 101st Cong., 1st Sess. 71-72 (1989). Reinforcing that view, the Commissioner of the INS testified that "[o]ne of the most important deterrents to illegal immigration is a credible and timely threat of removal for violation of the immigration laws." Testimony of Doris Meissner, Commissioner, INS, Before the Senate Judiciary Comm. Concerning S. 269, the Immigrant Control and Financial Responsibility Act of 1995 and the Immigration Enforcement Improvements Act of 1995, 1995 WL 110488 (Mar. 14, 1995).

Second, Congress determined that criminal aliens who are not timely removed "are a serious threat to our public safety." 140 Cong. Rec. 4965 (1994) (statement of Sen. Roth). A report prepared by the House Judiciary Committee explained that as a result of past congressional and Executive Branch policies, "many aliens who committed serious crimes were released into American society after they were released from incarceration, where they then continue to pose

17

a threat to those around them." H.R. Rep. No. 22, 104th Cong., 1st Sess. 6-7 (1995). There was hard evidence of criminal aliens' recidivism. A 1986 study by the General Accounting Office found that, out of a sample of 200 felony arrestees in New York whom the INS identified as being potentially deportable, 77% were arrested at least one more time before the INS initiated deportation proceedings, and 45% were arrested multiple times before their deportation proceedings began. *1989 House Hearing*, supra, at 54, 62; see 141 Cong. Rec. 15,013, 16,038 (1995) (statement of Sen. Abraham). In Los Angeles, 40% of the deportable aliens who were released from the County Jail in May 1990 were rearrested within the next 12 months, and 90% had a history of previous or subsequent arrests (totaling seven arrests, on average). *Hearing on H.R. 723, et al., Before the Subcomm. on International Law, Immigration, and Refugees of the House Comm. on the Judiciary (1994 House Hearing)*, 103d Cong., 2d Sess. 171, 173 (1994) (statement of Rep. Bellenson).

Third, Congress found that the INS's failure to remove recidivist criminal aliens was imposing a "significant cost * * * on our society." H.R. Rep. No. 22, supra, at 6-7. The Senate Committee on Governmental Affairs estimated that confinement of criminal aliens in state and federal prisons cost taxpayers at least $724 million per year. S. Rep. No. 48, supra, at 1, 9; *Criminal Aliens in the United States: Hearings Before the Permanent Subcomm. on Investigations of the Senate Comm. on Governmental Affairs (1993 Senate Hearing)*, 103d Cong., 1st Sess. 13-14 (1993). There were 59,000 criminal aliens in federal and state prisons in 1995, as compared to fewer than 9000 in 1980. Criminal aliens were the "fastest growing segment of federal prison population" and comprised approximately 25% of all federal inmates. S. Rep. No. 48, supra, at 1, 6-7. Criminal aliens likewise made up 16% of California's state prison population, and they "place[d] a substantial burden on certain local and

18

State governments" because of the costs of prosecuting and incarcerating criminal aliens and their contribution to prison overcrowding. H.R. Rep. No. 645, 103d Cong., 2d Sess. 4, 18, 21 (1994); see *1993 Senate Hearing, supra,* at 18 ("Law enforcement costs money and a considerable amount of money is being spent policing, adjudicating, confining and deporting criminal aliens.").

3. Motivated by the collective force of those concerns, Congress resolved "to help ensure that aliens convicted of serious crimes are promptly removed from our society after serving their [criminal] sentence." H.R. Rep. No. 22, *supra,* at 6. Accomplishing that objective in turn required consideration of the frequency with which criminal aliens, once located, were absconding before their deportation. While the mandatory detention provisions instituted by the Anti-Drug Abuse Act of 1988 had "prevent[ed] the very worst of the criminal aliens from further endangering the public and from being able to flee before deportation," the 1990 and 1991 amendments—which restored the possibility of bond for certain aggravated felons—had "weakened substantially" the government's efforts to deport criminal aliens and to protect public safety. *1993 Senate Hearing, supra,* at 15, 26 (staff report and testimony); see H.R. Rep. No. 22, *supra,* at 12. The Senate Governmental Affairs Committee found that as a result of the 1990 and 1991 amendments, and because of a shortage of space in INS detention facilities, "many [criminal aliens] who should be detained [during deportation proceedings] are released on bond." H.R. Rep. No. 22, *supra,* at 2; see *1993 Senate Hearing, supra,* at 21 (staff report) ("Although detaining a criminal alien pending his removal proceeding guarantees that the alien will actually appear at that proceeding, this option is often not available due to INS's chronic lack of detention space."). The House Judiciary Committee agreed that the INS's failure to detain aliens during their deportation proceedings was "[a] chief

19

reason why many deportable aliens are not removed from the United States." H.R. Rep. No. 469, *supra,* Pt. 1, at 123.

Congress had before it specific evidence about the consequences of allowing discretionary release of criminal aliens during their deportation proceedings. According to information collected in 1992, more than 20% of criminal aliens who were released on bond or otherwise not kept in custody throughout their deportation proceedings failed to appear for those proceedings. S. Rep. No. 48, *supra,* at 2, 23; *1993 Senate Hearing, supra,* at 21. The rate of flight doubled to 42% for criminal aliens whom the INS had not taken into custody at any time before a final order of deportation was entered. *1993 Senate Hearing, supra,* at 21. In 1992 alone, approximately 11,000 aliens who had committed an aggravated felony failed to appear for their deportation hearing. *Id.* at 8.

A "related" problem was that aliens who were not already in INS custody were overwhelmingly likely to abscond from actual deportation. *1993 Senate Hearing, supra,* at 9. In New York in fiscal year 1993, 88% of non-detained aliens failed to report for deportation after receiving a notice of their scheduled departure.[6] *Ibid.;* S. Rep. No. 48, *supra,* at 23-24; accord J.A. 38-39 (372 notices in nationwide sample resulted in 40 alien surrenders). Consistent with the New York data, the Justice Department's Inspector General calculated in March 1996, based upon a sample of 1063 cases in 1993 and 1994, that only 11% of non-detained aliens with final orders of deportation were successfully removed from the United States, whereas the INS was able to remove almost 94% of the detained aliens who were ordered deported. (The remaining 6% were allowed to stay in this country for

---

[6]  Because of the extraordinarily high flight rate, INS officials often referred to the INS's departure notices as "run notices." S. Rep. No. 48, *supra,* at 24; see J.A. 38.

20

political or humanitarian reasons, or remained for other reasons unrelated to their availability for removal) J.A. 14, 21, 26, 32.[7]

Witnesses before Congress who were intimately familiar with the problem of absconding criminal aliens confirmed the importance of detaining those aliens pending deportation. Based upon its investigation, the General Accounting Office advised that "[w]e know that alternatives to detaining prisoners don't often work." *1989 House Hearing, supra,* at 75; accord J.A. 46 (Justice Department Inspector General's conclusion that "[d]etention is key to effective deportation"); see J.A. 17, 47 (same). Similarly, the Chief of the Trial Division of the Manhattan District Attorney's Office told the House Judiciary Committee that his "[n]umber one" recommendation for addressing the problem of criminal aliens was to incarcerate alien aggravated felons for their crimes, and then

---

[7] In this case, the Ninth Circuit deemed it "obvious" that aliens released on bond were counted as "detained" aliens in the Inspector General's report, and thus did not contribute to the 89% "skip rate." Pet. App. 15a-16a & n.1. The conclusion that the Inspector General would describe aliens who were released from custody as "detained" is, to say the least, not "obvious." In fact, contrary to the court of appeals' belief, the text of the Inspector General's report confirms that aliens who were released on bond rather than held in detention were counted in the category of "nondetained" aliens, who had an overall 11% removal rate. See J.A. 36 ("[INS] staff cited *detained* aliens and *aliens released on bond* as their priority cases. *Other nondetained cases were worked as time allowed.*")(emphasis added). The court relied, as support for its linguistically unlikely reading, on the report's statement that two detained aliens who were released on bond absconded. Pet. App. 16a n.1. But we have been informed by the Office of the Inspector General that—consistent with the language in its report—it in fact counted aliens who were released on bond while awaiting removal within the "nondetained" category. The two aliens referred to in the portion of the report cited by the court of appeals were held in INS detention for a period after the entry of a final order of deportation and were only later released on bond.

21

"detain and deport" them. *Id.* at 120, 130. The Executive Director of the Justice Department office responsible for adjudicating deportation proceedings suggested that no amount of bond could ensure aliens' appearance at those proceedings. *Id.* at 35 (testimony of David Milhollan). And the INS informed Congress that it had used appropriated funds to take additional aliens into custody during their deportation proceedings in fiscal year 1996, which "contributed greatly to [a] 25 percent increase in removals" of aliens during that year. *Criminal and Illegal Aliens, Subcomm. on Immigration and Claims of the House Comm. on the Judiciary,* 1996 WL 532071 (Sept. 5, 1996) (statement of David A. Martin, General Counsel, INS).

Such evidence led Congress ineluctably to conclude that discretionary release of deportable criminal aliens was undermining enforcement of the immigration laws, and that mandatory detention during removal proceedings would be an effective measure to ensure the aliens' availability for removal. See, e.g., S. Rep. No. 48, *supra,* at 32 ("Congress should consider requiring that all aggravated felons be detained pending deportation. Such a step may be necessary because of the high rate of no-shows for those criminal aliens released on bond."); 142 Cong. Rec. S281, S293-S294 (1996) (recommendation of Congressional Task Force on Immigration Reform to require detention of all criminal aliens).

4. In April 1996, Congress addressed the problem of criminal aliens when it enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214. Section 440(c) of AEDPA, 110 Stat. 1277, overrode the 1990 and 1991 amendments that had allowed the Attorney General to release lawfully admitted aliens who had been convicted of aggravated felonies, and instead required the detention of all aliens convicted of aggravated felonies or certain other crimes. In September 1996, Con-

22

gress readopted those reforms by enacting Section 1226(c) as part of IIRIRA, thus again requiring the Attorney General to detain aliens who are removable because of serious criminal convictions, pending an administrative determination of their removability.

Congress did *not* require detention of all criminal aliens, however. In light of the practical restriction on the INS's ability to house detained criminal aliens (see S. Rep. No. 48, *supra*, at 21), Congress limited the mandatory detention remedy to criminal aliens who had committed crimes that Congress deemed especially serious because of their impact upon national security, public safety and welfare, and enforcement of the immigration laws. Section 1226(c) therefore requires mandatory detention pending removal following an alien's participation in terrorist activities or espionage (see 8 U.S.C. 1226(c)(1)(B) and (D)), commission of an aggravated felony (see 8 U.S.C. 1226(c)(1)(B))[3] or commission of a specified controlled-substance offense, a firearms offense, or (under certain circumstances) crimes of moral turpitude (see 8 U.S.C. 1226(c)(1)(A), (B), and (C)).

[3] In a series of amendments, Congress expanded the INA's definition of "aggravated felony" (8 U.S.C. 1101(a)(43)), principally to include offenses that it found to underlie organized immigration crime. See citations at pp. 34-36, *infra*. The Immigration and Nationality Technical Corrections Act of 1994, Pub. L. No. 103-416, § 222, 108 Stat. 4320, amended the definition to include offenses relating to: firearms and explosive materials; theft; the demand or receipt of ransom; child pornography; racketeer influenced corrupt organizations; operation of prostitution businesses; peonage, slavery, and involuntary servitude; fraud; and document fraud. AEDPA further revised the aggravated felony definition by adding gambling offenses, transportation for the purpose of prostitution if committed for commercial advantage, forgery and counterfeiting, commercial bribery, unlawful trafficking in vehicles, obstruction of justice, perjury, and bribery of a witness. AEDPA § 440(e), 110 Stat. 1277-1278.

23

**B. Congress's Determinations About The Necessity Of Mandatory Detention Are Judgments About Immigration Policy That Merit Particular Judicial Respect**

This Court has long recognized that proceedings to expel aliens "would be vain if those accused could not be held in custody pending the inquiry into their true character and while arrangements were being made for their deportation." *Wong Wing*, 163 U.S. at 235; see *Zadvydas v. Davis*, 533 U.S. 678, 699 (2001) (finding no basis for constitutional concern when detention of alien subject to final order of removal occurs within "a period reasonably necessary to secure removal"). The power to exclude or expel aliens is a "fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1983)). Because detention of removable aliens is an aspect of that exclusion and expulsion, it is largely "committed to the political branches of the Federal Government." *Reno v. Flores*, 507 U.S. 292, 305 (1993).

Thus, although congressional determinations underlying detention in aid of removal pursuant to the INA are not wholly beyond judicial review, "the judicial branch must defer to executive and legislative branch decisionmaking in that area." *Zadvydas*, 533 U.S. at 695. In particular, judicial review of Section 1226(c) "must take appropriate account of the greater immigration-related expertise of the [political Branch[es], of the serious administrative needs and concerns inherent in the necessarily extensive INS efforts to enforce this complex statute, and the Nation's need to 'speak with one voice' in immigration matters." *Id.* at 700.

Against this background, the court of appeals was wrong to override Congress's determination that mandatory detention of criminal aliens who are subject to Section 1226(c) is

24

necessary to accomplish important immigration objectives (see Pet. App. 12a-21a), and then to order, for permanent resident aliens (see id. at 30a), a return to the same discretionary-release system that Congress found so deficient.[9]

1. The court of appeals was "not persuaded" that mandatory detention is necessary to ensure removal of the criminal aliens whom Congress has made subject to Section 1226(c), or sufficiently tailored to that objective. Pet. App. 19a. The court of appeals reasoned that a criminal alien subject to Section 1226(c) might not be removed at all if he obtains: (a) a determination that he is not removable under the INA; (b) discretionary cancellation of his removal under 8 U.S.C. 1182 (1994) and *INS v. St. Cyr*, 533 U.S. 289 (2001); or (c) withholding of removal under 8 U.S.C. 1231(b)(3) in order to protect the alien against possible persecution in his home country. In the court of appeals' view, the possibility that removal proceedings might be resolved in the alien's favor on one of those grounds, together with the fact that some aliens who are released from custody will appear for their removal proceedings and for removal if it is ordered, render mandatory detention impermissibly over-broad as a re-

[9] In addition to its "substantive" due process analysis, the court of appeals undertook a short and essentially repetitive "procedural" due process analysis. See Pet. App. 49a-50a. As the Fourth Circuit has explained, a criminal alien's procedural due process challenge to denial of a bond hearing in accordance with Section 1226(c) "collapses into" a substantive due process challenge to the requirement of mandatory detention under Section 1226(c). *Welch v. Ashcroft*, 293 F.3d 213, 218 n.4 (4th Cir. 2002). For the same reasons discussed below within the framework of substantive due process, respondent has no procedural due process right to a bond hearing. The government's interests in detention during removal proceedings and the government's inability to prevent flight by aliens through individualized bond hearings outweigh respondent's interest in release from custody during his removal proceedings. See *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

25

sponse to the problem of flight by permanent resident aliens who have committed one of the predicate crimes. See Pet. App. 13a-16a. The court of appeals' analysis is severely flawed.

a. In the first place, the court of appeals ignored that mandatory detention under Section 1226(c) ensures not only a criminal alien's availability for removal if it is ordered, but also, in every case, the criminal alien's availability for *removal proceedings*. Evidence before Congress showed that criminal aliens who were not in custody had a flight rate of 20 to 42% from deportation proceedings (in addition to non-detained aliens' extraordinary flight rate of approximately 90% from actual deportation). See p. 19, *supra*. Congress could reasonably determine that the discretionary release system unacceptably undermined immigration enforcement when, in any group of five deportable criminal aliens, one or two predictably would abscond from their deportation proceedings. See *Richardson v. Reno*, 180 F.3d 1311, 1318 (11th Cir. 1999) ("The relationship of detention to removal proceedings is underscored by congressional findings that criminal aliens, with great regularity, fail to show for their immigration proceedings.") (citing S. Rep. No. 48, *supra*), cert. denied, 529 U.S. 1036 (2000). Indeed, that legislative determination rests upon a policy judgment about the sufficiency of particular removal procedures that is entitled to the utmost deference by the courts. Cf. *Zadvydas*, 533 U.S. at 695 (indicating that challenge to INS detention would not be justiciable if relief entailed "sufferance of aliens' who should be removed'" (quoting *id.* at 703 (Scalia, J., dissenting)) (internal quotation marks omitted)).

b. Quite aside from the court of appeals' failure to appreciate the importance of Section 1226(c) in securing a criminal alien's presence at his removal proceedings, the three hypothetical scenarios that the court of appeals relied

26

upon do not support the conclusion that mandatory detention under Section 1226(c) violates due process.

*Removability.* The court of appeals noted (Pet. App. 14a-15a) that the alien might be able to persuade the immigration judge that he is not removable from the United States, for instance because his crime is not one that requires removal. In the case of criminal aliens who are subject to mandatory detention, however, the fact of removability ordinarily will be established, beyond dispute, by the alien's judgment of conviction. In this case, for example, respondent has conceded that, based upon his 1987 conviction, he is removable as an aggravated felon and therefore is subject to detention under Section 1226(c). See Br. in Opp. 1-2; J.A. 8-9.

The court of appeals also overlooked that aliens may raise key issues concerning their removability in a challenge to detention under Section 1226(c). A person in INS custody who disputes that he is subject to mandatory detention may do so in a bond determination proceeding before the INS district director and in a subsequent bond redetermination hearing before an immigration judge. See 8 C.F.R. 3.19(a), (b), and (h)(2)(ii); 8 C.F.R. 236.1(c)(10) and (d)(1); *In re Joseph*, 22 I. & N. Dec. 799, 805, 1999 WL 339053, at *5 (BIA 1999). An adverse decision by an immigration judge may be appealed to the Board of Immigration Appeals (BIA). See 8 C.F.R. 236.1(d)(3). Thus, if a criminal alien in mandatory detention raises an issue such as whether he is a United States citizen, whether he actually was convicted of an offense, or whether his conviction is for an offense that triggers removal proceedings and mandatory detention under Section 1226(c)(1)—and if the alien can show that the INS is "substantially unlikely" to prevail on its underlying charge of removability—Section 1226(c) will not apply to the alien and the alien will be eligible for discretionary release while his

27

claims are resolved in the removal proceeding. *In re Joseph*, 22 I. & N. Dec. at 806, 1999 WL 339053, at *6-7.

*Discretionary Relief from Removal.* In IIRIRA, Congress rendered aliens who have been convicted of aggravated felonies ineligible for the discretionary relief of asylum and cancellation of removal. See 8 U.S.C. 1158(b)(2), 1229b. The court of appeals observed (Pet. App. 14a) that under this Court's decision in *St. Cyr*, some aggravated felons who pleaded guilty before the 1996 amendments to the INA are eligible for discretionary relief from removal under 8 U.S.C. 1182 (1994), which Congress repealed in 1996. But that possible avenue to discretionary relief for some aliens does not render mandatory detention under Section 1226(c) unconstitutional.

An alien who is seeking discretionary relief from removal has no claim to be free from mandatory detention on that basis. A grant of wholly discretionary relief is "not a matter of right under any circumstances, but rather is in all cases a matter of grace." *Jay v. Boyd*, 351 U.S. 345, 354 (1956). Such relief is accorded pursuant to the Attorney General's "unfettered discretion," and is akin to "a judge's power to suspend the execution of a sentence, or the President's power to pardon a convict." *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 30 (1996) (internal quotation marks omitted). An alien (like a citizen) has no constitutionally protected interest in obtaining such relief. *Okim v. Wakinekona*, 461 U.S. 238, 249 (1983); see *Tefel v. Reno*, 180 F.3d 1286, 1300-1301 (11th Cir. 1999) (alien lacks protected liberty or property interest in grant of suspension of deportation, cert. denied, 530 U.S. 1228 (2000). Thus, a removable alien who is detained while discretionary relief is properly treated as removable unless and until a decision to award discretionary relief is made, at which time mandatory detention under Section 1226(c) would cease.

The court of appeals also overstated (Pet. App. 14a) St. Cyr's significance for a due process analysis of Section 1226(c). This Court held in St. Cyr that Congress's elimination of the possibility of a discretionary waiver of deportation under 8 U.S.C. 1182(c) (1994) does not apply retroactively to aliens who pleaded guilty before the effective date of that repeal and who would have been eligible for a discretionary waiver of deportation, despite their convictions, at the time of their criminal plea. See St. Cyr, 533 U.S. at 314-326. Even before Congress repealed 8 U.S.C. 1182(c) (1994), however, aggravated felons who had served a sentence of more than five years were ineligible for relief under that section. St. Cyr therefore allows an alien to seek discretionary relief from deportation on account of a conviction for which the alien entered a guilty plea before April 1996, but only if the alien is a lawful permanent resident who did not serve an aggravated felony sentence of more than five years. See 67 Fed. Reg. 52,627, 52,628-52,629 (Aug. 13, 2002) (discussing proposed Justice Department rule implementing St. Cyr); 8 U.S.C. 1182(c) (1994).

At the present time and in the future, an alien who is taken into INS custody under Section 1226(c) upon release from his criminal sentence will have served more than five years of imprisonment following any guilty plea covered by St. Cyr (which must have been entered before April 1996, see 67 Fed. Reg. at 52,629).[10] Thus, St. Cyr applies to few aggravated felons who became subject to detention under Section 1226(c) after April 2001. Respondent, who pleaded guilty to his aggravated felony offense in April 1997, is

---

[10] The Attorney General is required to take aliens subject to mandatory detention under Section 1226(c) into detention when they are released from penal custody. 8 U.S.C. 1226(c)(1).

28

among the many criminal aliens not eligible to make a St. Cyr claim for discretionary relief.[11]

Withholding of Removal. Finally, the court of appeals relied (Pet. App. 13a-14a) upon the fact that not all aliens who have committed a criminal offense that triggers mandatory detention during removal proceedings are ineligible for withholding of removal. Withholding of removal protects an alien from removal to his home country if the Attorney General determines that the "alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. 1231(b)(3)(A). Unlike asylum, withholding of removal is a mandatory rather than discretionary form of protection from removal. The alien, however, bears the burden of demonstrating a "clear probability of persecution." INS v. Aguirre-Aguirre, 526 U.S. 415, 419-420 (1999) (discussing relationship between asylum and withholding of removal); 8 C.F.R. 208.16(b). The possibility that an alien ultimately might carry that burden does not render unconstitutional mandatory detention in the meantime—i.e., when the alien has not proved his eligibility for withholding of removal.

Moreover, withholding of removal is country-specific and does not prevent the INS from removing the alien to another country where he would not be persecuted. See 8 U.S.C. 1231(b)(3)(A). The premise of that protection is not that the alien has an entitlement to avoid removal from the United States, but rather that he should not be removed to a particular country at that time. See 8 C.F.R. 208.16(f), 208.22.

---

[11] Respondent was convicted in California Superior Court on April 23, 1997, and sentenced on October 8, 1997. See C.A. E.R. 6, 7. The court of appeals' opinion incorrectly states that respondent was convicted in August 1997.

29

Furthermore, many criminal aliens held under Section 1226(c) are statutorily disqualified from receiving withholding of removal because they have committed a "particularly serious crime" such as an aggravated felony for which a sentence of at least five years' imprisonment was imposed. See 8 U.S.C. 1231(b)(3)(B). Finally, withholding of removal is rarely granted. The Executive Office for Immigration Review in the Department of Justice advises that in fiscal year 2001, its immigration judges decided 47,513 cases (involving both criminal and non-criminal aliens) in which a claim for asylum or withholding of removal was filed, and withholding of removal was granted in only 3,450 of those cases, or approximately seven percent.[12]

c. More broadly, and contrary to the court of appeals' reasoning (Pet. App. 13a-15a), the correlation between an alien's likely removal and a risk of flight highlights the particular appropriateness of mandatory detention in the context of an aggravated felon. Through IIRIRA, Congress expedited the removal of aggravated felons, and made them wholly ineligible for discretionary relief from removal. See 8 U.S.C. 1160(b) (asylum), 1229b (cancellation of removal). Thus, aggravated felons are particularly likely to be ordered removed from the United States. Indeed, because aggravated felons (with the limited exception of those covered by St. Cyr) are no longer entitled to seek the discretionary relief that had been available before 1996, the flight rates from deportation proceedings that Congress identified during its consideration of the 1996 immigration reforms

12 In respondent's case, South Korea is not a country for which applications for protection from removal are often granted. Compare INS, Refugees, Asylees, Fiscal Year 2000 Table 25 <http://www.ins.usdoj.gov/graphics/aboutins/statistics/00yrbk_REFVRA2000.pdf> (asylum awards) with INS, Enforcement, Fiscal Year 2000 Table 66 <http://www.ins.usdoj.gov/graphics/aboutins/statistics/00yrbk_ENF_REV/ENF2000.pdf> (removal).

30

likely understate the current probability that an aggravated felon would be absconded if not detained.

2. The court of appeals also determined (Pet. App. 16a-21a) that protecting the public against recidivism by criminal aliens is not a sufficient justification for mandatory detention under Section 1226(c). Looking to cases involving civil detention outside the immigration area (see id. at 17a-18a), the court of appeals concluded that the correct test is whether Section 1226(c) "is narrowly tailored to people who pose an unusual and well-defined danger to the public" (id. at 17a). The court was of the view that Section 1226(c) does not satisfy that test, because "[g]iven the range of crimes qualifying as aggravated felonies, the government simply cannot show that § 1226(c) covers only aliens who pose an especially serious danger to the public." Id. at 20a; accord Hoang v. Comfort, 282 F.3d 1247, 1260 (10th Cir. 2002), petition for cert. pending, No. 01-616 (filed May 8, 2002).

a. The court of appeals gave no weight in its analysis to the immigration context in which this case arises. Because of Congress's broad powers over immigration and the distinct status of aliens while they are in this country, detention of aliens can be within Congress's "broad power over immigration and naturalization"—and therefore permissible under the Constitution—even if detention of a citizen would be impermissible under the same circumstances. Flores, 507 U.S. at 305-306 (quoting Fiallo, 430 U.S. at 792). Thus, in Flores, the Court held that "any doubts as to the [facial] constitutionality of institutional custody over unaccompanied juveniles" who were suspected of being deportable was eliminated by the fact that most of the juveniles subject to detention were aliens. Id. at 305. The detainees' status as non-citizens, and the detention's relationship to immigration policy, dictated "unexacting" rational-basis review. Id. at 306; see Welch v. Ashcroft, 293 F.3d 213, 222 (4th Cir. 2002) (detention under Section 1226(c)

31

32

comports with substantive due process if it is reasonably related to legitimate government interests and nonpunitive).[13]

Categorical rules about which aliens should be admitted to or removed from the United States, and about the timing and terms of such admission or removal, are a pervasive and necessary feature of immigration law. Accordingly, categorical legislative judgments are particularly permissible when Congress exercises its plenary authority over immigration. See Plyler v. Doe, 457 U.S. 202, 225 (1982) ("Congress has developed a complex scheme governing admission to our Nation and status within our borders. * * * The obvious

---

[13] The Court need not choose between the rational-basis test of Flores and stricter tests such as the "special justification" rule applied by the court of appeals in this case (see Pet. App. 12a). Nor is it necessary to resolve the disagreement among the courts of appeals as to whether detention of permanent resident aliens pending the outcome of their removal proceedings implicates a fundamental right. Compare Patel v. Zemski, 275 F.3d 299, 309-310 (3d Cir. 2001) (finding fundamental right) and Hoang, 282 F.3d at 1257-1258 (same), petition for cert. pending, No. 01-1616 (filed May 3, 2002), with Welch, 293 F.3d at 220-222 (no fundamental right) and Parra v. Perryman, 172 F.3d 954, 958 (7th Cir. 1999) (same). Whatever standard of review is applicable in this case, it should be applied with regard for the political Branches' plenary authority over matters of immigration policy. See Rostker v. Goldberg, 453 U.S. 57, 64-72 (1981) (rejecting government's argument for rational-basis review in equal protection challenge to draft-registration law, but stating that deference nevertheless must be given to Congress' decisions about military affairs); see also Weiss v. United States, 510 U.S. 163, 177-178 (1994) (military context affects due process analysis). In these circumstances, deference principles require essentially the same analysis as the rational-basis standard that this Court applied in Flores. In Zadvydas, by contrast, the detention that this Court found constitutionally problematic occurred after removal from the United States was "no longer practically attainable," and the detention therefore did not "bear[] [a] reasonable relation" to implementation of any congressional immigration policy. 533 U.S. at 690.

33

need for delicate policy judgments has counseled the Judicial Branch to avoid intrusion into this field.'"); Mathews v. Diaz, 426 U.S. 67, 77-84 (1976).

For example, a permanent resident alien who is personally loyal to the United States nevertheless may be expelled if his nation becomes an enemy of the United States. Harisiades v. Shaughnessy, 342 U.S. 580, 587 (1952). And nationality is a permissible basis for drawing immigration-related distinctions among aliens who are lawfully in this country, so long as the distinctions are not wholly irrational. See, e.g., Narenji v. Civiletti, 617 F.2d 745, 747 (D.C. Cir. 1979) (upholding registration requirements for Iranian students); cert. denied, 446 U.S. 957 (1980).

In the detention context, this Court has upheld the drawing of categorical conclusions about a deportable alien's dangerousness from the alien's participation in Communist activities. Carlson v. Landon, 342 U.S. 524, 541-542 (1952). In Carlson, the Court rejected the dissent's argument that a "general practice of denying bail to all active Communists" was impermissible, and that "[t]hese persons should have the benefit of an exercise of discretion by the Attorney General, freed from any conception that Congress had made them in effect unbailable." Id. at 559, 568 (Frankfurter, J., dissenting). Similarly, the detention upheld in Flores was based "upon a 'blanket' presumption of the unsuitability of custodians other than parents, close relatives, and guardians," yet this Court held that such "reasonable presumptions and generic rules" were permissible even when made by the INS rather than Congress itself. 507 U.S. at 313.

b. In this case, the court of appeals afforded Congress's categorical judgments no deference at all. Instead, the court relied upon its own view (Pet. App. 20a) that some of the crimes within the INA's definition of "aggravated felony" (8 U.S.C. 1101(a)(43))—including possession of a firearm by a felon, involuntary manslaughter constituting a "crime of

34

violence" under 18 U.S.C. 16, and counterfeiting[14]—do not indicate an "especially serious danger to the public." The court of appeals appears to have concluded (Pet. App. 4a) that only an alien's conviction of a violent crime that facially endangers "physical safety" can support mandatory detention.

Congress made a different judgment. It deemed all crimes within the INA's definition of "aggravated felony" to be particularly serious when committed by an alien, because such crimes are integral to international terrorism, drug trafficking, and organized immigration crime, which do threaten physical (and other) harms. See, e.g., 1994 House Hearing, supra, at 124, 125, 131 (connecting visa and passport fraud to terrorism and drug-trafficking); 1989 House Hearing, supra, at 18 (statement of Jack Shaw, Assistant Commissioner, INS) (listing immigration fraud, along with crimes of violence and drug smuggling, as "activity [that] represents the greatest threat to public safety and national security"); H.R. Rep. No. 469, supra, Pt. 1, at 107.

Congress was especially intent upon addressing the harms associated with alien smuggling and related offenses. See H.R. Rep. No. 22, supra, at 7-8 (discussing alien smuggling rings and their involvement in other crimes); H.R. Rep. No. 469, supra, Pt. 1, at 116 ("Alien smuggling is often linked to other crimes, such as drug smuggling and trafficking, prostitution, racketeering, and severe labor law violations."); Testimony of Doris Meissner, supra, 1995 WL 110488 (organized immigration rings engage in criminal activities and enterprises including counterfeiting, illegal acquisition of firearms and explosives, narcotics smuggling and trafficking, money laundering, and racketeering activity such as ex-

[14] See cases cited at Pet. App. 20a; see also 8 U.S.C. 1101(a)(43)(E)(ii), (F), and (R).

35

tortion, bribery, obstruction of investigation by violence, and financial fraud); 1989 House Hearing, supra, at 36 (statement of Jack Shaw) (discussing crimes of alien smuggling ring), 44 (same). As Representative McCollum of Florida explained, aliens in organized crime rings "extort large sums from * * * illegal immigrants in return for passage to the United States and for the fraudulent documents they need to obtain entry. In many cases, these illegal immigrants * * * are forced into involuntary servitude, prostitution, and other crimes in order to repay these fees. In some cases * * *, the attempt to smuggle these illegals goes tragically wrong and people die." 141 Cong. Rec. 4394 (1995). Representative Kennedy likened alien-smuggling to the "slave trade." Id. at 4895-4896; see H.R. Rep. No. 469, supra, Pt. 1, at 117 ("many smuggled aliens are victims, more than beneficiaries" of alien smuggling). Congress thus reasonably determined that smuggling-related crimes are "serious crimes that threaten public safety and national security." H.R. Rep. No. 469, supra, Pt. 1, at 107.

c. The court of appeals also expressed the view that "the fact of a prior conviction alone * * * can be unreliable evidence of dangerousness." Pet. App. 20a. But there is nothing unusual or constitutionally suspect about basing a prediction of future dangerousness upon a past criminal conviction. See Zadvydas, 533 U.S. at 714 (Kennedy, J., dissenting) ("Aliens ordered deported as the result of having committed a felony have proved to be dangerous."); Kansas v. Hendricks, 521 U.S. 346, 358 (1997) ("[P]revious instances of violent behavior are an important indicator of future violent tendencies.") (internal quotation marks omitted). Congress, moreover, identified a repeat arrest rate for criminal aliens of approximately 40% within one year of release from prison, and noted that approximately 80% of criminal aliens have multiple arrests. See p. 17, supra.

36

In this case, the permissibility of Congress's categorical determination that respondent's convictions are sufficient to terminate his permanent resident status and render him removable is unchallenged. Congress was equally entitled to determine on a categorical basis that respondent's criminal history warrants effective steps to guarantee that he will not harm the United States—through criminal recidivism or by flouting the sovereign right of removal—before the statutory removal requirement can be implemented.

3. The court of appeals found support for its decision in "doubt" expressed by the Commissioner of the INS "about whether no-bail civil detention is a desirable—let alone a necessary—means of dealing with aliens subject to removal proceedings." Pet. App. 21a; see id. at 21a-22a. Congress was fully aware in 1996 of the INS's preference for a detention regime that vested the Attorney General (and hence the INS) with broad discretion. See, e.g., Testimony of David A. Martin, supra, 1996 WL 502071 (arguing after AEDPA's amendments to Section 242 that "a better enforcement strategy would restore at least some of the flexibility previously granted to the Attorney General"), 1993 Senate Hearing, supra, at 100 (Justice Department opposition to mandatory detention). But the INS's principal reason was that mandatory detention would quickly fill INS detention space—not that mandatory detention would be ineffective. Testimony of David A. Martin, supra, 1996 WL 502071; see 1993 Senate Hearing, supra, at 55 (mandatory detention of additional criminal aliens would "substantially impact our limited detention capability"). The INS stressed the direct connection between detention of criminal aliens, their successful removal from the United States, and effective enforcement of the immigration laws. Testimony of David A. Martin, supra, 1996 WL 502071 ("[I]ncreased detention space does much more than ensure the removal of a given alien. It also helps restore the overall credibility of the

37

deportation process."); see 1989 House Hearing, supra, at 22-28 (testimony of Jack Shaw, Assistant Commissioner, INS) ("[T]he limitations on our detention capacity directly impact our ability to effectively remove the alien from the country.").

When it enacted Section 1226(c), Congress rejected the INS's view that discretionary detention of criminal aliens should be favored over mandatory detention. But Congress accommodated the INS's immediate pragmatic concern about detaining additional criminal aliens pending deportation. IIRIRA provided the Attorney General the option of invoking, for a period of up to two years, transitional custody rules that delayed certain expansions of the class of removable criminal aliens subject to mandatory detention, and allowed the Attorney General to release criminal aliens who were not aggravated felons if he determined that they would not present a danger to the safety of other persons or property and would be likely to appear for their removal proceedings. See IIRIRA § 303(b) (reprinted in 8 U.S.C. 1226(c) note). The Attorney General could (and did) trigger the transitional rules by certifying that there were insufficient detention space and INS personnel to implement Section 1226(c), but the mandatory detention provisions of Section 1226(c) thereafter became effective in October 1998. See IIRIRA § 303(b)(2) (reprinted in 8 U.S.C. 1226 note).

Congress thus was resolute that mandatory detention of the criminal aliens described in 8 U.S.C. 1226(c), rather than a regime allowing discretionary release, is necessary. Congress's decision to commit itself to new spending for the detention facilities and staff needed to institute mandatory detention highlights Congress's conviction that the discretionary detention policy in place until 1988 and during the early 1990s had failed. A 1988 report by the staff of the Senate Governmental Affairs Committee captures Congress's view. The Committee staff acknowledged that "[t]he

detention option is problematical" because "INS has limited detention space and * * * funds for detention," but it nevertheless determined that "[r]elease on bond * * * is even more of a problem since our investigation has found that large numbers of non-detained criminal aliens abscond and fail to appear for their deportation hearing." *1993 Senate Hearing*, supra, at 8.

C. *Zadvydas* Supports A Determination That Section 1226(c) Is Constitutional

The four courts of appeals that have held that Section 1226(c) violate due process in some applications cite this Court's decision in *Zadvydas* as support for their holdings. See Pet. App. 9a-12a, 23a, 26a; *Welch*, 293 F.3d at 224-227, 233 (Widener, J., concurring), 228-236 (Williams, J., concurring in the judgment); *Hoang*, 282 F.3d at 1235-1259; *Patel v. Zemski*, 275 F.3d 299, 309-310, 313 (3d Cir. 2001). In fact, however, *Zadvydas* supports the constitutionality of Section 1226(c).

The critical fact in *Zadvydas*, which the Court found to justify interpreting 8 U.S.C. 1231(a) to limit the duration of detention of two permanent resident aliens who were subject to final removal orders, was that Section 1231(a) otherwise would have authorized "indefinite, perhaps permanent, detention." 533 U.S. at 699; see id. at 690 ("A statute permitting indefinite detention of an alien would raise a serious constitutional problem."). The Court eliminated that constitutional doubt by construing 8 U.S.C. 1231(a)(6) to authorize detention of the alien, after entry of a final removal order, only as long as removal is reasonably foreseeable. 533 U.S. at 699.[15]

_____
[15] This Court held in *Zadvydas* that the detention authorized by Section 1231(a) is civil, and "assume[d]" for purposes of its due process analysis that the detention is "nonpunitive in purpose and effect." 533 U.S. at 690. As the court of appeals in this case correctly held (Pet. App.

38

Section 1226(c) does not raise a similar constitutional concern. In Section 1226(c) Congress itself specified an "obvious termination point" (533 U.S. at 697) for detention, because the provision applies only during the pendency of the alien's removal proceedings. The Court in *Zadvydas* expressly distinguished detention under Section 1226(c) from detention under Section 1231(a)(6) on precisely that basis. Ibid. ("[P]ost-removal-period detention, *unlike detention pending a determination of removability* * * *, has no obvious termination point.") (emphasis added).[16]

The actual implementation of Section 1226(c) reinforces this fundamental statutory difference. The Executive Office for Immigration Review has calculated that, in cases where the alien is charged with being removable on grounds that trigger mandatory detention under Section 1226(c), its immigration judges complete removal proceedings in an average time of 47 days and a median time of 30 days—both far below the six-month period that this Court determined was presumptively reasonable for detention after a final order of

_____
12a), the detention required by Section 1226(c) likewise is civil and regulatory rather than criminal and punitive. Accord *Patel*, 275 F.3d at 310-311; *Hoang*, 282 F.3d at 1258-1259; see *Welch*, 293 F.3d at 222-224 (Section 1226(c) not punitive on its face); see also *Carlson*, 342 U.S. at 537-538 ("Deportation is not a criminal proceeding and has never been held to be punishment.").

[16] Similarly, and contrary to the opinion of the court of appeals (Pet. App. 22a-23a), there is no logical inconsistency between the mandatory detention requirement of Section 1226(c) and 8 U.S.C. 1231(a)(6), which gives the Attorney General discretionary authority, after the expiration of the statutory 90-day removal period, to release a criminal alien who is subject to a final order of removal but who has not yet been removed. The possibility of discretionary release after the end of the post-order removal period serves to address the possibility of an indefinite and unavoidable delay in removal, which has no analog when an alien is detained under Section 1226(c) during his administrative removal proceedings.

39

removal.[17] See Zadvydas, 533 U.S. at 701. In approximately 85% of the cases, the immigration judge's decision is not appealed to the BIA and becomes a final decision, and the alien thereafter would be detained (if ordered removed) under 8 U.S.C. 1231(a) rather than under Section 1226(c). In the relatively small percentage of cases that are appealed to the BIA, the average time required for disposition of the appeal—from the filing of the appeal through the BIA's issuance of its decision—is approximately four months. The median time is slightly shorter (114 days).[18] Accordingly, detention during the pendency of removal proceedings cannot fairly be compared to the "indefinite, perhaps permanent, detention" (533 U.S. at 699) of aliens that raised a constitutional concern in Zadvydas.

Other aspects of Zadvydas further support the constitutionality of Section 1226(c). The Court's constitutional concern about indefinite detention under Section 1231(a)(6) arose in part from the possibility of detention "where detention's goal—removal from the United States—"is no longer practically attainable." 533 U.S. at 690; see id. at 699 ("[I]nterpreting the statute to avoid a serious constitutional threat, we conclude that, once removal is no longer reasonably foreseeable, continued detention is no longer author-

---

[17] The processing times given for proceedings before an immigration judge reflect the amount of time between the docketing of the INS's charging document and the issuance of an appealable decision by an immigration judge, for cases completed in fiscal year 2001. They do not apply to cases adjudicated by an immigration judge while the alien is still in criminal custody. In that situation, the alien is not detained by the INS pursuant to Section 1226(c). See 8 U.S.C. 1226(a).

[18] Moreover, the BIA has recently established a streamlined appeal process that is expected to reduce further the length of time that cases are pending before that body. See 8 C.F.R. 3.1(a)(7) (allowing affirmance by single Board member without opinion where three-judge review is not warranted).

40

ized by statute."). Because detention under Section 1226(c) is limited to the period when the alien is in removal proceedings, it always serves the purpose of ensuring a criminal alien's appearance at removal proceedings, as well as the alien's availability for removal at the end of those proceedings if (as is very likely) a final order of removal is entered. Section 1226(c) thus is analogous to post-order detention while removal is reasonably foreseeable, which this Court found free from constitutional doubt in Zadvydas.

Relatedly, Zadvydas indicates that the risk of flight from immigration proceedings constitutes a "sufficiently strong special justification" for detention when there is a "reasonable relation" between the detention and its purpose. 533 U.S. at 690 (internal quotation marks omitted); cf. Flores, 507 U.S. at 306 (testing deportation-related detention under "the (unexacting) standard of rationally advancing some legitimate governmental purpose"). The evidence compiled by Congress about criminal aliens' 20-42% flight rate from deportation proceedings under the discretionary-release regime, and the approximately 90% flight rate of non-detained aliens from actual deportation (see p. 19, supra), firmly establishes a "reasonable relation" between mandatory detention and the removal of criminal aliens pursuant to the requirements of the INA.

Likewise, the Court indicated in Zadvydas that an alien's dangerousness suffices to justify detention when it is "limited to specially dangerous individuals and subject to strong procedural protections." 533 U.S. at 691; see id. at 721 (Kennedy, J., dissenting) (satisfaction of due process requirements depends upon procedures available to aliens). Congress included in the list of deportable aliens subject to mandatory detention under Section 1226(c) only a subset of aliens who committed crimes that Congress deemed especially serious. For those aliens, moreover, the predicate for the determination of dangerousness, like the predicate for

41

their removability, is a conviction that was obtained in court with full criminal process.[19] See *Welch*, 293 F.3d at 223-224 ("Prior convictions as a basis for regulatory detention require fewer due process safeguards" because, "unlike virtually any other consideration used to enlarge the possible deprivation[,] . . . a prior conviction must itself have been established through procedures satisfying the fair notice, reasonable doubt, and jury trial guarantees.") (quoting *Jones v. United States*, 526 U.S. 227, 249 (1999)) (brackets omitted); S. Rep. No. 48, *supra*, at 3 ("[Criminal aliens have already been afforded all the substantial due process required under our system of criminal justice before being convicted beyond a reasonable doubt of a felony."). In these respects as well, *Zadvydas* supports the constitutionality of mandatory detention under Section 1226(c).

## II. SECTION 1226(C) DOES NOT IN ANY EVENT VIOLATE DUE PROCESS ON ITS FACE

Respondent's habeas corpus petition presented only a facial due process challenge to 8 U.S.C. 1226(c) (Pet. App. 33a; J.A. 9-10), and the district court held that the law is "unconstitutional on its face." Pet. App. 60a. The court of appeals did not affirm that aspect of the district court's decision. Instead, the court of appeals stressed (*id.* at 5a-6a) that it was not considering the constitutionality of mandatory detention of aliens stopped at the border, who have not been admitted into the United States. Nevertheless, the court of appeals held that Section 1226(c) is unconstitutional as applied to respondent and, more broadly, that due process requires that lawful permanent residents who are subject to

---

[19] As discussed (see pp. 26-27, *supra*), a detained alien who disputes the existence of a predicate criminal conviction in his case may seek release from detention on that basis. Cf. *Zadvydas*, 533 U.S. at 722/728 (Kennedy, J., dissenting) (discussing regulatory procedures that protect alien held under Section 1231(a)(6)).

42

mandatory detention under Section 1226(c) must be given "a bail hearing with reasonable promptness to determine whether the alien is a flight risk or a danger to the community." *Id.* at 65a, 89a.

The court of appeals was correct to reject respondent's assertion that Section 1226(c) can *never* be constitutionally applied to detain an alien without a bond hearing during his removal proceeding. See *United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is * * * the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."). But the court was wrong to extend its (incorrect) holding on the facts of this case categorically to a whole class of aliens. Indeed, even if it were assumed for purposes of argument that Section 1226(c) may not be applied to respondent on the particular facts of this case, the law still would be enforceable against many thousands of criminal aliens.[20]

---

[20] The Seventh Circuit in *Parra*, 172 F.3d 954, rejected a due process challenge to Section 1226(c) where the alien (a lawful permanent resident) conceded his removability. The Tenth Circuit, like the Ninth Circuit, has held Section 1226(c) unconstitutional as applied to lawful permanent residents, but the law's constitutionality as applied to other groups of criminal aliens is uncertain. See *Hoang*, 282 F.3d at 1261. In the Third Circuit, Section 1226(c) has been held unconstitutional as applied to both a lawful permanent resident alien (see *Patel*, 275 F.3d 299) and an alien who entered the United States without inspection and who remained in the United States unlawfully (see *Radoncic v. Zemski*, 28 Fed. Appx. 113 (2002), petition for cert. pending, No. 01-1469 (filed Apr. 4, 2002)). In *Welch*, the Fourth Circuit rejected a facial challenge to Section 1226(c) and instead undertook a case-specific inquiry into whether mandatory detention "based on a record of prior criminal conduct is a reasonable and not excessive way to prevent flight risk and to protect the community." 293 F.3d at 223, 224-228. A majority of the Fourth Circuit panel concluded that the alien in that case, having been detained for more than six months, was entitled to release unless entry of a final order of removal

43

44

## A. Aliens Detained At The United States Border Have No Due Process Right To Avoid Detention, And Aliens Who Enter Or Remain Illegally Have A Diminished Due Process Claim

The court of appeals itself highlighted one situation in which mandatory detention is manifestly permissible: that of an alien who has been stopped at the border and has not entered the United States. As this Court observed in *Zadvydas*, detention of "[a]liens who have not yet gained initial admission to this country * * * present[s] a very different question" from detention of lawful permanent resident aliens like respondent, and the two aliens in *Zadvydas*. 533 U.S. at 682; see id. at 692-694 (distinguishing *Mezei*). As the Court held in *Mezei* and reaffirmed in *Zadvydas*, due process protections do not apply to aliens at the border. "Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Mezei*, 345 U.S. at 212 (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)); see *Zadvydas*, 533 U.S. at 692-693. Furthermore, detention of aliens who are stopped at the border effectuates the political Branches' power to prevent those aliens' unlawful entry and physical presence in the United States in the first place.[21] See *Fiallo*, 430 U.S. at 792; *Mezei*, 345 U.S. at 210, 215-216. Respondent

[21] This is true even of aliens who are physically present in the United States on immigration parole, which is not an admission to the country. See 8 U.S.C. 1182(d)(5)(A) ("parole * * * shall not be regarded as an admission of the alien"); 8 U.S.C. 1101(a)(13)(B) (alien who is paroled "shall not be considered to have been admitted"); *Mezei*, 345 U.S. at 215 (alien's "harborage" on land, as an act of "legislative grace," conferred no additional rights); *Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958) (parole of aliens seeking admission to United States is not admission).

(or actual removal) was reasonably likely in the foreseeable future. See 293 F.3d at 228 (Widener, J., concurring), 234-235 (Williams, J., concurring in the judgment).

45

himself appears to accept that Section 1226(c) satisfies the process as applied to an alien who is stopped at the United States border. See Br. in Opp. 16.

Aliens who enter the United States illegally or do not comply with the terms of their visa also have a far weaker claim to due process protection as a general matter than permanent resident aliens.[22] As the Court noted in *Zadvydas*, the due process protection to which a removable alien is constitutionally entitled "may vary depending upon [the alien's] status and circumstance." 533 U.S. at 694; see *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950) ("The alien, to whom the United States has been traditionally hospitable, has been accorded a generous and ascending scale of rights as he increases his identity with our society."). Aliens who are present in the United States in violation of law are removable for that reason alone. See 8 U.S.C. 1227(a)(1)(B). Because illegal aliens' presence in this country is unlawful, the necessarily limited association, rights, and responsibilities that they accumulate during their unlawful presence convey only the most attenuated entitlement to constitutional protection. Furthermore, it is particularly doubtful that an alien who is in the United States illegally, could be considered likely to obey the requirements of the law if released into the community, or to be likely to appear voluntarily for removal proceedings. Section 1226(c) therefore is especially justified as applied to this group of aliens, as well.[23]

[22] Aliens who enter the United States illegally or who overstay their permission to be in this country might be compared to common-law trespassers, to whom the landowner—here, by analogy, the United States—owes no duty of care. See Restatement (Second) of Torts §§ 329, 333 (1965).

[23] For these reasons, the Third Circuit was clearly wrong when it held that "the legal issue" of Section 1226(c)'s constitutionality as applied to an

46

B. Mandatory Detention During Removal Proceedings Is Particularly Permissible As Applied To Aliens For Whom There Is Not A Significant Likelihood Of Avoiding Removal

As explained above (pp. 24-30, *supra*), Section 1226(c) is not rendered unconstitutional by the theoretical possibility that a criminal alien might, as a result of the removal proceedings for which he is detained, be allowed to remain in the United States. Nevertheless, Section 1226(c) is especially defensible as applied to aliens who concede their removability, or for whom there is not a significant likelihood of succeeding in a challenge to removal. See *Parra*, 172 F.3d 954.

There is no constitutionally significant difference between detention during an administrative proceeding that assuredly will lead to a final order of removal, and detention to execute the final removal order—which this Court has stated is permissible. *Wong Wing*, 163 U.S. at 235; see *Zadvydas*, 533 U.S. at 688, 698-699. Furthermore, when an alien has no credible basis for avoiding removal, his removal proceedings will be straightforward and, therefore, are likely to be particularly speedy. Withdrawing all objections to removal and departing the United States also is a reasonable alternative, from the alien's perspective, to continuing with the removal proceeding and its associated detention. See S. Rep. No. 48, *supra*, at 19 ("A significant percentage of criminal alien deportations are of criminal aliens who do not contest their deportation and in many cases even wish to be deported."). Such an alien "has the keys in his pocket." *Parra*, 172 F.3d at 968. Similar considerations are present

---

alien who entered the United States without inspection "is the same" as in a case involving a permanent resident alien. *Radonac*, 28 Fed. Appx. at 116.

47

any time an alien asserts a defense to removal that, while not frivolous, is unlikely to succeed.

C. Mandatory Detention Also Is Especially Warranted When The Alien Has Committed The Most Serious Crimes That Trigger Section 1226(c)

There are cases in which the nature of the alien's crime is alone sufficient to establish the permissibility of mandatory detention, without regard for the additional considerations of flight risk and immigration enforcement. That would be the case, for instance, when a terrorist is held pursuant to 8 U.S.C. 1226(c)(1)(D). See *Zadvydas*, 533 U.S. at 696 (noting that "terrorism or other special circumstances" may support "special arguments * * * for forms of preventive detention and for heightened deference to the judgments of the political branches with respect to matters of national security."); *Carlson*, 342 U.S. at 541 (alleged participation in Communist activities sufficient for detention during removal proceedings). So, too, a deportable murderer, rapist, or sexual abuser of a child who is placed in custody pursuant to 8 U.S.C. 1226(c)(1)(B) and 1101(a)(43)(A) could make only the most tenuous claim of a due process right to an individualized bond hearing. Along the same lines, the Fourth Circuit suggested in *Welch* that a constitutional line might be drawn between aggravated felons and criminal aliens who commit misdemeanor offenses that are not aggravated felonies but nonetheless trigger mandatory detention under 8 U.S.C. 1226(c)(1)(B) and 1227(a)(2). See 293 F.3d at 225-226; cf. 8 U.S.C. 1226b(a)(3) (prohibiting discretionary cancellation of removal for aggravated felons but not other permanent resident aliens with criminal convictions); IIRIRA § 303(b) (*reprinted in* 8 U.S.C. 1226 note) (transition rules allowing release of criminals who are not aggravated felons until INS developed detention capability to implement Section 1226(c)).

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

EUGENIO REYNA-MONTOYA, ET. AL,      )
                                    )
        Petitioners,                )
                                    )   CIVIL ACTION NO. B-02-026
        v.                          )
                                    )
E.M. TROMINSKI,                     )
INS DISTRICT DIRECTOR               )
BOARD OF IMMIGRATION APPEALS        )
                                    )
        Respondent.                 )
_____ )

ORDER


    Upon consideration of Respondent's Motion for Stay Pending

Appeal, the Court finds that the motion should be granted.

    Done this _____ day of _____, 2002.


                        _____